1 | Michael Tenenbaum, Esq. (No. 186850)
2 | *mt@post.harvard.edu*
  | THE TENENBAUM LAW FIRM
3 | 1431 Ocean Ave., Ste. 400
  | Santa Monica, CA  90401
4 | Tel   (310) 919-3194
5 | Fax   (310) 919-3727

6 | *Counsel for Plaintiffs*

7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | WESTERN DIVISION

11 |

12 | ASSOCIATION DES ÉLEVEURS DE
   | CANARDS ET D'OIES DU QUÉBEC, a
13 | Canadian nonprofit corporation; HVFG
   | LLC, a New York limited liability
14 | company; and HOT'S RESTAURANT
   | GROUP, INC., a California
15 | corporation;
16 |
17 |                          Plaintiffs,
18 |          – against –
19 | KAMALA D. HARRIS, in her official
20 | capacity as Attorney General of
   | California; EDMUND G. BROWN, in
21 | his official capacity as Governor of
   | California; and the STATE OF
22 | CALIFORNIA;
23 |
24 |                          Defendants.
25 |
26 |
27 |
28 |

Case No. CV-12-5735-SVW (RZx)

**PLAINTIFFS' BRIEF IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Date:    July 3, 2012
Time:    1:00 p.m.

(Notice provided under L.R. 7-19.1)

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

Report of Notice to Defendants' Counsel under L.R. 7-19 & 7-19.1 ........................ 3

STATEMENT OF RELEVANT FACTS ................................................................ 3

I.      California now regulates the feeding of ducks within the state, but section 25982 bans the sale of any duck product that is the result of such process, regardless of where the duck was fed ................................................ 3

        Notes on the BFL's scope and the references in this brief ................................ 4

II.     The production of foie gras involves careful attention to the feeding and welfare of mulard ducks .............................................................................. 5

III.    Every duck product destined for human consumption — like every duck itself — is subject to regulation and inspection by an extensive federal statutory and regulatory scheme ......................................................................... 6

IV.     The American market for foie gras and other duck products has been growing, but section 25982 is causing Plaintiffs to suffer irretrievably lost sales and will have serious effects on interstate and foreign commerce ........... 7

ARGUMENT ................................................................................................. 9

I.      The legal standard for a temporary restraining order and preliminary injunction focuses on preventing irreparable harm ........................................... 9

II.     Plaintiffs are highly likely to succeed on the merits of their claims that section 25982 is unconstitutional on any of several grounds ........................... 9

        A.      The Bird Feeding Law is void for vagueness because it is impossible for Plaintiffs to ascertain from it a meaningful measure of how much a duck may be lawfully fed ........................................... 11

        B.      Section 25982 violates basic due process because it has no *scienter* requirement, yet it imposes unlimited penalties on a seller of USDA-approved duck products who cannot know what the particular duck from which they were produced was fed throughout its lifetime ............................................................................ 14

        C.      Section 25982 directly violates the Commerce Clause by creating a state-imposed boycott that interferes with free trade in wholesome and unadulterated goods in interstate and foreign commerce ............. 15

PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

D.   Section 25982 violates the Commerce Clause because its only practical effect is to regulate economic activity beyond California's borders .................................................................................................. 16

1.   To the extent it imposes any additional requirement on producers of USDA-approved duck products for any reason of public health, section 25982 is preempted by the federal Poultry Products Inspection Act ................................................. 18

E.   Section 25982 excessively burdens interstate and foreign commerce without advancing any legitimate local interest of protecting Californians — or even of protecting any duck in California — and thus violates the Dormant Commerce Clause. .............................. 19

III.   Plaintiffs are *certain* to suffer imminent and irreparable harm in the absence of a TRO and preliminary injunctive relief ....................................... 21

IV.   Because Defendants have nothing to lose as a result of a TRO or injunction, the balance of equities tips heavily in Plaintiffs' favor ................. 23

V.   Injunctive relief is in the public interest ......................................................... 24

CONCLUSION ............................................................................................................... X

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .............. 10

*California Medical Ass'n v. Douglas*, ___ F.Supp.2d ___ (C.D. Cal. Jan. 31, 2012) ................................................................................................... 23

*F.C.C. v. Fox Television Stations, Inc.*, 2012 WL 2344462 (U.S. Jun. 21, 2012) .... 12

*Gerling Global Reinsurance Corp. of America v. Low*, 240 F.3d 739 (9th Cir. 2001) .................................................................................................... 18, 21

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 94 S.Ct 1113 (1974) ................................................................................................................ 9

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) .............................................................................................................. 13

*H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949) .............................................................................................................. 15

*Healy v. Beer Institute, Inc.*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) .............................................................................................................. 17

*McLeod v. J. E. Dilworth Co.*, 322 U.S. 327, 64 S.Ct. 1023 (1944) ....................... 15

*National Meat Ass'n v. Harris*, ___ U.S. ___, 123 S.Ct. 965, 181 L.Ed. 2d 950 (2012) .......................................................................................................... 19, 20

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) .............................................................................................................. 20

*Schollenberger v. Com. of Pa.*, 171 U.S. 1, 18 S.Ct. 757 (1898) ............................. 16

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 660 U.S. 330, 127 S.Ct. 1786 (2007) ................................................................... 18

*Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186 (9th Cir. 1990) .......... 17

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186 (1982) ..................................................................................... 12

*Welton v. State of Missouri*, 91 U.S. 275 (1875) ..................................................... 16

*Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365 (2008) .................. 9

PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1
2  **Statutes**
3
4  21 U.S.C. § 451 ................................................................................ 7, 15
5  21 U.S.C. § 452 .................................................................................... 18
6  21 U.S.C. § 467e .................................................................................. 18
7
8  Cal. Health & Safety Code § 25980 .............................................. *passim*
9  Cal. Health & Safety Code § 25981 .............................................. *passim*
   Cal. Health & Safety Code § 25982 .............................................. *passim*
10 Cal. Health & Safety Code § 25983 ..................................................... 3
11 Cal. Health & Safety Code § 25984 ....................................... 4, 17, 23
12 Cal. Penal Code § 496 ....................................................................... 14
13
14 **Regulations**
15 9 C.F.R. § 381.1 *et seq.* ....................................................................... 7
16 9 C.F.R. § 381.195 ................................................................................ 7
17
18 **Other Materials**
19 FSIS Directive 6100.3 Rev. 1, Apr. 30, 2009............................................ 7
20
21
22
23
24
25
26
27
28

PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1    Plaintiffs Association des Éleveurs de Canards et d'Oies du Québec ("AECOQ"),

2   HVFG LLC ("Hudson Valley"), and Hot's Restaurant Group, Inc. ("Hot's Kitchen"),

3   seek a temporary restraining order and an order to show cause why a preliminary

4   injunction should not issue to save Plaintiffs from incurring unrecoverable losses and

5   facing arbitrary prosecution if section 25982 of the California Health & Safety Code is

6   allowed to remain in effect even another day after July 1, 2012, as it is destroying the

7   retail and wholesale markets for foie gras and other duck products in California and

8   significantly burdening interstate and foreign commerce without advancing any

9   legitimate local interest.

10    Plaintiffs are collectively losing over $11,000 a day — the equivalent of over a

11   quarter million dollars a month — with every passing day that this unconstitutionally

12   vague and burdensome law is in effect, and they can never recover these losses against

13   the state government defendants.  All this in the name of California's attempt to impose

14   its dietary guidelines for ducks far beyond its borders.  This Court's issuance of a TRO

15   and preliminary injunction is necessary to avoid further irreparable harm.

16                    **INTRODUCTION AND SUMMARY OF ARGUMENT**

17    Plaintiffs are:  (1) AECOQ, an association of Canadian producers of foie gras

18   and other duck products who supply 100% of Canada's imports of foie gras to the

19   United States and California and who cannot ascertain from the statute any meaningful

20   limit on what amount of food they may feed their ducks for their products to continue

21   to be sold in California — even assuming section 25982 were not unconstitutional

22   under the Commerce Clause — and who have already started suffering decreasing

23   orders from California since July 1st; (2) Hudson Valley, the largest U.S. producer of

24   foie gras and other duck products which faces the same uncertainty and immediate

25   harm as AECOQ's members — including current losses at the rate of over $75,000 per

26   week and the certain loss of millions of dollars per year — if section 25982 is not

27   enjoined today; and (3) Hot's Kitchen, a restaurant whose chef has been free to serve

28   foie gras and other duck products but who, as of July 1st, faces prosecution and

- 1 -

1   draconian penalties of $1,000 per sale per day if — even without his knowledge as to
2   what a particular duck was fed throughout its lifetime — he continues to serve products
3   from a duck that was fed more than the statute allows.

4          Plaintiffs readily satisfy the requirements for the issuance of a TRO and
5   preliminary injunction.  Section 25982 prohibits any product from being sold in
6   California "if it is the result" of a process that causes a bird "to consume more food
7   than a typical bird of the same species would consume voluntarily" — an illusory and
8   impossible measure for anyone who actually raises ducks.  In its unprecedented attempt
9   to ban the sale of a lawful, wholesome, federally-inspected, USDA-approved product
10  that freely circulates in commerce throughout the United States — and everywhere in
11  the world — section 25982 does not just wall off California from the interstate and
12  international market for foie gras and for other products from ducks raised outside the
13  state for their livers.  For the reasons outlined below, section 25982 also violates the
14  United States Constitution, and Plaintiffs are highly likely to prevail on any of their
15  several grounds under the Due Process Clause and the Commerce Clause.

16         At a minimum, Plaintiffs have raised serious questions going to the merits which
17  make an injunction appropriate.  Injunctive relief is necessary today to prevent Plaintiffs
18  from losing millions of dollars in sales that they will never be able to recover from
19  Defendants, who enjoy Eleventh Amendment immunity.  The balance of hardships tips
20  heavily in Plaintiffs' favor.  On one side, Plaintiffs are forced to abandon millions of
21  dollars in sales or face the threat of millions more in draconian fines.  On the other side,
22  the Legislature delayed the enforcement of section 25982 by over seven *years.*
23  Especially since Plaintiffs do not challenge the ban on production in California, a few
24  more weeks or months to resolve the constitutional issues will thus not result in any
25  possible harm to any duck in California.  By freeing everyone — chefs, restaurants,
26  distributors, and 37 million Californians — from the chilling effect of this ambiguous
27  statute at least until this Court can rule on its constitutionality, an injunction is also in
28  the public interest.

1    **Report of Notice to Defendants' Counsel under L.R. 7-19 & 7-19.1**

2        The accompanying declaration of Plaintiffs' counsel sets forth under oath his

3    compliance with L.R. 7-19.1. (Tenenbaum Decl. ¶¶ 1-4.) Pursuant to L.R. 7-19,

4    counsel for Plaintiffs reports here that, upon calling the California Attorney General's

5    Office in Los Angeles to provide notice of this Application as required under L.R. 7-

6    19.1, he was directed to leave a message in the voicemail of the "Service Deputy,"

7    Sheila Rhoads, and did so as set forth in his declaration. (Tenenbaum Decl. ¶ 3.)

8    Counsel also left a message in the voicemail of Susan K. Smith, Esq., in that office.

9    (Tenenbaum Decl. ¶ 2.) Counsel's declaration also summarizes the circumstances that

10   briefly delayed the filing of this Application. (Tenenbaum Decl. ¶¶ 5-9.)

11                        **STATEMENT OF RELEVANT FACTS**

12

13   I.    **California now regulates the feeding of ducks within the state, but section
            25982 bans the sale of any duck product that is the result of such process,**

14   **regardless of where the duck was fed.**

15       California Senate Bill 1520, which was authored by then Sen. John Burton and

16   signed by Governor Arthur Schwarzenegger on September 29, 2004, added the Bird

17   Feeding Law (the "BFL") to the California Health and Safety Code. Section 25981 of

18   the BFL makes it a violation of state law for a person to "force feed a bird for the

19   purpose of enlarging the bird's liver beyond normal size." Cal. Health & Safety Code

20   § 25981.[1] (Plaintiffs do not feed birds in California and do not challenge section

21   25981.) Section 25980(b) defines "force feeding" to mean "a process that causes the

22   bird to consume more food than a typical bird of the same species would consume

23   voluntarily."

24       The BFL goes far further, however, in that section 25982 prohibits the *sale* of

25   any product in California "if it is the result of force feeding a bird for the purpose of

26   enlarging the bird's liver beyond normal size." Under sections 25983(a) and (b), any

27   _____

28   [1]   All further unspecified section references are to the California Health & Safety
            Code.

- 3 -

1  peace officer, humane society officer, or animal control officer may issue a citation for a

2  violation, which "shall require the person cited to pay a civil penalty in an amount up

3  to one thousand dollars ($1,000) for each violation, and up to one thousand dollars

4  ($1,000) for each day the violation continues." The civil penalty is payable to the local

5  agency that initiates proceedings to enforce the BFL. Section 25984(a) delayed the

6  operative date of the BFL's until July 1, 2012.

7      The BFL notably does not prohibit a person from merely "force feeding" a bird;

8  as provided in section 25981, it only applies if the person does so "for the purpose of

9  enlarging the bird's liver beyond normal size." Similarly, the BFL does not prohibit a

10  person from feeding a bird for the purpose of enlarging its liver beyond normal size; it

11  only does so if, as defined in section 25980(b), the person causes the bird to consume

12  "more food than a typical bird of the same species would consume voluntarily."

13  Furthermore, as to a product which comes from a bird that has been fed more than the

14  statute allows, section 25982 only prohibits it from being "sold in California." The

15  BFL notably does not prohibit such a product from being imported, exported,

16  transported, offered for sale, advertised, distributed, stored, transferred, gifted,

17  possessed, prepared, or served — or consumed.

18      Finally, conspicuously absent from the BFL is any mention of one of the most

19  popular products that results from feeding ducks and geese large amounts of food: foie

20  gras, which is the bird's fattened liver. The statute nowhere prohibits the sale of foie

21  gras as such. Indeed, in his signing message, then Governor Arnold Schwarzenegger

22  wrote to the Senate, "This bill's intent is to ban the current foie gras production

23  practice . . . It does not ban the food product, foie gras." (Tenenbaum Decl. ¶ 10 &

24  Ex. A.)

25  *Notes on the BFL's scope and the references in this brief*

26      By its terms, the BFL's provisions apply to any "bird," which section 25980(a)

27  defines as follows: "A bird includes, but is not limited to, a duck or goose." As a

28  practical matter, Plaintiffs are unaware of any bird other than a duck or goose that

- 4 -

1  could be deemed to have been fed for the purpose — among others — of enlarging its

2  liver.  For the sake of simplicity, this brief will refer only to ducks.

3       Ducks raised for foie gras are the source of a host of other products for human

4  consumption such as their breasts, legs, and fat.  (Henley Decl. ¶ 2.)  The meat and

5  livers from these ducks are also used to create various packaged food products.  (Henley

6  Decl. ¶ 2.)  Excess fat from the duck is used for biodiesel.  (Henley Decl. ¶ 2.)  Their

7  bones contain nutrients and are ground and added to pet food.  (Henley Decl. ¶ 2.)

8  And perhaps the most familiar product that is the result of ducks raised for foie gras

9  (apart from the liver itself) is the down feathers that are used in everything from

10  outdoor apparel to sleeping bags.  (Henley Decl. ¶ 2.)  Virtually all of these products

11  are sold in California today.  (Henley Decl. ¶ 2.)

12       The BFL makes no explicit reference to foie gras; rather, section 25982 prohibits

13  the sale in California of any "product . . . that is the result of force feeding a bird for the

14  purpose of enlarging the bird's liver beyond normal size," which arguably applies to

15  these other products.  (It is also not limited to products from ducks and geese.)  For the

16  sake of simplicity, this brief will refer to all of these other products as "other duck

17  products."

## II.    The production of foie gras involves careful attention to the feeding and welfare of mulard ducks.

20       A basic understanding of foie gras production is essential to recognizing why the

21  BFL is hopelessly vague to anyone actually required to follow it.  Foie gras is the result

22  of hand-feeding ducks and geese.  *See* Cal. Health & Safety Code § 122320(c) (defining

23  "hand-feeding" of pet shop birds to mean "the process by which a bird is manually fed

24  by a human through the use of . . . oral gavage.")  While the livers used to make foie

25  gras can come from a variety of these animals, the most common bird used for foie gras

26  produced in the United States and Canada is the mulard duck.  (Henley Decl. ¶ 3;

27  Cuchet Decl. ¶ 6.)  The mulard is the hybrid progeny of a domesticated male Muscovy

28  duck and a domesticated female Pekin duck.  (Henley Decl. ¶ 3.)

The mulard is a hybrid of two ducks that not only come from different species but also are not even from the same genus. The Muscovy duck is of the genus *Cairina*, and its species is *moschata*. (Henley Decl. ¶ 3.) The domesticated Muscovy duck is known as the subspecies *Cairina moschata momelanotus*. (Henley Decl. ¶ 3.) The Pekin duck is of the genus *Anas*, and its species is *platyrhynchos*. (Henley Decl. ¶ 3.) The Pekin breed of domesticated duck is known as the subspecies *Anas platyrhynchos domestica* or *Anas peking*. (Henley Decl. ¶ 3.) There is thus no single species or even subspecies to which the mulard can be said to belong.

For Hudson Valley and the Canadian farmers in the AECOQ, it is impossible to ascertain from the BFL a feeding limit that would ensure that their products can continue to be sold in California. (Henley Decl. ¶ 4; Cuchet Decl. ¶ 7.) In addition to ducks raised for foie gras, Hudson Valley and the members of AECOQ also raise, slaughter, and process other ducks into other products such as duck breast, duck legs, and duck fat. (Henley Decl. ¶ 4; Cuchet Decl. ¶ 7.) For any of these products, there is no way for a reseller to know whether the duck from which it came was raised for foie gras or not. (Henley Decl. ¶ 4.) More importantly, there is no way for a reseller to know what amount of food was fed to the particular duck or ducks from which these products were made or whether the purpose for which the ducks were fed was to enlarge their livers. (Henley Decl. ¶ 4.)

**III.    Every duck product destined for human consumption — like every duck itself — is subject to regulation and inspection by an extensive federal statutory and regulatory scheme.**

Under the federal Poultry Products Inspection Act (the "PPIA"), all ducks intended for human consumption in America must be submitted to several stages of federal inspection by the United States Department of Agriculture (USDA). Under the PPIA, a comprehensive set of detailed regulations and directives issued by the USDA and its Food Safety and Inspection Service (FSIS) govern the facilities at which ducks are slaughtered and processed, the operating procedures of those facilities, the ante-mortem

- 6 -

1    inspection of the ducks, the post-mortem inspection of the ducks, the marking of duck
2    products with the USDA seal, the labeling and containers of the duck products, and
3    even the definitions and standards of identity or composition of the duck products. 9
4    C.F.R. § 381.1 *et seq.* As for foie gras in particular, a specific FSIS directive expressly
5    instructs federal inspectors to consider foie gras as wholesome, which thus renders it fit
6    for sale in interstate commerce. FSIS Directive 6100.3 Rev. 1, Apr. 30, 2009, at pp. 10-
7    11 ("Inspection program personnel are to consider livers with a uniform yellow color,
8    resulting from excessive fat deposits (fatty infiltration), as wholesome.").

9         As a New York-based producer of foie gras and other duck products, Hudson
10   Valley is of course subject to and complies with these federal regulations. (Henley Decl.
11   ¶ 5.) The three members of the AECOQ who export their foie gras and other duck
12   products to the United States are also subject to the USDA's regulations, including
13   special requirements for import to the United States. 9 C.F.R. § 381.195 *et seq.* Unless
14   excepted under the PPIA, no duck product may be sold in the United States — including
15   foie gras — unless it complies with these extensive federal regulations. Once it does, the
16   product is considered to be wholesome and unadulterated and fit to circulate in
17   interstate commerce. 21 U.S.C.§ 451 ("regulation by the Secretary of Agriculture and
18   cooperation by the States and other jurisdictions as contemplated by this chapter are
19   appropriate to prevent and eliminate burdens upon such commerce").

20
21   **IV.  The American market for foie gras and other duck products has been
22   growing, but section 25982 is causing Plaintiffs to suffer irretrievably lost
     sales and will have serious effects on interstate and foreign commerce.**

23        Demand for foie gras among California consumers has been rising. Until days
24   ago, there were three producers in the United States whose foie gras and other duck
25   products were sold in California: Plaintiff Hudson Valley (in New York), La Belle
26   Farms (in New York), and Sonoma-Artisan Foie Gras. (Henley Decl. ¶ 6.) Sonoma-
27   Artisan Foie Gras, the only producer of foie gras and other duck products in California,
28   closed down its business in recent days rather than risk prosecution under the BFL.

PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1  (Henley Decl. ¶ 6.)  Thus, the only two producers of foie gras and other duck products
2  in the United States are both out-of-state.
3      For Hudson Valley, California is its largest market, and sales here — over $1.6
4  million for just the first half of 2012 — represent 18.7% of its revenues.  Sales since
5  2009 have grown by an average of over 20% per year.  (Henley Decl. ¶ 7.)  Similarly,
6  for at least one of the three members of AECOQ that exports to the United States, its
7  $1 million in annual sales to California represents 25% of its U.S. sales.  (Cuchet Decl.
8  ¶ 4.)  Its year-over-year sales since 2009 have been growing by an average of over 70%.
9  (Cuchet Decl. ¶ 4.)  Hudson Valley and the members of AECOQ sell to distributors in
10  California who resell their products to restaurants at an average mark-up of
11  approximately 50%.  (Grandjean Decl. ¶ 3; Henley Decl. ¶ 7.)  This represents a
12  wholesale market in California of roughly $6.3 million (i.e., $4.2 million x 1.5) just
13  from Plaintiffs' products alone.  An estimated 90% or more of foie gras and duck
14  products sold in California (at least by dollar volume) reaches consumers' plates
15  through the skilled hands of a chef in a restaurant.  (Grandjean Decl. ¶ 4.)  Based on an
16  average industry food-cost-to-menu-price markup of 4-to-1, this represents a loss in
17  California restaurant sales of over $2 million per month or $70,000 per day.  (Chaney
18  Decl. ¶ 10.)
19      In the month before section 25982 took effect on July 1st, Hot's Kitchen sold
20  over 700 dishes that included either foie gras or another part of the duck, its most
21  popular being duck confit tacos and a hamburger topped with a small piece of foie gras.
22  (Chaney Decl. ¶ 9.)  Hot's Kitchen was also selling hundreds more dishes that were
23  made with duck legs or duck fat, such as foie gras tater tots and a poutine with duck
24  confit and French fries cooked in duck fat.  (Chaney Decl. ¶ 9.)  In the last few days,
25  however, because it cannot be sure that the foie gras and other duck products its
26  restaurants sell are from ducks that were not fed more than the BFL's vague definition
27  allows — and because it faces penalties of $1,000 per dish per day if it guesses wrong
28  — Hot's Kitchen has stopped selling these products.  (Chaney Decl. ¶¶ 7, 12.)

- 8 -

In the few days since section 25982 has taken effect in California, Hudson Valley and the exporting members of AECOQ have seen their orders from California evaporate, and they are fearful of continuing to sell their products into the state based on the risk of prosecution of their customers and potential civil liability. (Henley Decl. ¶ 8; Cuchet Decl. ¶ 8.) Based on the figures above, this is costing them a combined average loss of over $11,000 per day.[2]

## ARGUMENT

### I. The legal standard for a temporary restraining order and preliminary injunction focuses on preventing irreparable harm.

The "underlying purpose" of a TRO is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439, 94 S.Ct 1113 (1974). The standard for a TRO is the same as that of preliminary injunction, which Plaintiffs also seek here. "[T]o obtain a preliminary injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365 (2008). Plaintiffs exceed this standard.

### II. Plaintiffs are highly likely to succeed on the merits of their claims that section 25982 is unconstitutional on any of several grounds.

Plaintiffs are highly like to succeed on the merits of any of their several claims that section 25982 is unconstitutional. Section 25982 runs afoul of the United States Constitution in at least five ways.

---

[2] In light of time and space constraints, this is hardly a full treatment of the burdens of section 25982 on interstate and foreign commerce. The development of a more complete factual record must await trial, and injunctive relief is necessary in the interim to save Plaintiffs from continuing to suffer irreparable losses and arbitrary prosecution.

1    *First*, it is impermissibly vague, at least as applied to Plaintiffs, since it is
2    impossible for a person of ordinary intelligence to know at what point a duck has been
3    fed "more food" than the statute allows.  The statute provides no intelligible measure
4    by which the bird's food consumption is to be assessed, let alone a coherent standard
5    against which to compare a mulard duck.
6        *Second*, the fatal vagueness of the statute is compounded by section 25982's
7    absence of a *scienter* requirement for the seller of any duck product, such as Hot's
8    Kitchen or any other restaurant or distributor, who cannot possibly know how much
9    the duck was fed throughout its lifetime — or for what purpose.
10       *Third*, beyond these Due Process infirmities, section 25982 represents an
11   unprecedented attempt by California to impose a boycott of federally approved, USDA-
12   inspected, lawful, wholesome goods in interstate and foreign commerce.  This is a direct
13   violation of the Commerce Clause.
14       *Fourth*, section 25982 violates the Commerce Clause in its attempt to directly
15   regulate the activities of farmers far beyond California's borders.  This also renders the
16   statute subject to preemption to the extent that, in the name of human health or safety,
17   it purports to require out-of-state producers to do anything beyond what the federal
18   Poultry Products Inspection Act demands of them.
19       *Finally*, the practical effect of the statute's ban on an ill-defined production
20   process in California together with section 25982's ban on sale places a significant
21   burden entirely on out-of-state and foreign foie gras producers.  Section 25982
22   effectively decimates not just Plaintiffs' businesses but the North American market for
23   foie gras and other duck products.  And it does so without advancing any legitimate
24   local interest, since the ducks whose welfare it purports to care for are raised entirely
25   outside the state, thus violating the Dormant Commerce Clause.
26       At a minimum, Plaintiffs' claims raise serious questions about the
27   constitutionality of the BFL that need to be fully adjudicated through trial (or at least at
28   the summary judgment stage).  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1127, 1135 (9th Cir. 2011) ("'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."). In the interim — and at least until the issues can be further developed at a preliminary injunction hearing — a TRO is the only way to prevent Plaintiffs from continuing to lose over $100,000 in sales each week that cannot be compensated by the state government Defendants.

### A.   The Bird Feeding Law is void for vagueness because it is impossible for Plaintiffs to ascertain from it a meaningful measure of how much a duck may be lawfully fed.

Section 25980(b) of the BFL defines "force feeding a bird" as follows: "Force feeding a bird means a process that causes the bird to consume more food than a typical bird of the same species would consume voluntarily."[3] The BFL's definition of "force feeding" is not just inartfully drafted without any understanding of the reality animal husbandry. It is vague to the point of being standardless, requiring men of common intelligence to guess at its limit on feeding — and is therefore unconstitutional under the Due Process Clause.

The Supreme Court has said: "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen,

---

[3] The next sentence provides: "Force feeding methods include, but are not limited to, delivering feed through a tube or other device inserted into the bird's esophagus." Cal. Health & Safety Code § 25980(b). This does not obviate the requirement that, regardless of the "method," a bird must be fed "more food than a typical bird of the same species would consume voluntarily" in order to meet the definition of "force feeding."

1   judges, and juries for resolution on an ad hoc and subjective basis, with the attendant
2   dangers of arbitrary and discriminatory applications." *Village of Hoffman Estates v.*
3   *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186 (1982). As to the
4   members of AECOQ and Hudson Valley, who actually have to feed ducks every day
5   and want their products to be sold in California, this law is unconstitutionally vague.

6        First, the definition does not indicate the *measure* of the bird's food consumption
7   a farmer must use to avoid feeding a duck "more food" than it would consume
8   voluntarily. Is it by weight? Is it by volume? Is it by caloric value? No intelligent
9   person could divine from the statutory definition how "more food" is to be measured.
10   A statute that "fails to provide a person of ordinary intelligence fair notice of what is
11   prohibited, or is so standardless that it authorizes or encourages seriously
12   discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 2012 WL
13   2344462 at *10 (U.S. Jun. 21, 2012).

14        Second, the definition does not indicate over what period of *time* the duck's
15   consumption is to be measured. Over its lifetime? Per day? In a single feeding? All
16   the Court need do to recognize the hopeless ambiguity in the BFL's definition is imagine
17   a parenting magazine that prescribed a diet limiting a child to "no more food than a
18   typical [child] would consume voluntarily" — but with a penalty of $1,000 for every
19   violation. To say that the vagueness in this purported standard could have a chilling
20   effect on those who feed ducks for foie gras and who wish to sell their products in
21   California is an understatement; it already does. (Henley Decl. ¶¶ 4, 8.)

22        Third, the BFL requires a farmer to measure his ducks' consumption against that
23   of a "typical" bird of the same species. It does not say "average" or "median" (nor
24   could it without deeming half of all ducks statutorily overfed) or provide any other
25   standard for comparison. Turning to the dictionary for the definition of "typical"
26   provides little guidance, as Webster's defines the word as "[1] constituting or having the
27   nature of a type: symbolic; [2][a] combining or exhibiting the essential characteristics of
28   a group; [b] confirming to a type." *See* http://www.merriam-webster.com/dictionary/

1  typical.  The farmer and the feeder are again left with no sensible measure of when their

2  ducks have been fed "more food" than California allows.

3       Finally, it is impossible for a farmer of mulard ducks — the only kind in the

4  United States and Canada raised for, among other products, their livers — to know

5  against *which* "same species" of duck he must measure his ducks' consumption.  That

6  is because, as explained above, ducks raised for foie gras are hybrids of two different

7  subspecies of two different species that do not even belong to the same genus.  The BFL

8  is thus nonsensical as applied to Plaintiffs' ducks.

9       In the absence of a meaningful standard in the BFL — and in the absence of

10  preliminary relief from this court — the vagueness in the definition of "force feeding"

11  carries over to section 25982 and leaves Hot's Kitchen and other chefs and restaurants

12  at the mercy of the state when it comes to the thousands of dollars of civil penalties to

13  which they could be subject after just a single evening's dinner.  As the Supreme Court

14  observed just days ago, "Just as in the First Amendment context, the due process

15  protection against vague regulations 'does not leave [regulated parties] . . . at the mercy

16  of *noblesse oblige.*'"  *Fox Television* at *10.

17       "Even when speech is not at issue, the void for vagueness doctrine addresses at

18  least two connected but discrete due process concerns: first, that regulated parties

19  should know what is required of them so they may act accordingly; second, precision

20  and guidance are necessary so that those enforcing the law do not act in an arbitrary or

21  discriminatory way."  *Fox Television at *10,* citing *Grayned v. City of Rockford,* 408

22  U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).  Here, it is not only

23  impossible for Hudson Valley and the members of AECOQ to discern any meaningful

24  standard from the BFL; the vagueness in the law subjects the sellers of their products —

25  California distributors and any restaurant in the state — to entirely arbitrary

26  prosecution.  *See, e.g.,* D. Goodyear, *The New Yorker* (online version only), Jun. 27,

27  2012 (quoting the L.A.P.D.'s response to her inquiry about the enforcement of section

28  25982 as, "We are not trained to recognize foie gras from chop suey."), last viewed on

- 13 -

Jun. 29, 2012 at http://tinyurl.com/7syu8f5.  The BFL flunks the Supreme Court's test for clarity and renders section 25982 unconstitutional.

*     *     *

The BFL's unconstitutional vagueness directly affects Plaintiffs — and every other person in the distribution chain from farm to table.[4]  Every restaurant and distributor faces crippling penalties for selling products from ducks that have been fed "too much," despite the fact that even the farmers themselves cannot know at what point they have run afoul of California's standardless law.  And because it thus threatens and effectively destroys the markets for foie gras and other duck products in California, (Grandjean Decl. ¶¶ 5-8; Chaney Decl. ¶¶ 5-8, 12), section 25982 is causing irreparable harm to out-of-state farmers such as Hudson Valley and the members of AECOQ.

**B.** **Section 25982 violates basic due process because it has no *scienter* requirement, yet it imposes unlimited penalties on a seller of USDA-approved duck products who cannot know what the particular duck from which they were produced was fed throughout its lifetime.**

It is basic due process that no person should be penalized for conduct in which he has taken no part and about which he has no knowledge.  Even California's crime of receiving stolen property requires that a person receive or sell such property "knowing the property to be so stolen."  Cal. Penal Code § 496.  Yet section 25982 penalizes a person who sells in California any product that "is the result of" a duck — whether it be foie gras, duck breast, duck leg, duck fat, or even duck feathers — based on a vaguely-defined feeding process, even where the person has no knowledge or other form of *scienter* as to how much the duck was fed throughout its lifetime.

The fatal vagueness in the Bird Feeding Law's illusory limit on feeding a duck is compounded when it comes to sellers of foie gras and duck products in California.  How is a restaurant such as Hot's Kitchen — or any other restaurant or distributor or gourmet retailer — supposed to know how much a duck was fed in New York or

---

[4]   Section 25982 reflects an additional ambiguity insofar it prohibits an offending product from being "sold" in California but does not indicate who may be prosecuted in connection with the sale.

- 14 -

1    Canada?  Here, all of Plaintiffs' products sold in California for food are "the result of"

2    a duck that has passed several levels of USDA inspection and approval.  That process is

3    designed so that a seller may rely on the federal government's imprimatur of

4    wholesomeness and so that poultry products will circulate free of "burdens upon such

5    commerce."  21 U.S.C. § 451.

6         Section 25982 is on even shakier constitutional footing by penalizing a person

7    who sells in California any product from a duck that was fed by another person if such

8    person fed the duck "for the purpose" of enlarging the bird's liver beyond normal size.

9    Here again, how is a restaurant such as Hot's Kitchen — or anyone else in California

10   who sells any product of a duck — supposed to know for what "purpose" the duck was

11   fed?  Section 25982 thus unconstitutionally penalizes a California seller for the

12   unknowable mental state of another.

13        C.    **Section 25982 directly violates the Commerce Clause by creating a**
14              **state-imposed boycott that interferes with free trade in wholesome and**
15              **unadulterated goods in interstate and foreign commerce.**

16        Section 25982 represents a direct violation of the Commerce Clause because it

17   imposes a state boycott on wholesome and unadulterated food products from other

18   states.  Such laws have long been recognized as unconstitutional.  "The very purpose of

19   the Commerce Clause was to create an area of free trade among the several States."

20   *McLeod v. J. E. Dilworth Co.*, 322 U.S. 327, 330, 64 S.Ct. 1023 (1944).  As Justice

21   Jackson eloquently put it, "Our system, fostered by the Commerce Clause, is that every

22   farmer and every craftsman shall be encouraged to produce by the certainty that he will

23   have free access to every market in the Nation, that . . . no foreign state will by customs

24   duties or regulations exclude them.  Likewise, every consumer may look to the free

25   competition from every producing area in the Nation to protect him from exploitation

26   by any.  Such was the vision of the Founders; such has been the doctrine of this Court

27   which has given it reality."  *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539,

28   69 S.Ct. 657, 93 L.Ed. 865 (1949).

1    In *Schollenberger v. Com. of Pa.*, 171 U.S. 1, 18 S.Ct. 757 (1898), the Supreme
2    Court considered a Pennsylvania statute that prohibited the sale of oleomargarine.
3    Schollenberger had purchased a quantity of this product from a manufacturer in Rhode
4    Island for resale in Pennsylvania. *Id.* at 4. The manufacturer had complied with "all
5    the provisions" of an act of Congress regulating the manufacture and sale of
6    oleomargarine. *Id.* at 3. Schollenberger sold a tub of the product and was convicted.
7    *Id.* at 2. The Supreme Court reversed on grounds that call for the invalidation of
8    section 25982 here. First, it observed, "If [C]ongress has affirmatively pronounced the
9    article to be a proper subject of commerce, we should rightly be influenced by that
10   declaration." *Id.* at 8. Congress had provided for the inspection and labeling of the
11   oleomargarine, *id.* at 8-9, just as it has done for duck products through the PPIA here.
12       The Supreme Court held, "[W]e yet deny the right of a state to absolutely
13   prohibit the introduction within its borders of an article of commerce which is not
14   adulterated, and which in its pure state is healthful." *Id.* at 14. Plaintiffs' duck
15   products, whether they be duck breast, duck legs, or duck fat — or even foie gras,
16   which is specifically deemed wholesome under an FSIS directive — are pure and
17   unadulterated articles of commerce under federal law. Accordingly, section 25982
18   directly violates the Commerce Clause in prohibiting their sale within the state. *See also*
19   *Welton v. State of Missouri*, 91 U.S. 275, 281 (1875) ("The power which insures
20   uniformity of commercial regulation must cover the property which is transported as an
21   article of commerce from hostile or interfering legislation[.]") *Schollenberger* remains
22   binding precedent on this Court, and, for the same reasons as the Supreme Court
23   correctly recognized in that case, section 25982 should be found unconstitutional.

24       D.    **Section 25982 violates the Commerce Clause because its only practical**
25             **effect is to regulate economic activity beyond California's borders.**

26       In forcing out-of-state farmers to comply with the California legislature's vague
27   feeding standard, section 25982 attempts to directly regulate economic activity outside
28   its borders. As the Court of Appeals for this circuit has explained, "'Direct regulation'

occurs when a state law directly affects transactions that 'take place across state lines' or entirely outside of the state's borders. . . . *Such a statute is invalid per se*, regardless of whether the state intended to inhibit interstate commerce. . . . A court must therefore consider the "practical effect" of the state law on interstate commerce in evaluating its validity under the commerce clause. *Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186, 1189-90 (9th Cir. 1990) (emphasis added; citations omitted).

While section 25981's feeding ban is necessarily directed to California duck farmers, section 25982's ban on sale essentially says to out-of-state producers such as Hudson Valley and AECOQ, "If you folks in New York and Canada feed your ducks 'more food' than we think is too much, your products can't be sold in our state." (Technically, section 25982 tells Plaintiffs, "Good luck even trying to sell your products in California when we've threatened every one of your distributor and restaurant customers here with a $1,000 penalty per sale per day if a policeman correctly guesses that the ducks from which they came were fed too much.") This is unconstitutional.

"The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). The "critical inquiry" is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336. Here, regulating the agricultural practices of farmers outside California and the United States was *exactly* what section 25982 was intended to do. The statute even says so on its face. Section 25984(c) declares the "express intention of the Legislature," in delaying the operative date of the BFL, which was to cause "persons or entities engaged in agricultural practices that include raising and selling force fed birds to modify their business practices."

In other words, an out-of-state producer is given a choice to either go beyond anything required of it by the USDA and conform its "agricultural practices" and "business practices" to California's vague dietary guidelines for ducks or face a state-

- 17 -

1   imposed boycott of its products. This is particularly invidious as to Hudson Valley and
2   the members of AECOQ since they cannot have any say in the California political
3   process. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 660
4   U.S. 330, 345, 127 S.Ct. 1786 (2007) (observing that when "the burden of state
5   regulation falls on interests outside the state, it is unlikely to be alleviated by the
6   operation of those political restraints normally exerted when interests within the state
7   are affected") (internal citation omitted).

8        "The Commerce Clause seeks to prevent extraterritorial economic 'effects,' not
9   purposes." *Gerling Global Reinsurance Corp. of America v. Low*, 240 F.3d 739, 746
10  (9th Cir. 2001). If, as the Ninth Circuit and the U.S. Supreme Court have said,
11  extraterritorial regulation is invalid regardless of the enacting legislature's purpose, then
12  section 25982 is all the more so here, where the statute reflects on its face California's
13  intent to impose its duck dietary guidelines on out-of-state farmers. For these reasons,
14  section 25982 is unconstitutional.

15            **1.    To the extent it imposes any additional requirement on**
16            **producers of USDA-approved duck products for any reason of**
17            **public health, section 25982 is preempted by the federal Poultry**
                 **Products Inspection Act.**

18       The PPIA reflects Congress's findings that federally-approved poultry products
19  should move freely in interstate commerce. "It is hereby declared to be the policy of the
20  Congress to provide for the inspection of poultry and poultry products and otherwise
21  regulate the *processing and distribution* of such articles as hereinafter described to
22  prevent the *movement or sale* in interstate or foreign commerce of, or the burdening of
23  such commerce by, poultry products which are adulterated or misbranded." 21 U.S.C.
24  § 452. The PPIA also includes an express preemption clause that specifically covers
25  labeling, packaging, and "*ingredient* requirements" for products prepared at USDA-
26  approved establishments such as those of Plaintiffs here. 21 U.S.C. § 467e. Defendants
27  thus cannot argue that section 25982 is based on any concern for the wholesomeness of
28  the products, or — in the words of the Supreme Court — they will run "smack into"

1    the PPIA's preemptive regulations. (In any case, California notably does not ban the

2    import or consumption of foie gras or other duck products.)

3       The Supreme Court made clear earlier this year that the federal regulatory

4    scheme for slaughtering meat preempts California laws that would impose additional or

5    different requirements. In *National Meat Ass'n v. Harris*, ___ U.S. ___, 123 S.Ct. 965,

6    181 L.Ed. 2d 950 (2012), the California legislature — motivated by "undercover"

7    footage of animal husbandry practices involving pigs — amended a law governing the

8    treatment of nonambulatory animals so that it would apply to federally-regulated

9    slaughterhouses. *Id.* at 965. Plaintiffs challenged the statute, and the district court

10    found it preempted by the Federal Meat Inspection Act (FMIA). The Ninth Circuit

11    reversed, stating, "[S]tates are free to decide which animals may be turned into meat."

12    *Id.* at 973. "We think not," the Supreme Court responded, holding that the preemption

13    clause in the FMIA — which is identical to that found in the PPIA — invalidated the

14    California statute.

### E. Section 25982 significantly burdens interstate and foreign commerce without advancing any legitimate local interest of protecting Californians — or even of protecting any duck in California — and thus violates the Dormant Commerce Clause.

18       For the above reasons, Plaintiffs submit that section 25982 directly violates the

19    Commerce Clause. But, even in the absence of a direct violation, state regulations such

20    as section 25982 run afoul of the Constitution if they violate the Dormant Commerce

21    Clause. As the Court of Appeals for this Circuit has recently recognized, the Supreme

22    Court has set forth the following summary of Dormant Commerce Clause law:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on

1   whether it could be promoted as well with a lesser impact on
    interstate activities.

2   *National Ass'n of Optometrists & Opticians v. Harris*, ___ F.3d ___ at *4 (Jun. 13,

3   2012), citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d

4   174 (1970) (citation omitted).

5       Here, section 25982 flunks the *Pike* balancing test. In the first place, it has a

6   decidedly discriminatory effect, if not a discriminatory purpose. When — with the

7   BFL's stated goal of getting California farmers to change their "agricultural practices"

8   — the legislature enacted section 25981 to limit the way farmers in California may feed

9   their ducks, it ensured that no product from a duck that had been fed more than the

10  statute allows would be produced in California. The legislature could have adjourned

11  then knowing that it had protected every duck within the state. At that point, the

12  addition of section 25982 can be said to have been aimed in only one direction: at out-

13  of-state producers who, until they modify *their* agricultural practices to California's

14  liking, cannot sell in the largest American market for their goods. It is difficult to view

15  this as anything but discriminatory.

16      But even under the second tier of the *Pike* balancing test, section 25982 cannot

17  survive because its burdens are substantial and it advances no legitimate local interest.

18  First, section 25982 places significant burdens on interstate commerce because it

19  attempts to regulate activities — the sale of USDA-inspected, wholesome, unadulterated

20  poultry products — that are "inherently national or require a uniform system of

21  regulation." *National Ass'n of Optometrists & Opticians* at *3. Second, as discussed

22  above, it effectively walls off California from the North American market for foie gras

23  and other duck products, gutting the size of that market by 20 to 25%. Third, it places

24  California off-limits to foreign commerce with Canada and the United States' trading

25  partners in Europe and interferes with the federal government's exclusive authority to

26  negotiate any restrictions on imports under the NAFTA. And it does all this in a

27  misguided effort to get out-of-state farmers to change the way they feed their ducks.

28

- 20 -

State laws that affect foreign commerce run afoul of the Constitution if they interfere with the federal government's authority to "speak with one voice" in foreign affairs. *Cf. Gerling Global Reinsurance Corp. of America*, 240 F.3d at 747 (recognizing that state laws affecting foreign commerce where Congress has "spoken affirmatively" in the area of insurance and has "acquiesced in state laws" affecting foreign commerce). The consequence of section 25982 is especially egregious here, as it closes off California to Canadian importers of foie gras and other duck products — one of whom indicates that the California market represents 25% of its business in the United States. (Cuchet Decl. ¶ 4.) At the WTO level, California's ban is already threatening repercussions to the sale of American goods abroad. As Radio France International reported this past week, producers in France, Bulgaria, and Hungary "have asked their governments to take the question to the World Trade Organisation," and "France's foreign affairs ministry backs the foie gras producers and has promised to fight the California law." (RFI [online only], Jun. 29, 2012, http://tinyurl.com/7enyho8, last viewed on Jul. 3, 2012.)

### III.  Plaintiffs are *certain* to suffer immediate and irreparable harm in the absence of a TRO and preliminary injunctive relief.

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." 11A Wright & Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2004). Here, Plaintiffs are certain to suffer immediate and irreparable harm if section 25982 is not enjoined. With each day of the month of July (and beyond) that goes by, chefs and restaurants such as Hot's Kitchen face a lose-lose situation: either stop selling foie gras and other duck products and suffer the continuing loss in sales *or* keep these items on their menus and face crippling penalties if any police or animal control officer cites them and it turns out that the product in question came from a duck that had been fed "too much." (Chaney Decl. ¶¶ 5-8, 12.) Consider a chef who sells 35 dishes a night containing either foie gras or some other duck product — including, e.g., duck legs or duck fat. By the end of a month, he could face penalties of

1 over $1 million.  The effect of section 25982 is that, fearing arbitrary prosecution,
2 restaurants such as Hot's Kitchen are no longer selling foie gras.  *Id.*

3     For a California distributor of foie gras and other duck products to restaurants,
4 the consequence is magnified.  With few chefs or restaurants willing to risk prosecution
5 and severe penalties — and with the distributor himself facing penalties for a larger
6 volume of products from ducks that risk being deemed to have been fed too much
7 under the BFL — there is every reason to exit the California market completely.
8 (Grandjean Decl. ¶¶ 4-8.)  In the face of the BFL's vagueness, this distributor will not
9 be selling foie gras or other duck products after July 1, 2012, and will not be placing
10 orders for it from his Canadian supplier.  (Grandjean Decl. ¶ 8.)

11     Not surprisingly, then, the cumulative practical effect of section 25982 is to
12 destroy both the retail and the wholesale markets for foie gras and other duck products.
13 The immediate harm to Plaintiffs Hudson Valley and the Canadian members of
14 AECOQ is devastating.  California sales represent 18.7% of Hudson Valley's total sales
15 volume and 25% of one of AECOQ's largest members.  Hudson Valley's orders from
16 California sellers have gone from over $435,040 last month to zero today.  (Henley
17 Dec. ¶ 8.)  And AECOQ itself has been forced to expend resources in an effort to make
18 sense of the BFL's intended feeding limit to determine whether its members' products —
19 which the USDA approves as wholesome and unadulterated for free entry into the
20 United States — may continue to be sold in California.  (Cuchet Decl. ¶ 9.)

21     Beyond the unrecoverable lost sales and risk of prosecution from the state,
22 Plaintiffs also face threats from animal extremists who have vowed to take the law into
23 their own hands.  (Tenenbaum Decl. ¶¶ 6-9.)  As the president of at least one such
24 organization told Bloomberg, "We're going to come down like a hammer on any chef
25 or restaurant that wants to continue serving this very cruel product. . . .  We're going
26 to make life very difficult for them. . . .  If we find somebody still serving that product,
27 the gloves are going to come off . . ."  *See* Bloomberg, Jun. 25, 2012, http://tinyurl.com/
28 7wmuj5b, last viewed Jul. 2, 2012.  These threats cannot be discounted insofar as

1    extremists have previously targeted chefs and restaurateurs with acts of violence at both
2    their homes and businesses, according to press reports at the time.  *See* New York
3    Times, Sep. 24, 2003, http://tinyurl.com/7gk8ruz, last viewed Jul. 2, 2012.

4         Plaintiffs' financial losses are real and immediate and — unless this Court issues a
5    TRO and injunction to prevent them from continuing — they can never get these back.
6    Unlike in a case against a private party, Defendants in this case are state government
7    officials and the state itself, which, as it is well known, are immune from suit for money
8    damages under the Eleventh Amendment.  Even aside from the risk of prosecution from
9    the state and the threats from vigilante animal extremists, this harm is exactly the kind
10   that courts have found irreparable in support of granting injunctive relief.  *California*
11   *Medical Ass'n v. Douglas*, ___ F.Supp.2d ___ at *15 (C.D. Cal. Jan. 31, 2012).

12   **IV.    Because Defendants have nothing to lose as a result of a TRO or injunction,**
13   **the balance of equities tips heavily in Plaintiffs' favor.**

14        In sharp contrast to what Plaintiffs stand to lose, Defendants will suffer no real
15   consequence from an injunction that simply prevents the prosecution of duck product
16   sales under section 25982 for the matter of weeks it will take to be heard at a
17   preliminary injunction hearing — or even the months it will take for the issues to be
18   fully adjudicated through a motion for summary judgment or trial.  The BFL was added
19   back in 2004 and, by its own terms, provided that it would not even take effect for 7.5
20   *years.*  Cal. Health & Safety Code § 25984.  A delay of a few more weeks or months to
21   ensure that the important constitutional issues raised by section 25982 are fully
22   adjudicated cannot possibly cause Defendants any harm.

23        Moreover, Plaintiffs do not challenge section 25981's prohibition on feeding
24   ducks in California, so that provision will remain in effect and ensure that no duck in
25   California is fed more than whatever the terms of the BFL allow.  Defendants thus
26   cannot claim that they themselves — or even any duck in California — will suffer any
27   harm as a result of a TRO and preliminary injunction.  With foie gras *production*
28   effectively shut down in California as of July 1st, not a single in-state duck will be

1  protected by a ban on the sale of duck products made from out-of-state producers.

2  Especially when weighed against Plaintiffs' continuing and unrecoverable losses of over

3  $11,000 per day — i.e., over a quarter million dollars a month — and the destruction

4  that section 25982 has started to wreak in the North American market for foie gras and

5  other duck products, the balance of hardships tips heavily in Plaintiffs' favor.

6  **V.    Injunctive relief is in the public interest.**

7       This action is brought by an association of Quebec producers representing the

8  entire market of imports from Canada to the United States of foie gras and other

9  products from ducks raised for foie gras, by the largest American producer of such

10  products, and by a Los Angeles restaurant group with two locations that serve these

11  products.  Hundreds of chefs and restaurants in California today serve not only foie

12  gras but countless dishes made using other parts of the duck, such as the breast, the leg,

13  and the fat. (Grandjean Decl. ¶ 2; Chaney Decl. ¶¶ 2, 9.)  Beyond the irreparable harm

14  that Plaintiffs will be spared if enforcement of section 25982 is restrained, these other

15  sellers of foie gras and duck products will be saved from similar losses by the grant of

16  preliminary relief here.

17       On its face, section 25982 applies not only to foie gras sold in restaurants but

18  also to any product that "is the result of" the BFL's prohibited feeding practice.

19  Retailers of gourmet food products such as terrines, pâtés, mousses, and rillettes now

20  face a similar choice to that of the chefs and distributors in California:  sell these

21  products and face a $1,000 penalty per sale per day or take the products off their

22  shelves and lose those sales forever.  Moreover, the vagueness in the statute is even

23  raising concerns for sellers of clothing products made with down feathers, such as The

24  North Face, which are reportedly sourced from ducks and geese raised for foie gras that

25  could be deemed to have been fed too much under the BFL. (Daily Mail, Feb. 20, 2012,

26  http://tinyurl.com/7pvn74r, last viewed on Jul. 3, 2012.)  Until this Court rules on the

27  merits of Plaintiffs' Due Process claims, no one in California can know if their sale or

28  purchase of any duck or goose product — or the product of any "bird," for that matter

- 24 -

1  — is legal.  In the meantime, the only certain result is lost sales and the specter of

2  arbitrary prosecution.

3  Finally, what cannot be ignored in considering the public interest is the demand

4  of consumers for foie gras and other duck products.  As evidenced by the barrage of

5  recent press accounts of diners flocking to restaurants to discover and enjoy foie gras,

6  Californians' demand for foie gras is rising.  *See, e.g.*, San Francisco Chronicle, Jun. 28,

7  2012, http://tinyurl.com/dxja2e4 last viewed on Jun. 3, 2012 (headline: "California Foie

8  Gras Ban Backfires: Demand for the Delicacy at All-Time High"); see also Henley Decl.

9  ¶ 7 (describing 76% growth in California foie gras sales in just three years based on

10  2012 sales to date).  Keeping it available for sale to those who want it pending the trial

11  of this case is in the public interest and causes no harm to any person or duck in

12  California.  While a TRO and injunction are in effect, every California consumer will

13  still have a very easy way of not being sold a duck product she may not like — a way

14  that does not depend on section 25982's vague ban on lawful goods in interstate and

15  foreign commerce:  she can simply not purchase it.

16                                    CONCLUSION

17  Given the certainty of continuing financial losses that cannot be compensated by

18  Defendants, a balance of hardships that tips sharply in favor of Plaintiffs, a result that

19  serves the public interest, and Plaintiffs' likely success on the merits — and, at a

20  minimum, serious questions going to the constitutionality of section 25982 — this

21  Court should issue a temporary restraining order and order to show cause why a

22  preliminary injunction should not issue to enjoin Defendants from enforcing section

23  25982 pending a fuller adjudication of the factual and legal issues in this case at trial.

24  Dated:      July 3, 2012                    THE TENENBAUM LAW FIRM

25

26

27                                              Michael Tenenbaum, Esq.

28

PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION