UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ASSOCIATION DES  ÉLEVEURS DE )    2:12-cv-05735-SVW-RZ
CANARDS ET D'OIES DU QUÉBEC, ET )
AL.,                        )     ORDER DENYING PLAINTIFFS'
                            )     MOTION for Preliminary
          Plaintiffs,       )     Injunction To Enjoin Defendants
                            )     from Enforcing Section 25982 of
          v.                )     the California Health & Safety
                            )     Code against Plaintiffs or the
KAMALA D. HARRIS, ET AL.,   )     Sale of Products from Moulard
                            )     Duck [51]
          Defendants.       )
                            )
                            )
                            )
                            )

I.   **INTRODUCTION AND FACTUAL BACKGROUND**

On September 29, 2004, Governor Arnold Schwarzenegger signed
California Senate Bill 1520 ("SB 1520").  See Pls.' Req. for Judicial
Notice A (Dckt. 52).  SB 1520 sought to regulate the practice of
force-feeding birds, the preferred method of producing foie gras.[1]
According to SB 1520's author, force-feeding requires "restraining the
bird and inserting a 10- to 12- inch metal or plastic tube into the
bird's esophagus and delivering large amounts of concentrated meal and

_____

[1] French for "fatty liver," foie gras is fattened duck or goose liver.

compressed air into the bird." <u>See</u> Defs.' Req. for Judicial Notice, Ex. 1 (Dckt. 58).  Traditionally, foie gras was made from geese; however, for mainly financial reasons, producers have in recent years used primarily ducks instead.  <u>Id.</u>  Most producers use the "moulard duck," a hybrid of the male Muscovy duck and female Pekin duck.  <u>Id.</u> From SB 1520's legislative history and the declarations submitted by the parties, it appears that foie gras is the only product sold that requires a bird to be force-fed: although sellers of foie gras also sell other parts of force-fed ducks (such as their breasts and legs), force-feeding is not required to produce them.

SB 1520 added five new sections to California's Health and Safety Code.  Section 25981 bars any person from "force feed[ing] a bird for the purpose of enlarging the bird's liver beyond normal size, or hir[ing] another person to do so."  Cal. Health & Safety Code § 29581. Section 25982 bars the sale of a product "in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."  Health & Safety §25982.  The statute defines force-feeding a bird as "a process that causes the bird to consume more food than a typical bird of the same species would consume voluntarily," through methods such as "delivering feed through a tube or other device inserted into the bird's esophagus."  Health & Safety § 25980(b).  The bill provided for civil penalties of up to $1,000 per violation, which can be issued by "[a] peace officer, officer of a humane society as qualified under Section 14502 or 14503 of the Corporations Code, or officer of an animal control or animal regulation department of a public agency, as qualified under Section 830.9 of the

Penal Code, may issue a citation to a person or entity that violates
this chapter."  Health & Safety § 25983.  Finally, the bill delayed the
effective date of Section 25981 and 25982 until July 1, 2012, "to allow
a seven and one-half year period for persons or entities engaged in
agricultural practices that include raising and selling force fed birds
to modify their business practices."  Health & Safety § 25984©.

Sections 25981 and 25982 became effective on July 1, 2012.  On
July 2, 2012, Plaintiffs filed a complaint in this Court challenging
the constitutionality of only Section 25982, the ban on sales of
products from force-fed birds.  (Dckt.1.)  Plaintiffs are a collection
of organizations and businesses that sell various duck products,
including foie gras.  Plaintiff Association des Éleveurs de Canards et
d'Oies du Québec ("the Association") is an association of Quebec's
"leading producers and exporters of foie gras and other products from
ducks raised for foie gras" that "account for virtually all of the
production of such products in Canada as well as 100% of the imports of
such products to the United States."  First Amended Complaint ("FAC")
¶ 7.  Plaintiff HVFG LLC ("Hudson Valley") is a New York producer of
duck products and is "the largest producer of foie gras and other
products raised for foie gras in the United States."  FAC ¶ 6.
Plaintiff Hot's Restaurant Group, Inc., owns and operates restaurants
in Southern California that sold foie gras.  FAC ¶ 7.  Plaintiff Gauge
Outfitters, Inc, is a California corporation that sells "leading brands
of ski apparel, including goose down jackets."  FAC ¶ 8.  Plaintiffs
named the State of California, California Attorney General Kamala D.

Harris, and California Governor Edmund G. Brown as defendants.  FAC ¶¶ 9-11.

Plaintiffs' First Amended Complaint alleges that Section 25982 is unconstitutional on three grounds: first, that Section 25982 is unconstitutionally vague; second, that it violates the dormant Commerce Clause; and third, that it is pre-empted by the Federal Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-472.  FAC ¶¶ 64-107. Plaintiffs requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, as well as injunctive relief.  FAC ¶¶ A-C.  On July 5, 2012, Plaintiffs filed an ex parte application for a temporary restraining order in this Court, which was denied on July 18, 2012.  (Dckt. 6, 35.)  On August 21, 2012, Plaintiffs filed the instant motion for a preliminary injunction of Section 25982.  (Dckt 51.)

Plaintiffs filed several declarations in support of their motion for a preliminary injunction.  (Dckt. 51.)  According to Plaintiffs, the Association is losing an estimated $100,000 a month of "moulard duck products" sales due to Section 25982, Cuchet Decl. ¶ 9 (72,845), Nassans Decl. ¶¶ 3-4; Hudson Valley, a little over $250,000 a month of "edible moulard products," Henley Decl. ¶¶ 16-19; and Hot's Restaurant $6,000 a month in sales of "dishes made with foie gras."  Chaney  Decl. ¶ 12.  Other businesses involved in the production, distribution, and sale of foie gras and other moulard duck products also submitted declarations.  According to their declarations, these businesses are losing a little less than $120,000 in monthly sales of foie gras and other moulard duck products because of Section 25982.  Ambrose Decl.

¶¶ 1-4; Grandjean Decl. ¶ 4; Stout Decl. ¶ 3; Vanden Broeder Decl. ¶ 3[2]; Beylier Decl. ¶¶ 4-5, 12.  However, at least two of these businesses have been able to procure duck products other than foie gras (such as duck breasts) from suppliers apparently unaffected by Section 25982. Vanden Broeder Decl. ¶ 7; Beylier Decl. ¶¶ 15-16; Cayer Decl. ¶ 4. Plaintiff Gauge Outfitter also submitted a declaration, including print-outs from websites of the various suppliers of the outerwear sold at its stores.  Craycraft Decl. ¶ 6-9.  Two of the print-outs indicate that Gauge Outfitter's suppliers have taken steps to ensure that the down feathers used in their gear do not come from force-fed birds. Craycraft Decl. Ex. A, B.

## II.  STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

A preliminary injunction is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting Mazurek v. Armstrong, 502 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff seeking a preliminary injunction must establish that he is 1) likely to succeed on the merits; 2) likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and, 4) that an injunction is in the public interest.  Winter v.

---

[2] According to the Vanden Broeder Declaration, Vandif Specialty Foods, Inc., a California business, bought $30,919.87 dollars worth of foie-gras from the Association for the twelve months ending June 30, 2012. Vanden Broeder Decl. ¶ 3.  The declaration does not indicate at what price the foie-gras was resold, so for calculation purposes the Court used the $30,919.87 figure provided in the declaration.

Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (same).

Although they are often articulated separately, the Ninth Circuit has held that the first and third requirements-the likelihood of success on the merits and the balance of equities-should be considered in tandem. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). Under this "sliding-scale" approach, these two elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id. at 1131. Thus, the standard for granting a preliminary injunction varies depending on the relative harm and the likelihood of success on the merits. Id. For example, the Ninth Circuit has articulated a "serious questions" test, whereby a plaintiff need only raise "serious questions going to the merits," rather than a likelihood of success on the merits, when he or she can also show that the balance of hardships tips "sharply towards the plaintiff." Id. at 1135. Even under the serious questions test, however, an applicant must demonstrate that they are likely to suffer irreparable harm and that the injunction is in the public interest. Id.

At a minimum, then, Plaintiffs must raise a "serious question going to the merits" in order to prevail on their motion for a preliminary injunction. Because they have not done so here, the Court will assume, without deciding, that the serious questions test is the appropriate standard.

**III.  IRREPARABLE HARM**

Plaintiffs "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." Alliance for the Wild Rockies, 632 F.3d at 1131.  Plaintiffs claim that they are suffering "irreparable harm" in the form of $360,000 a month in lost sales.  See Pls.' Br. In Supp. of Mot. For Prelim. Inj. ("Br. in Supp.") 27.

Monetary losses are usually not considered irreparable harm for purposes of granting a preliminary injunction.  Most applicants who suffer such losses have "an adequate alternate remedy in the form of money damages."  Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & Richard L. Marcus, Federal Practice and Procedure § 2948.1 (2d ed. 1995).  In this case, however, the State's Eleventh Amendment immunity would prevent Plaintiffs from recovering lost sales, even were they to succeed on the merits.  Thus, Plaintiffs are likely to suffer irreparable harm if a preliminary injunction is not granted.  See California Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852 (9th Cir. 2009) vacated on other grounds and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc., 132 S. Ct. 1204 (U.S. 2012) ("Because the economic injury doctrine rests only on ordinary equity principles precluding injunctive relief where a remedy at law is adequate, it does not apply where, as here, the Hospital Plaintiffs can obtain no remedy in damages against the state because of the Eleventh Amendment."), O'Brien v. Appomattox Cnty., Va., 213 F. Supp. 2d 627, 631-32 (W.D. Va. 2002) (finding irreparable harm from a state law that

would result in $80,000 of losses to plaintiffs that would not be recoverable even were the plaintiffs to succeed on the merits because of the state's Eleventh Amendment immunity).

**IV.   LIKELIHOOD OF SUCCESS ON THE MERITS**

    **A.   Jurisdiction**

    Before turning to the merits of Plaintiffs' motion, the Court first addresses the State's arguments that this Court does not have jurisdiction to hear Plaintiffs' case.

        1.   Eleventh Amendment Immunity

    Defendants argue that the Eleventh Amendment bars Plaintiffs' action.  Plaintiffs have named the state of California, Governor Edmund G. Brown, and Attorney General Kamala Harris as defendants.  "The Eleventh Amendment grants to states a sovereign immunity from suit that, when invoked, bars adjudication of a dispute in federal court." Agua Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041, 1045 (9th Cir. 2000) (footnote omitted).  However, there is an exception that allows federal courts to hear suits to enjoin allegedly unconstitutional state laws, notwithstanding the Eleventh Amendment's bar.  Under the Supreme Court's decision in Ex Parte Young, 209 U.S. 123 (1908), plaintiffs may bring suit in federal court "against state officials for the purpose of enjoining the enforcement of an

1    unconstitutional state statute." Okpalobi v. Foster, 244 F.3d 405, 411

2    (5th Cir. 2001).  This exception is

3         premised on the fiction that such a suit is not an action
          against a "State" and is therefore not subject to the
4         sovereign immunity bar. The Young doctrine strikes a delicate
          balance by ensuring on the one hand that states enjoy the
5         sovereign immunity preserved for them by the Eleventh
          Amendment while, on the other hand, giving recognition to the
6         need to prevent violations of federal law.

7    Agua Caliente Band of Cahuilla Indians, 223 F.3d at 1045 (internal

8    citation and quotation marks omitted).

9

10        However "a plaintiff may not avoid [the Eleventh Amendment's] bar

11   simply by naming an individual state officer as a party in lieu of the

12   State." Okpalobi, 244 F.3d at 411.  Rather, a named defendant must

13   have some connection with enforcement of the challenged law, a

14   connection that "must be fairly direct; a generalized duty to enforce

15   state law or general supervisory power over the persons responsible for

16   enforcing the challenged provision will not subject an official to

17   suit." Snoeck v. Brussa, 153 F.3d 984, 986 (9th Cir. 1998) (internal

18   citations and quotation marks omitted).  The connection is "determined

19   under state law depending on whether and under what circumstances a

20   particular defendant has a connection with the challenged state law."

21   Id.

22

23        Here, California's own statutes indicate that, at a minimum, the

24   Attorney General has the power to enforce Section 25982.  Section 25983

25   provides that "[a] peace officer . . . may issue a citation to a person

26   or entity that violates this chapter." Cal. Health & Safety Code §

27   25983 (emphasis added).  The Attorney General herself is a peace

28

officer under California law.  Cal. Penal Code § 830.1.  Thus, at least
one named defendant is proper, and the Ex Parte Young exception to the
Eleventh Amendment confers upon this Court jurisdiction to hear
Plaintiffs' constitutional challenge.


   2.   Ripeness


    Defendants further argue that Plaintiffs' claims are not ripe
because they have not shown "imminent or even likely prosecution for
violating the statue."  Opp'n of the State of Cal., Governor of Cal.,
and Att'y Gen. to Pl.'s Mot. For Prelim. Inj. 6.  Defendants' argument
lacks merit.  Facing almost identical facts, the Ninth Circuit found
the claims at issue to be ripe in National Audubon Society, Inc. v.
Davis, 307 F.3d 835, 856 (9th Cir. 2002).  The plaintiffs in Davis
challenged California's Proposition 4, which banned the use of certain
traps and poisons to capture or kill wildlife in the state.  Id. at
843.  As a result of Proposition 4, many private trappers stopped using
"leghold traps," which, the court observed, caused them "actual,
ongoing economic harm resulting from their cessation of trapping."  Id.
at 855.  Thus, the Ninth Circuit found the trappers' claim ripe because
the "*gravamen of the suit is economic injury rather than threatened
prosecution*."  Id.  Moreover, the "prudential" requirements of Article
III-fitness for judicial resolution and the hardship suffered by the
trappers-were satisfied.  Id. at 857.  The court reasoned that "more
specific facts surrounding possible actions to enforce the statute will
not aid resolution" of the case and the trappers' economic injury would
continue "[f]or so long as they refrained from trapping."  Id.

1    Plaintiffs are in exactly the same situation that the trappers in

2  <u>Davis</u> were.  Each day, they are losing sales because of Section 25982.

3  Moreover, this is not a case in which specific facts from an

4  enforcement action would aid resolution.  Thus, Plaintiffs' claims are

5  ripe and this Court properly has jurisdiction.

6

7    **B.    Vagueness**

8

9    Plaintiffs contend that the definition of "force-feeding" is

10  unconstitutionally vague.  Br. in Supp. 10-11.  Though the definition

11  of "force feeding" provided in Section 25980 uses language that does

12  not lend itself to perfect clarity (especially the phrase "typical bird

13  of the same species"), the term "force feeding" itself is sufficiently

14  clear to give a "person of ordinary intelligence a reasonable

15  opportunity to know what is prohibited, so that he may act

16  accordingly."  <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).

17

18    1.    <u>Legal Standard</u>

19

20    "It is a basic principle of due process that an enactment is void

21  for vagueness if its prohibitions are not clearly defined."  <u>Grayned</u>,

22  408 U.S. at 108.  Vague laws

23    offend several important values.  First, because we assume
     that man is free to steer between lawful and unlawful conduct,
24    we insist that laws give the person of ordinary intelligence
     a reasonable opportunity to know what is prohibited, so that
25    he may act accordingly.  Vague laws may trap the innocent by
     not providing fair warning.  Second, if arbitrary and
26    discriminatory enforcement is to be prevented, laws must
     provide explicit standards for those who apply them.  A vague
27    law impermissibly delegates basic policy matters to policemen,
     judges, and juries for resolution on an ad hoc and subjective

28

1   basis, with the attendant dangers of arbitrary and
2   discriminatory application.

3   Id. at 108-09.

4

5   However, the "degree of vagueness tolerated by the Constitution
6   depends in part on the nature of the enactment." Craft v. Nat'l Park
7   Serv., 34 F.3d 918, 922 (9th Cir. 1994). Thus, the Supreme Court has
8   held that "economic regulation is subject to a less strict vagueness
9   test because its subject matter is often more narrow, and because
10  businesses, which face economic demands to plan behavior carefully, can
11  be expected to consult relevant legislation in advance of action."
12  Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S.
13  489, 498 (1982). Similarly, statutes that impose only civil penalties
14  are reviewed for vagueness with "somewhat greater tolerance than one
15  involving criminal penalties because the consequences of imprecision
16  are less severe." Craft, 34 F.3d at 922 (internal citations and
17  quotation marks omitted). A scienter requirement may also "mitigate
18  vagueness." Id. Finally, "'perhaps the most important factor
19  affecting the clarity that the Constitution demands of a law is whether
20  it threatens to inhibit the exercise of constitutionally protected
21  rights,' in which case a more stringent vagueness test applies." Id.
22  (quoting Hoffman Estates, 455 U.S. at 499).

23

24      2.   Discussion

25

26  Section 25982 bars the sale of products that are "the result of
27  force feeding a bird for the purpose of enlarging the bird's liver

28

beyond normal size."  Cal. Health & Safety Code § 25982.   Force-feeding is defined as "a process that causes the bird to consume more food than a typical bird of the same species would consume voluntarily."  Health & Safety Code § 25980.  Methods of force-feeding include, but are not limited to, "delivering feed through a tube or other device inserted into the bird's esophagus."  Id.

Plaintiffs argue that the phrase "more food that a typical bird of the same species" provides "no intelligible measure by which a birds' food consumption is to be assessed."  Br. in Supp. 11.  This argument omits key terms and phrases that clarify this somewhat ambiguous phrase: indeed, this is a case where less would have been more.  Most importantly, the statute bans the sale of products that are the result of "force-feeding."  That term is self-explanatory: it is the "forcible administration of food."  MERRIAM-WEBSTER'S DICTIONARY.  Section 25980 provides further clarity by giving examples of force-feeding methods, such as "delivering feed through a tube or other device inserted into the bird's esophagus."  This language provides enough guidance to give a person "of ordinary intelligence a reasonable opportunity to know what is prohibited."  Demanding more risks ignoring the Supreme Court's warning that the due process clause should not be used to create an "insuperable obstacle to legislation" that demands perfect clarity and precise guidance.  U.S. v. Petrillo, 332 U.S. 1, 7 (1947); Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2719 (2010) (quotations and citations omitted) ("But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.") (internal citations and quotation marks omitted).

Plaintiffs contend that Section 25982 is "especially invidious" when it comes to "sellers of duck or goose products" like Hot's or Gauge Outfitters-businesses that buy duck products but are not involved in raising them. Plaintiffs claim that such businesses "have no idea how much-let alone for what purpose-any particular duck of goose may have been fed." Br. in Supp. 14. This argument misses the purpose of the vagueness inquiry. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the *indeterminacy of precisely what that fact is*." <u>United States v. Williams</u>, 553 U.S. 285, 306 (2008) (emphasis added). Though it may be difficult to determine where a particular duck liver, breast, or feather came from, it is clear that the government must prove that at least some portion of the product being sold come from a bird that was force fed for the purpose of enlarging its liver. Section 25982's application does not depend on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." <u>Id.</u>

Moreover, Section 25982 is the type of statute that can tolerate a greater degree of vagueness. First, and most importantly, the law does not "inhibit the exercise of constitutionally protected rights." <u>Craft</u>, 34 F.3d at 922. Second, Section 25982 imposes only civil penalties. Third, the law regulates economic activity, giving Plaintiffs, who "face economic demands to plan behavior carefully," the opportunity to "consult relevant legislation in advance of action."

<u>Hoffman Estates</u>, 455 U.S. at 498.   Indeed, Plaintiffs have had seven and a half years to plan for Section 25982 and to determine exactly what it would apply to.   Moreover, as Plaintiffs' own declarations indicate, the business community appears to understand what "force-feeding" means.   In the exhibits attached to Plaintiff Gauge Outfitter's Co-Owner David Craycraft's Declaration, outerwear providers North Face and Patagonia each indicate on their websites that they have taken steps to ensure that the down feathers they use in their products are not the product of "force fed" birds.   The fact that businesses use this term lends further credence to the notion that it gives consumers enough notice of what, exactly, Section 25982 prohibits.

For these reasons, Plaintiffs do not raise serious questions going to the merits on their vagueness challenge.


        **C.   The Dormant Commerce Clause**


     Plaintiffs contend that Section 25982 is unconstitutional under the dormant Commerce Clause for three reasons.   First, they argue that it is invalid per se as a direct regulation of interstate commerce; second, that it "wreaks havoc on the federal interest in national uniformity in the market for poultry products;" and third, that it "massively burdens interstate and foreign commerce without advancing

1  any legitimate interest."  Br. in Supp. 14-27.[3]   For the reasons
2  explained below, none raise a serious questions going to the merits.

3

4        1.  Legal Standard

5

6        "The Commerce Clause as written is an affirmative grant of power
7  to Congress to regulate interstate commerce, but from it courts have
8  long inferred a prohibition on state actions limiting interstate
9  commerce."  Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc.
10 v. Brown, 567 F.3d 521, 523 (9th Cir. 2009).  Modernly, the primary
11 role of the dormant Commerce Clause has been to guard against state
12 economic protectionism, "regulatory measures designed to benefit
13 in-state economic interests by burdening out-of-state competitors.'"
14 Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147
15 (9th Cir. 2012) (quoting Dep't of Revenue v. Davis, 533 U.S. 328,
16 337-38 (2008)).  See also C & A Carbone, Inc. v. Town of Clarkstown,
17 511 U.S. 383, 390 (1994) (noting that the "central rationale" of the
18 dormant Commerce Clause "is to prohibit state or municipal laws whose

19

20 ─────────────────
21 [3]Although Plaintiffs' First Amended Complaint includes an allegation
   that Section 25982 is pre-empted by federal law, see FAC ¶¶ 94-101,
22 their motion for preliminary injunction is based only upon vagueness
   and Commerce Clause grounds.  Other than their vagueness challenge,
23 each one of their arguments on the merits is entitled "Commerce
   Clause."  See Br. in Supp. 14, 18, 23.  Plaintiffs' failure to argue
24 pre-emption here may be because their initial complaint did not
   include a pre-emption challenge, and their motion for a preliminary
25 injunction was filed before their First Amended Complaint.  (Dckt. 1,
   51, 54.)  Nonetheless, because Plaintiffs did not raise their pre-
26 emption challenge in their preliminary injunction briefing papers,
27 the Court will consider only the Plaintiffs' vagueness and Commerce
   Clause challenges.
28

object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent.").

In light of this primary purpose, the Ninth Circuit has observed that most regulations that run afoul of the dormant Commerce Clause "do so because of discrimination"; that is, they "impose disparate treatment on similarly situated in-state and out-of-state interests." Harris, 682 F.3d at 1148, 1150.  Such laws are subject to strict scrutiny.  Brown, 567 F.3d at 521.[4]   Thus, for example, the Supreme Court struck down a Maine law that provided a lesser tax benefit to charitable institutions that were "conducted or operated principally for the benefit of persons *who are not residents of Maine*." Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 568, 571 (1997) (internal citations and quotation marks omitted) (emphasis added).  The Court has also consistently struck down facially-neutral laws that have discriminatory effects.  See, e.g. C & A Carbone, 511 U.S. at 386;  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977).

However, the dormant Commerce Clause's reach extends beyond discriminatory laws.  Exactly how and to what extent has not always

---

[4] At one point, both the Supreme Court and the Ninth Circuit have indicated that discriminatory laws are invalid "without further inquiry." Valley Bank of Nev. v. Plus Sys., Inc., 914 F.2d 1186, 1189 (9th Cir. 1990) (quoting Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 578-79 (1986)).  However, more recently, both the Supreme Court and the Ninth Circuit have applied strict scrutiny analysis to discriminatory laws.  See C & A Carbone, 511 U.S. at 392 (1994); Brown, 567 F.3d at 524.

been clear: as "Justice Scalia has candidly observed[,] . . . 'once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a quagmire.'"  Harris, 682 F.3d at 1149 (quoting W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 210 (1994) (Scalia, J., concurring) (internal quotation marks omitted)).  However, at least two distinct lines of inquiry can be discerned out of this "quagmire."  First, state laws that "directly regulate" interstate commerce are, like discriminatory laws, almost always found invalid.  See, e.g. Healy v. Beer Inst., 491 U.S. 324, 336 (1989).  Second, if a state law does not discriminate against nor directly regulate interstate commerce but still "substantially burdens" it, the law will be scrutinized under a more lenient balancing test.  Valley Bank of Nev., 914 F.2d at 1189.  As the Ninth Circuit has noted, only a small number of statutes have been struck down under this balancing test, and those that do usually violate the dormant Commerce Clause because they result in "inconsistent regulation of activities that are inherently national or require a uniform system of regulation."  Harris, 682 F.3d at 1148.

### 2.   Discrimination Against Interstate Commerce

A statutory scheme can discriminate against out-of-state interests in three ways: 1) facially; 2) purposefully; or, 3) in practical effect.  Brown, 567 F.3d at 525 (internal citations and quotation marks omitted).  Plaintiffs do not argue that Section 25982 facially or purposefully discriminates against out-of-state entities, only that its

1   effect is to favor in-state over out-of-state interests.  See Br. in

2   Supp. 23-24.

3

4        Discrimination, the Supreme Court has held, "simply means

5   differential treatment of in-state and out-of-state economic interests

6   that benefits the former and burdens the latter."  Oregon Waste Sys.,

7   Inc. v. Dep't of Envtl. Quality of State of Or., 511 U.S. 93, 99

8   (1994); see also Brown, 567 F.3d at 525 ("To determine whether the laws

9   have a discriminatory effect it is necessary to compare [out-of-state

10  producers] with a similarly situated in-state entity.").  Comparing

11  in-state and out-of-state producers of products that are "the result of

12  force feeding a bird for the purpose of enlarging the bird's liver

13  beyond normal size," it is clear that Section 25982 has no

14  discriminatory effect whatsoever.  In-state and out-of-state producers

15  of both foie gras and other duck products are treated exactly the same

16  under Section 25982.  The statute creates no incentive for consumers to

17  purchase California products that are the "result of force feeding a

18  bird for the purpose of enlarging the bird's liver beyond normal size"

19  over out-of-state ones; it simply bans the purchase of such products

20  altogether.  Put another way, Section 25982's economic impact does not

21  depend on where the items were produced, but rather how they were

22  produced.  To paraphrase the Ninth Circuit, "California treats

23  out-of-state [producers], such as [Plaintiffs], the same as in-state

24  [producers].  The statutes and regulations apply to both."  Brown, 567

25  F.3d at 525.  The fact that most, or even all, of the adverse effects

26  of Section 25982 fall on out-of-state entities does not, alone, render

27  it unconstitutional.  See Exxon Corp. v. Governor of Md., 437 U.S. 117,

28

126-27 (1978) (upholding a Maryland law that barred petroleum producers and refiners from owning retail service stations in Maryland even though all producers and refiners were located out-of-state); Brown, 567 F.3d at 524-25 (upholding a California law impacting mostly out-of-state businesses).

Plaintiffs argue that Section 25982's discriminatory effect is "starting to be felt" because "California customers of Hudson Valley's moulard duck breasts are turning to in-state sellers of similar duck breasts, such as Grimaud Farms."  Br. in Supp. 23-24; Beylier Decl. ¶¶ 14-16; Vanden Broeder Decl. ¶ 8; Cayer Decl. ¶¶ 1-4.  Plaintiffs confuse correlation for causation.  The decision of Hudson Valley's former California customers-Vandif Specialty Foods and Savory Gourmet-to buy duck breasts from California-based Grimaud Farms is neither mandated nor incentivized by Section 25982.  If, for example, Hudson Valley began selling duck breasts from non-force-fed ducks, Section 25982 would give Vandif and Savory Gourmet no additional reason to purchase its goods from Grimaud instead of Hudson Valley.  As stated above, Section 25982's application does not depend on where the goods are made, only how.

Thus, Plaintiffs have not raised a serious question that Section 25982 impermissibly discriminates against out-of-state entities.

20

1                    3.    <u>Direct Regulation of Interstate Commerce</u>

2

3        In determining whether a statute directly regulates interstate

4   commerce, the Supreme Court has "emphasized that the 'practical effect'

5   of a challenged statute is 'the critical inquiry[.]' " <u>S.D. Myers,</u>

6   <u>Inc. v. City & Cnty. of S.F.</u>, 253 F.3d 461, 467 (9th Cir. 2001) (citing

7   <u>Healy</u>, 491 U.S. at 336).  A statute has the "practical effect" of

8   regulating interstate commerce if it "control[s] conduct beyond the

9   boundaries of the State."  <u>Nat'l Collegiate Athletic Ass'n v. Miller</u>,

10  10 F.3d 633, 639 (9th Cir. 1993) (quoting <u>Healy</u>, 491 U.S. at 336).

11  Such statutes violate the Commerce Clause per se.  <u>NCAA</u>, 10 F.3d at

12  639.

13       A law has the practical effect of controlling conduct beyond its

14  borders if it requires individuals or entities who want to engage in

15  business or conduct *entirely* outside of the regulating state to comply

16  with the challenged statute.  Such laws preclude a person or entity

17  from simultaneously being in compliance with the statute and engaging

18  in some activity in another state.  <u>See, e.g.</u>, <u>Healy,</u> 491 U.S. at

19  (1989) ("Forcing a merchant to seek regulatory approval in one State

20  before undertaking a transaction in another directly regulates

21  interstate commerce.") (internal citations and quotation marks

22  omitted).

23

24       Thus, for example, in <u>NCAA v. Miller</u>, the Ninth Circuit struck

25  down a Nevada statue that would have required the NCAA to conduct its

26  enforcement proceedings against illegal recruitment practices according

27  to Nevada law, even when both the practices and proceedings took place

28

1  entirely outside of Nevada.  See NCAA, 10 F.3d at 639.  The Ninth

2  Circuit explained:

3      [I]f a university in state X ("U of X") engaged in illicit
       practices while recruiting a high school quarterback from
4      state Y, the NCAA would have to conduct its enforcement
       proceeding according to Nevada law in order to maintain
5      uniformity in its rules. . . . In this way, the Statue could
       control the regulation of the integrity of a product in
6      interstate commerce that *occurs wholly outside Nevada's*
       *borders*. That sort of extraterritorial effect is forbidden by
7      the Commerce Clause.

8  
9  Id. (emphasis added).

10  
11      Section 25982, by contrast, only bars the sale of products that

12  are the "result of force feeding a bird for the purpose of enlarging

13  the bird's liver beyond normal size" *in California*.  It does not

14  require an individual or business to choose between force feeding a

15  bird in another state and complying with California law; a person or

16  business can do both at the same time.  Accord Kleenwell Biohazard

17  Waste & Gen. Ecology Consultants, Inc. v. Nelson, 48 F.3d 391, 392 (9th

18  Cir. 1995) (upholding a Washington statute that required corporations

19  to get a certificate from the state before collecting medical waste

20  from Washington and hauling it to California); Valley Bank of Nev.,

21  914 F.2d at 1192 (upholding a statute that required out-of-state banks

22  to impose and collect a fee on behalf of a Nevada bank from customers

23  who withdrew cash from it because the customer "making an ATM

24  withdrawal purchases the service while at the ATM in Nevada.").

25  
26      Plaintiffs argue that "the practical effect of Section 25982 is to

27  force out-of-state farmers to comply with the California legislature's

28  illusory feedings standard-and thus directly regulate beyond the

state's borders."  Br. in Supp. 15. This argument mischaracterizes the focus of the "direct regulation" inquiry.  The object is to ensure that state laws do not force businesses, like Plaintiffs, to face the Hobson's choice of engaging in an activity in one state and violating the law at issue.  Such an expansive interpretation of the term "direct regulation" would mean that virtually any regulation of local markets would violate the dormant Commerce Clause.  For example, it would require courts to strike down a growing number of state laws that prohibit the manufacture, sale, or distribution of bottles or cups that contain bisphenol-A, a suspected carcinogen.  See Cal. Health & Safety Code § 108940, Minn. Stat. Ann. § 325F.173, N.Y. Envtl. Conserv. Law § 37-0505.[5]

Thus, Plaintiffs have not raised a serious question that Section 25982 directly regulates interstate commerce.

---

[5] Plaintiffs point to one case from the Eastern District of California in support of their interpretation of "direct regulation."  In Rocky Mountain Farmer Union v. Goldstene, 843 F. Supp. 2d 1071 (E.D. Cal. 2011), the Court found that California's Low Carbon Fuel Standard (LCFS) directly regulated interstate commerce, and granted a preliminary injunction enjoining enforcement of the LCFS.  However, the Ninth Circuit has stayed the enforcement of the preliminary injunction.  See No. 12-1531 Dckt. 54.  Moreover, the Court in Rocky Mountain also found that the LCFS discriminated against interstate commerce, which, as explained above, Section 25982 does not.  See Rocky Mountain, F.Supp.2d at 1090.

4.   Other Substantial Burdens on Interstate Commerce and

    *Pike* Balancing

    Section 25982 therefore has only an "indirect effect[] on
interstate commerce and regulates evenhandedly." Valley Bank of Nev.,
914 F.2d at 1189.  Such regulations are only struck down if 1) they
impose a substantial burden on interstate commerce; and, 2) the burden
they impose is "'clearly excessive in relation to the putative local
benefits.'" S.D. Myers, Inc., 253 F.3d at 471 (quoting Pike v. Bruce
Church, Inc., 397 U.S. 137, 142 (1970).  If there is a legitimate
local purpose, then the extent of the burden on interstate commerce
that will be tolerated depends on both the nature of the local interest
involved and on whether it could be promoted as well with a lesser
impact on interstate activities. Pac. Nw. Venison Producers v. Smitch,
20 F.3d 1008, 1014 (9th Cir. 1994).  In conducting this analysis, "the
Supreme Court has frequently admonished that courts should not
second-guess the empirical judgments of lawmakers concerning the
utility of legislation." Id. at 1017 (internal citations and quotation
marks omitted).  This fact-intensive inquiry requires the *Plaintiffs*,
as the party challenging the statute, to "establish that the burdens
that the regulation imposes on interstate commerce clearly outweigh the
local benefits arising from it." Kleenwell, 48 F.3d at 399.

    As a threshold manner, Plaintiffs must establish that despite its
non-discriminatory character, Section 25982 substantially burdens
interstate commerce.  See Harris, 682 F.3d at 1148, 1155, 1157.
Plaintiffs have not raised a serious question that it will.  Most laws

that impose a substantial burden on interstate commerce do so because they are discriminatory.  <u>See</u> <u>Harris</u>, 682 F.3d at 1148 (noting that a critical requirement for proving a violation of the dormant Commerce Clause is that there must be a "*substantial burden on interstate commerce*" and that "[m]ost regulations that run afoul of the dormant Commerce Clause do so because of discrimination . . . ."). As discussed above, <u>see</u> <u>supra</u> Part IV.C.2, Section 25982 is not.  Second, unlike the "small number" of non-discriminatory statutes that have run afoul of the dormant Commerce Clause, Section 25982 does not undermine a market that is "inherently national or require[s] a uniform system of regulation." <u>Id.</u> at 1148.  <u>Cf.</u> <u>Bibb v. Navajo Freight Lines, Inc.</u>, 359 U.S. 520, 522-23 (1959) (conflict in state laws governing truck mud flaps); <u>S. Pac. Co. v. Ariz. ex rel. Sullivan</u>, 325 U.S. 761, 763 (1945) (train lengths).[6]

Third, although Plaintiffs allege that Section 25982 will result in the loss of over $5 million in "interstate and foreign sales of wholesale foie gras and moulard duck products," Br. in Supp. 25, this

---

[6] Plaintiffs argue at length that the PPIA demonstrates that there is a "federal interest in national uniformity in the market for poultry products." Br. in Supp. 19, 19-22. However, the mere fact that Congress also regulates the poultry industry does not elevate the market for foie gras into an inherently national one that requires a uniform system of regulation.  If that were the case, then the reach of the dormant Commerce Clause would be virtually limitless, extending to all areas in which Congress has articulated detailed regulations.  Moreover, as noted above, Plaintiffs did not argue that Section 25982 is preempted in their motion for a preliminary injunction.  <u>See</u> <u>supra</u> note 3.

figure overestimates Section 25982's impact.[7]  The $5 million figure

used by Plaintiffs includes both foie gras and "other moulard duck

products"; however, as Plaintiffs' own declarations demonstrate,

consumers of products other than foie gras, such Vandif Specialty Foods

and Savory Gourmet, have found suitable replacements in the market.

See Beylier Decl. ¶¶ 14-16, Vanden Broeder Decl. ¶ 8.  Finally, as the

Ninth Circuit recently held, a significant burden on interstate

commerce does not exist "merely because a non-discriminatory regulation

precludes a preferred, more profitable method of operation in a retail

market."  Harris, 682 F.3d at 1154.  Here, the evidence may show that

Section 25982 only precludes a "more profitable method of

operation"-force feeding birds for the purpose of enlarging its

liver-rather than affecting the interstate flow of goods.  If so,

Section 25982 would not substantially burden interstate commerce, thus

---

[7] In cursory fashion, Plaintiffs also argue that Section 25982
unconstitutionally burdens foreign commerce, citing to South-Central
Timber Development, Inc. v. Wunnicke, 467 U.S. 82 (1984).  See Br. in
Supp. 26.  The plurality in Wunnicke, however, found the regulations
at issue to be protectionist because they required "business
operations to be performed in the home State that could more
efficiently be performed elsewhere." Id. at 100.  Section 25982 has
no similar protectionist effect.  Moreover, state laws that affect
foreign commerce are only subject to additional scrutiny if they
"impair uniformity in an area where federal uniformity is essential
or implicate matters of concern to the whole nation . . . . such as
the potential for international retaliation." Smitch, 20 F.3d at
1014 (internal citations and quotation marks omitted).  Plaintiffs'
general citations to the PPIA and foie gras's presence on the U.S.-
Canada Harmonized Tariff Schedule are not enough to make the market
for foie gras one in which "federal uniformity is *essential*" or one
that implicates "matters of concern to the *whole* nation."  Thus, it
is appropriate to "analyze the burden on foreign commerce in the same
manner [as] the burden on interstate commerce." Id.

rendering it constitutional without having to engage in Pike balancing. _Id._

Moreover, Plaintiffs have not raised a serious question that Section 25982's burden "clearly exceeds" its local benefits.  It is worth reiterating that Plaintiffs must establish that Section 25982's burden on interstate commerce clearly exceed its local benefits, both at this early stage and should this case reach the merits.  They have not done so here.  Preventing animal cruelty in California is clearly a legitimate state interest.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 538 (1993); see also United States v. Stevens, 130 S.Ct. 1577, 1585 (2010) ("[T]he prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies.").  The State has chosen to pursue this interest both by outlawing the actual practice of force-feeding birds for the purpose of enlarging their livers (Section 25981) and the sale of such products (Section 25982), and Plaintiffs have presented no evidence that Section 25982 is an ineffective means of advancing that goal.  Furthermore, the only alternative Plaintiffs offer to Section 25982 is the passage of a statewide resolution in which California would "express its disfavor for particular farming practices."  Br. in Supp. 26.  This option, at least at first blush, appears to do little to advance California's interest in preventing animal cruelty.  Plaintiffs have thus failed to raise a serious question that Section 25982's burden on interstate commerce "clearly exceeds" its local benefits.

**V.   BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST**

Moreover, Plaintiffs have not carried their burden of demonstrating that the balance of equities tip *sharply* in their favor. Plaintiffs argue that while they are losing $360,000 a month in sales-losses they will be unable to recover due to the State's Eleventh Amendment immunity-the State "suffer[s] no real consequence from an injunction."  Br. in Supp. at 28.  Plaintiffs point to the fact that they are not challenging Section 25981, which bars the force-feeding of birds in California, and thus claim that the State "cannot claim that [it]-let alone any duck in California-will suffer any hardship as a result of a preliminary injunction[]" of Section 25982.  Br. in Supp. 28-29.

Even assuming that the State's only legitimate interest is preventing the force-feeding of birds in California, Plaintiffs overestimate the harm that Section 25982 is causing them while underestimating the harm granting an injunction would impose on the State.  As discussed above, the $360,000 a month figure is likely greater than the actual impact Section 25982 is having because it includes duck products other than foie gras that are readily available in the market.  Moreover, although Section 25981 does bar the actual practice of force-feeding birds in California, Section 25982 provides an additional deterrent to California-based force feeders by banning the sale of these products.

More importantly, the public's interest does not weigh in favor of granting a preliminary injunction. There is a direct correlation between the economic losses imposed on Plaintiffs and other sellers by Section 25982 and the number of birds that will not be force-fed. Moreover, given that Plaintiffs are unlikely to succeed on the merits, Plaintiffs' argument that it is "'in the public interest to terminate the unconstitutional application' of a statute" is inapplicable. Br. in Supp. 29 (quoting Levine v. Fair Political Practices Comm'n, 222 F. Supp. 2d 1182, 1191 (E.D. Cal. 2002)).

**VI.   CONCLUSION**

For the reasons put forward in this Order, Plaintiffs' motion for preliminary injunction is DENIED.


IT IS SO ORDERED.


DATED: September 28, 2012

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE