Michael Tenenbaum, Esq. (No. 186850)
*mt@post.harvard.edu*
THE TENENBAUM LAW FIRM
1431 Ocean Ave., Ste. 400
Santa Monica, CA 90401
Tel    (310) 919-3194
Fax    (310) 919-3727

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ASSOCIATION DES ÉLEVEURS DE CANARDS ET D'OIES DU QUÉBEC, a Canadian nonprofit corporation; HVFG LLC, a New York limited liability company; and HOT'S RESTAURANT GROUP, INC., a California corporation;<br><br>                    Plaintiffs,<br><br>      – against –<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California;<br><br>                    Defendant. | Case No. 2:12-cv-05735-SVW-RZ<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL PREEMPTION CLAIM**<br><br><br>Date:         July 14, 2014<br>Time:        1:30 p.m.<br>Courtroom:  6<br><br>Hon. Stephen V. Wilson |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF MOTION ............................................. 1

STATEMENT OF RELEVANT FACTS ........................................................... 3

    A.    The Federal Poultry Products Inspection Act Preempts State Regulation of the Composition or Ingredients of Any Poultry Product Sold in the United States ............................................. 3

    B.    Federal Law Establishes the Definitive Standards and Ingredients for Foie Gras Products ........................................................... 5

    C.    Plaintiffs' Wholesome, USDA-Approved Poultry Products Fully Comply with the Federal Requirements ......................................... 8

    D.    Section 25982 Purports to Require that Plaintiffs' Poultry Products Be Made From Non-Force-Fed Ducks ......................................... 9

ARGUMENT ............................................................................................. 11

I.    The Legal Standard for Summary Judgment .................................... 11

II.    The Doctrine of Federal Preemption Recognizes that Congress May Preempt State Law In Multiple Ways. ................................................. 11

III.    The PPIA Expressly Preempts § 25982 Because California's Requirement that Poultry Products May Only Be Sold if Made from Non-Force-Fed Ducks Is "In Addition To, or Different Than" the Ingredient Requirements for Foie Gras under Federal Law ............................... 13

    A.    The Preemptive Language of the PPIA Has Been Held to Invalidate at Least One Other State's Attempt to Impose a "Higher" Standard on a USDA-Approved Meat Product ................................... 15

    B.    Courts Routinely Declare Even the Most Well-Intentioned State Laws Preempted under the PPIA's Express Preemption Clause .......... 18

IV.    Section 25982 is Also Impliedly Preempted by the PPIA Because Federal Regulation Pervasively Occupies the Field of Poultry Product Ingredients and Because § 25982 Stands as an Obstacle to Ensuring the Uniform Availability of Poultry Products in the Nation's Food Supply ...................... 20

    A.    Field Preemption .............................................................. 21

    B.    Obstacle Preemption ......................................................... 22

CONCLUSION .......................................................................................... 25

- i -

# TABLE OF AUTHORITIES

**Cases**                                                      **Page**

*Altria Group, Inc. v. Good*,
    555 U.S. 90 (2009)................................................................12

*American Meat Institute v. Leeman*,
    180 Cal.App.4th 728, 735 (Cal. Ct. App. 2009)................................20

*Armour and Company v. Ball*,
    468 F.2d 76 (6th Cir. 1972)......................................... 2, 15-16, 18, 21

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
    729 F.3d 937 (9th Cir. 2013)................................................10

*Barnes v. Campbell Soup Company*,
    2013 WL 5530017 (N.D. Cal. Jul. 25, 2013) ................................20

*Bushie v. Stenocord Corp.*,
    460 F.2d 116 (9th Cir. 1972)................................................11

*Campbell v. Hussey*,
    368 U.S. 297 (1961)................................................................21-22

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992)

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................11-12

*Del Real, LLC v. Harris*,
    966 F.Supp.2d 1047 (E.D. Cal. 2013) ................................18

*English v. General Electric Co.*,
    496 U.S. 72 (1990)

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)................................................................17

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995)................................................................21

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL
PREEMPTION CLAIM

*Gade v. Nat'l Solid Wastes Mgmt. Assoc.*,
    505 U.S. 88 (1992)............................................................................21

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)............................................................................24

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977)..........................................................................25

*Kenney v. Glickman*,
    96 F.3d 1118 (8th Cir. 1996)............................................................16

*Kraft Foods North America, Inv. v. Rockland County Dep't of Weights and Measures*,
    2003 WL 554796 (S.D.N.Y. Feb. 26, 2003) ....................................20

*Kuenzig v. Hormel Foods Corp.*,
    505 Fed.Appx. 937 (11th Cir. 2013) ................................................20

*Meaunrit v. The Pinnacle Food Groups, LLC*,
    2010 WL 1838715 (N.D. Cal. May 5, 2010)....................................20

*Mississippi Poultry Ass'n, Inc. v. Madigan*,
    31 F.3d 293 (11th Cir. 1994)............................................................22

*Nat'l Broiler Council v. Voss*,
    44 F.3d 740 (9th Cir. 1994)..........................................................12-13

*Nat'l Meat Ass'n v. Harris*,
    132 S.Ct. 965 (2012) .....................................................................2, 19

*Northwestern Selecta, Inc. v. Munoz*,
    106 F.Supp.2d 223 (D. Puerto Rico 2000) .......................................19

*People v. Southern Pac. Co.*,
    208 Cal.App.2d 745 (Cal. Ct. App. 1962) .......................................24

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)....................................................................12, 21

*Tarin v. County of Los Angeles*,
    123 F.3d 1259 (9th Cir. 1997)..........................................................11

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL PREEMPTION CLAIM

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013)...................................................................11

*Zogenix, Inc. v. Patrick*,
    2014 WL 1454696 (D. Mass. Apr. 15, 2014) ....................................23

**Statutes, Regulations, and Rules**

**Federal**

21 U.S.C. § 451 .............................................................................3, 23-24

21 U.S.C. § 452 ...............................................................................................3

21 U.S.C. § 453 ...................................................................................4, 8, 9, 13

21 U.S.C. § 457 ...............................................................................................4

21 U.S.C. § 458 ..........................................................................................4, 8

21 U.S.C. § 463 ...............................................................................................5

21 U.S.C. § 466 ...............................................................................................4

21 U.S.C. § 467e ...................................................................................*passim*

21 U.S.C. § 678 .............................................................................................16

9 C.F.R. § 300.2 ...............................................................................................4

9 C.F.R. § 300.4 ...............................................................................................4

9 C.F.R. § 381.1 .................................................................................3, 4, 9, 13

9 C.F.R. § 381.133 ..........................................................................................8

9 C.F.R. § 381.155 ..........................................................................................5

9 C.F.R. § 381.190 ..................................................................................4, 8, 15

9 C.F.R. §§ 381.195 ........................................................................................4

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL
PREEMPTION CLAIM

Fed. R. Civ. P. 56 ................................................................................11

   **State**

Cal. Health & Safety Code § 25980 ....................................................9

Cal. Health & Safety Code § 25981 ................................................2, 9

Cal. Health & Safety Code § 25982 .............................................*passim*

Cal. Health & Safety Code § 25983 ...................................................10

Cal. Health & Safety Code § 122320(c) .............................................7


**Other Authorities**

*Code rural et de la pêche maritime*, Art. L654-27-1 ...........................7

USDA Policy Memo 076, dated Sep. 21, 1984................................6, 7, 13

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL
PREEMPTION CLAIM

Plaintiffs Association des Éleveurs de Canards et d'Oies du Québec (the "Canadian Farmers"), HVFG LLC ("Hudson Valley"), and Hot's Restaurant Group, Inc. ("Hot's Kitchen"), submit this brief in support of their motion for summary judgment on their claim for declaratory and permanent injunctive relief to prevent the enforcement of § 25982 of the California Health and Safety Code on the ground that § 25982 is preempted by federal law as applied to Plaintiffs' USDA-approved poultry products containing foie gras.  (SAC ¶¶ 111-21.)

## INTRODUCTION AND SUMMARY OF MOTION

Federal law not only governs the premises, facilities, and operations of slaughter-houses in which meat and poultry animals are processed for human consumption in this country.  Federal law also governs the marking, labeling, packaging, and *ingredient* requirements for every meat and poultry product sold as food in the United States. Under the Federal Meat Inspection Act (the "FMIA") and the Poultry Products Inspection Act (the "PPIA"), Congress empowered the United States Department of Agriculture (the "USDA") to establish the standards of identity or composition and ingredient requirements for all meat and poultry products sold in America.

Moreover, Congress has provided that compliance with the USDA's uniform ingredient requirements for poultry products *expressly preempts* any State laws that would impose any additional requirements — whether the product be an ordinary sausage or the finest foie gras.  Section 467e of the PPIA declares Congress's intent in unmistakable terms:  "[I]ngredient requirements … *in addition to, or different than*, those made under this chapter may not be imposed by any State … with respect to articles prepared at any official establishment in accordance with the requirements under" the PPIA.

As relevant to this case, the federal government establishes the ingredient requirements for poultry products containing foie gras.  Foie gras is defined as follows: "Goose liver and duck liver foie gras (fat liver) are obtained *exclusively from specially fed and fattened geese and ducks*."  This is no arbitrary definition but, rather, reflects

- 1 -

1    a longstanding agreement between the United States and the government of France, i.e.,

2    following international negotiations that only the federal government can undertake.

3    Relying on the French standards, federal law defines the ingredient requirements of no

4    less than 14 poultry products that are made with foie gras, ranging from "Whole Duck

5    Foie Gras" to "Pate of Duck Liver."

6            Against this federal backdrop, the California Legislature passed California Senate

7    Bill 1520 in 2004, which added Sections 25981 – 25984 to the California Health and

8    Safety Code, with an effective date of July 1, 2012.  In violation of the Supremacy

9    Clause, § 25982 purports to impose an "additional" and "different" requirement on

10   poultry products sold in California.  Specifically, § 25982 provides that a poultry

11   product may only be sold if it is not the result of force feeding a bird.  (SB 1520 defines

12   a "bird" to include a "duck or goose,"  and "force feeding" is defined to mean causing

13   a bird to consume "more food than a typical bird of the same species would consume

14   voluntarily.")  Defendant — as well as the author of the bill, the governor who signed

15   it, and the Ninth Circuit — insists that foie gras may continue to be sold in California

16   but only if it is made from the liver of a non-force-fed duck.  But federal law does not

17   include any such requirement, and the PPIA thus expressly preempts § 25982.

18          Countless cases recognize the PPIA's preemptive effect on even the most well-

19   intentioned state laws.  When the State of Michigan tried to impose what it believed to

20   be a "higher" standard on the sale of sausage in that State, the Sixth Circuit in *Armour*

21   *and Company v. Ball*, 468 F.2d 76 (6th Cir. 1972), recognized the law as preempted

22   under language identical to that in the PPIA.  Indeed, in addressing the scope of the

23   same preemption clause just two years ago, the Supreme Court even rejected the notion

24   that "states are free to decide which animals may be turned into meat," *Nat'l Meat*

25   *Ass'n v. Harris*, 132 S.Ct. 965, 973 (2012) ("We think not."), and instead declared a

26   California statute banning both the allegedly "inhumane" slaughter of non-ambulatory

27   pigs and sale of the resulting meat to be soundly preempted by USDA regulations.  In

28   light of the PPIA's "comprehensive" regulation of the uniform standards for poultry

- 2 -

1   products to ensure their availability in the food supply, § 25982 must also give way
2   under the doctrines of field and obstacle preemption.

3     Since July 2012, Plaintiffs have faced prosecution in California — and only in
4   California — for the sale of their USDA-approved products containing foie gras as a
5   result of § 25982's "additional" and "different" requirement that they be made from the
6   livers of non-force-fed ducks.  Plaintiffs have already suffered millions of dollars in lost
7   sales on account of this law, which this Court recognized as causing them irreparable
8   harm.  Plaintiffs respectfully request that the Court now grant summary judgment on
9   their preemption claim and enter a permanent injunction against the enforcement of
10  § 25982 as applied to Plaintiffs' USDA-approved poultry products containing foie gras.

## STATEMENT OF RELEVANT FACTS

### A. The Federal Poultry Products Inspection Act Preempts State Regulation of the Composition or Ingredients of Any Poultry Product Sold in the United States.

14    Congress passed the Poultry Products Inspection Act (the "PPIA") in 1957 to
15  ensure uniform federal regulation of poultry products and to assure that poultry
16  products distributed to the public are "wholesome, not adulterated, and properly
17  marked labeled, and packaged."  21 U.S.C. §§ 451 *et seq.*  Congress declared that
18  "poultry products are an important source of the Nation's total supply of food" and
19  deemed all poultry products to be "in interstate or foreign commerce."  *Id.*  Congress
20  further emphasized that "regulation by the Secretary of Agriculture and cooperation by
21  the States … are appropriate to *prevent and eliminate burdens upon such commerce*, to
22  effectively regulate such commerce, and to protect the health and welfare of
23  consumers."  21 U.S.C. § 451 (emphasis added).

24    Section 452 of the PPIA declares "the policy of the Congress" to provide for the
25  inspection of poultry products and to "otherwise regulate the processing and
26  distribution of such articles as hereinafter prescribed to prevent the movement or sale in
27  interstate or foreign commerce of, or the burdening of such commerce by, poultry
28  products which are adulterated or misbranded."  21 U.S.C. § 452; 9 C.F.R. § 381.1(b).

A poultry product is deemed "adulterated" if, *inter alia*, "any valuable constituent has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor." 21 U.S.C. § 453(g)(8); 9 C.F.R. § 381.1(b). A poultry product is "misbranded" if, *inter alia*, "if it purports to be or is represented as a food for which a definition and standard of identity or compensation has been prescribed by regulations of the Secretary [of Agriculture] under section 457 of this title unless," *inter alia*, "it conforms to such definition and standard[.]" 21 U.S.C. § 453(h)(6), (i).

Under section 457 of the PPIA, the Secretary of Agriculture, "whenever he determines such action is necessary for the protection of the public, may prescribe ... definitions and standards of identity or composition [f]or articles subject to this chapter[.]" 21 U.S.C. § 457(b)(2). Federal regulations further reflect that the Secretary of Agriculture has delegated to the Administrator of the Food Safety and Inspection Service (the "FSIS") within the USDA "the responsibility for exercising the functions of the Secretary of Agriculture under various statutes[.]" 9 C.F.R. §§ 300.2(a), 300.4(a).

As part of its comprehensive regulation of poultry products, Congress also regulates the *sale* of poultry products in commerce. The PPIA provides that "[n]o person shall ... sell ... [or] offer for sale ... any poultry products which are capable of use as human food and are adulterated or misbranded at the time of such sale ... or offer for sale." 21 U.S.C. § 458(a)(2); 9 C.F.R. § 381.190(b)(1). Also, no poultry products may be imported into the U.S. "unless they are healthful, wholesome, fit for human food, not adulterated, and contain no ... ingredient which renders them unhealthful, unwholesome, adulterated, or unfit for human food" — and also comply with all other rules and regulations for poultry products produced here. 21 U.S.C. § 466(a), (d); 9 C.F.R. §§ 381.195 *et seq.* In other words, federal law governs what domestic or foreign poultry products may be sold in the U.S. and mandates that they include all "valuable constituents," contain all conforming "ingredients," and meet the "definition and standard of identity or compensation" established by the USDA. The PPIA directs the

- 4 -

1 Secretary of Agriculture to "promulgate such other rules and regulations as are necessary
2 to carry out the provisions of this chapter."  21 U.S.C. § 463(b).

3       Most relevant here, Congress has expressly placed the regulation of the ingredient
4 requirements for all poultry products within the exclusive domain of the USDA and has
5 explicitly prohibited the States from attempting to impose any "additional" or
6 "different" requirements.  Specifically, to ensure national uniformity, the PPIA was
7 amended in 1968 by the passage of the Wholesome Poultry Products Act, Pub. L. No.
8 90-492 (Aug. 18, 1968), to include an express preemption provision:

> Marking, labeling, packaging, or ***ingredient requirements*** (or storage or
> handling requirements found by the Secretary to unduly interfere with the
> free flow of poultry products in commerce) ***in addition to, or different
> than***, those made under this chapter ***may not be imposed by any State*** …
> with respect to articles prepared at any official establishment in accordance
> with the requirements under this chapter[.]

13 21 U.S.C. § 467e (emphasis added).  The PPIA does not "preclude any State … from
14 making requirement or taking other action, *consistent with this chapter*, with respect to
15 any other *matters regulated under this chapter.*"  *Id.* (emphasis added).

16  **B.    Federal Law Establishes the Definitive Standards and Ingredients for
17         Foie Gras Products.**

18       As authorized by Congress, the USDA has established the ingredient requirements
19 for virtually every poultry product, ranging from *arroz con pollo* to turkey chops.
20 USDA regulations authorize the Administrator "to establish ***specifications or***
21 ***definitions and standards of identity or composition***, covering the ***principal***
22 ***constituents*** of any poultry product with respect to which a specified name of the
23 product or other labeling terminology may be used, whenever he determines such action
24 is necessary to prevent sale of the product under false or misleading labeling."  9 C.F.R.
25 § 381.155(a)(1) (emphasis added).  But the Administrator's power under the federal
26 regulations goes beyond mere labeling and is intended to serve the broader interest of
27 public protection.  "Further, the Administrator is authorized to prescribe ***definitions***
28 ***and standards of identity or composition*** for poultry products whenever he

determines such action is otherwise necessary for the protection of the public." *Id.* Pursuant to its congressional authority, the USDA has prescribed such definitions and standards of identity or composition in its Standards and Labeling Policy Book, which establishes standards for no less than 14 poultry products containing foie gras. (*See* Request for Judicial Notice ["RJN"] Ex. A.)

The USDA's definitions and standards for "FOIE GRAS PRODUCTS, DUCK LIVER AND/OR GOOSE LIVER" are among the most detailed in the book.  The starting point is the federal definition and standard for foie gras:  "Goose liver and duck liver foie gras (fat liver) *are obtained exclusively from specially fed and fattened geese and ducks.*"  (RJN Ex. A.)  The USDA's Standards and Labeling Policy Book refers producers to Policy Memo 076, dated September 21, 1984.  (*Id.*)  That Policy Memo, written by the Director of the USDA's Standards and Labeling Division, addresses the following issue:  "What are the standards and labeling requirements for duck liver and/or goose liver 'foie gras' products?"  (RJN Ex. B at p. 1.)  It, too, provides that "[g]oose liver and duck liver foie gras (fat liver) *are obtained exclusively from specially-fed and fattened geese and ducks.*"  (*Id.*)

Policy Memo 076 further explains that the standards for foie gras products have their origin in a petition from the French government and a subsequent agreement between our national governments to follow the French standards and ingredient requirements for these products:

> In 1975, representatives of the French government petitioned the USDA to adopt the French standards for foie gras products.  *An agreement was reached between our respective governments to follow these standards* pending a rulemaking procedure.  Although a rulemaking was not finalized at that time, *over the years the French standards were followed and applied to foie gras products.*
>
> In June of 1980, the French government and trade associations revised their 1973 standards for foie gras products* and requested our renewal and approval of the new regulations.  Since the standards followed over the years for the imported product have become obsolete and the marketing and consumption of these products have become more popular, *SLD has*

- 6 -

*decided to follow these requirements* with some modifications including the English translation of French terms, the requirements for product name qualifiers, and other general policy requirements. *The adoption of these requirements will eliminate confusion and provide a descriptive classification for these products.*

(*Id.* at p. 2 [emphasis added].)[1]

The USDA classifies products in which foie gras is used into the following three classifications based on the minimum content of goose or duck liver foie gras:

(1)    "Whole Goose Foie Gras" and "Whole Duck Foie Gras."  "These are products in which goose liver or duck liver foie gras are the only animal tissues present."

(2)    "Goose Foie Gras," "Duck Foie Gras," "Block of Goose Foie Gras," "Block of Duck Foie Gras," "Parfait of Goose Foie Gras," and "Parfait of Duck Foie Gras."  "These products are composed of a minimum 85 percent goose liver or duck liver foie gras, although 'parfaits' may contain mixtures of goose liver and/or duck liver foie gras."

(3)    "Pate of Goose Liver," "Pate of Duck Liver," "Galantine of Goose

---

[1]    Indeed, French law — which the USDA follows for foie gras products — specifies that foie gras *must* be the result of *gavage*, i.e., a term used in California law for the hand-feeding of birds.  *See* Cal. Health & Safety Code § 122320(c) (defining "hand-feeding" of birds in pet shop to mean "the process by which a bird is manually fed by a human through the use of … oral gavage").  The "revised" standards referenced in the USDA Policy Memo above — and adopted as the "requirements" under American law — were translated at the time to specify: "The 'foie gras' (livers) must *exclusively come from specially crammed* and suitably bleeded geese and ducks." [emphasis added].) (Tenenbaum Decl. ¶ 4 & Exs. B & C.)

In May 1983, i.e., a year before the USDA issued Policy Memo 076, the USDA wrote to the French Embassy "concerning the French regulations for the composition … of imported 'foie gras' products."  (Tenenbaum Decl. ¶ 5 & Ex. D at p. 1.)  In that letter, the USDA indicated that it will "continue to monitor all 'foie gras' products entering this country for compliance with the French regulations" and "will also continue to deny approval for any of these products which are not in compliance with these standards."  (*Id.*)  The Director even referred to the these preliminary decisions by the USDA "as an agreement between our two governments."  (*Id.* at p. 2.)

In 2006, French law codified the definition of foie gras as follows: "Foie gras is a part of the protected cultural and gastronomic heritage of France.  Foie gras means the liver of a duck or of a goose specially fattened by *gavage*."  (RJN Ex. C [*Code rural et de la pêche maritime*, Art. L654-27-1] & Tenenbaum Decl. ¶ 6.)

- 7 -

Liver," "Galantine of Duck Liver," "Puree of Goose Liver," and "Puree of Duck Liver."  "These products must contain a minimum of 50 percent duck liver and/or goose liver foie gras and may also contain a wrapping or stuffing of the lean or fat of pork, veal, or poultry, pork liver, aspic jelly, extenders, and/or binders."

(RJN Ex. A.)  There is no additional requirement that the most valuable constituent ingredient, i.e., the goose or duck liver foie gras, come from a duck that has been fed in any particular way or that has been limited to any quantity of food.

### C.    Plaintiffs' Wholesome, USDA-Approved Poultry Products Fully Comply with the Federal Requirements.

Hudson Valley and the Canadian Farmers produce foie gras products at their facilities in New York and Quebec.  (Henley Decl. ¶ 1-3; Cuchet Decl. ¶¶ 1-3.)  Every one of their foie gras products is prepared in an official establishment, 21 U.S.C. § 453(p), and every one is certified as wholesome by the USDA for sale in the United States.  (Henley Decl. ¶¶ 3-4; Cuchet Decl. ¶¶ 3-5.)  Indeed, the PPIA and USDA regulations would forbid their sale if they were adulterated or misbranded.  21 U.S.C. § 458(a)(2); 9 C.F.R. § 381.190(b)(1).  While federal law authorizes the sale of "single-ingredient" poultry products and all others that conform to the product standards set forth in the USDA's Standards and Labeling Policy Book without agency label pre-approval, 9 C.F.R. § 381.133(a), (b), Hudson Valley and the Canadian Farmers often seek such USDA approval, which requires them to specify the ingredients of each.

For example, before one of the Canadian Farmers, Palmex, started selling its "Whole duck foie gras torchon style" in the United States, it obtained special approval from the USDA based on a listing of ingredients that specified "Duck Foie Gras" as constituting 95.35% of the product formula.  (Cuchet Decl. ¶ 5 & Ex. A.)  Similarly, Hudson Valley obtained USDA approval for its "Mulard Duck Foie Gras" and "Torchon of Moulard Duck Foie Gras" products based on the submission of product formulas that specified the percentage of "Mulard Duck Foie Gras" as the ingredients. (Henley Decl. ¶¶ 5-6 & Exs. A & B.)  The USDA does not impose any requirement that the foie gras in Plaintiffs' products be the result of a non-force-fed duck.

- 8 -

### D. Section 25982 Purports to Require that Plaintiffs' Poultry Products Be Made From Non-Force-Fed Ducks.

Section 25981 of the California Health and Safety Code provides that "[a] person may not force feed a bird for the purpose of enlarging the bird's liver beyond normal size, or hire another person to do so."  Cal. Health & Safety Code § 25981.  By virtue of this provision, the California Legislature has already ensured that no duck or goose will be force fed in California.  Indeed, the only producer of foie gras in California ceased operations in the State before § 25981 took effect on July 1, 2012.  (*See* ECF Dkt. 51-17 [Gonzalez Decl.] at ¶¶ 2-3.)

Section 25982, meanwhile, goes well beyond California's traditional police power of preventing what it perceives as animal cruelty within its borders.  Instead, § 25982 imposes a peculiar requirement on all poultry products sold in California.  There is no question that, in referring to "a bird," the statute applies to Plaintiffs' poultry products, as § 25980(a) provides that a bird "includes, but is not limited to, a duck or goose."  Cal. Health & Safety Code § 25980(a); *see also* 21 U.S.C. § 453(e), (f); 9 C.F.R. 381.1(b).  Section 25982 thus requires that a poultry product "may not be sold in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."  Cal. Health & Safety Code § 25982.

Section 25980(b) defines "force feeding" to mean "a process that causes the bird to consume more food than a typical bird of the same species would consume voluntarily."  Cal. Health & Safety Code § 25980b).  The statute further provides that "[f]orce feeding methods include, but are not limited to, delivering feed through a tube or other device inserted into the bird's esophagus."  *Id.*  In other words, by virtue of these defined terms, § 25982 imposes a unique requirement on the sale of poultry products in California, namely, that the products not be the result of feeding in excess of a particular amount of food or using a particular "process."  If a poultry product meets this special requirement, California allows its sale; if a poultry product does not, California bans its sale and imposes a penalty of up to $1,000 per sale per day.  Cal.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL PREEMPTION CLAIM

1    Health & Safety Code § 25983(b).  (No other State imposes such a requirement.)

2    Everyone from the author of the legislation to the governor who signed it to

3    Defendant Harris herself — and even the Ninth Circuit — has emphasized that § 25982

4    does *not* ban foie gras but that it "merely" seeks to ban foie gras made from force-fed

5    ducks and geese.  Introducing SB 1520 in the California Senate on April 26, 2004,

6    Senator John Burton intoned:  "***This bill has nothing to do***, uh — despite the mail that

7    many of us get from restaurants — ***with banning, uh, foie gras***.  What it does is

8    prohibit, uh, what a process of which most people, uh, consider to be an inhumane of

9    force feeding ducks and geese for the purpose of unnaturally enlarging their liver

10   beyond the normal size."  (Tenenbaum Decl. ¶ 2.)  In his letter to the California State

11   Senate upon signing SB 1520, Governor Arnold Schwarzenegger made clear:  "This

12   bill's intent is to ban the current foie gras production practice of forcing a tube down a

13   bird's throat to greatly increase the consumption of grain by the bird.  ***It does not ban***

14   ***the food product, foie gras.***"  (Tenenbaum Decl. ¶ 3 & Ex. A.)  In her answering brief

15   on Plaintiffs' preliminary injunction appeal, Defendant Harris argued:  "Moreover,

16   section 25982 ***does not ban the sale of all foie gras***, but only the sale of foie gras

17   produced by means of prohibited animal cruelty."  (App. ECF Dkt. 16-1 at ECF p. 51.)

18   And in the portion of its opinion discussing "The Scope of § 25982," the Ninth Circuit

19   explained in our case:  "Section 25982, however, ***does not prohibit foie gras***.  It bans

20   the sale of foie gras produced through force feeding, but would not ban foie gras

21   produced through alternative methods."  *Ass'n des Eleveurs de Canards et d'Oies du*

22   *Quebec v. Harris*, 729 F.3d 937, 945 n.4 (9th Cir. 2013).

23   Based on this additional and different requirement, Plaintiffs fear prosecution of

24   the sale of their wholesome, USDA-approved products in California so long as § 25982

25   remains in effect.  (Cuchet Decl. ¶ 7; Henley Decl ¶ 8; Chaney Decl. ¶¶ 2-4.)[2]

26

27   [2]    Moreover, the District Attorneys of at least three California counties are now
threatening to enforce § 25982 not only against the sale of Hudson Valley's and the

28   Canadian Farmers' products in California but also — going far beyond the limited

- 10 -

## ARGUMENT

## I.  The Legal Standard for Summary Judgment.

The legal standard for summary judgment is well-known to the Court and is thus only summarily recited here.  Rule 56 of the Federal Rules of Civil Procedure requires summary judgment for the moving party when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).  A party may move for summary judgment on a single claim.  Fed. R. Civ. P. 56(a); *Bushie v. Stenocord Corp.*, 460 F.2d 116, 118 n.2 (9th Cir. 1972) (affirming grant of summary judgment on fewer than all claims).

## II.  The Doctrine of Federal Preemption Recognizes that Congress May Preempt State Law In Multiple Ways.

Under the Supremacy Clause of the United States Constitution, "the Laws of the United States" are "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  It is a "fundamental principle of the Constitution [] that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  There are "three classes of preemption":  express preemption, field preemption, and conflict preemption.  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013).

The first, express preemption, "arises when the text of a federal statute explicitly manifests Congress's intent to displace state law."  *Id.* (citations omitted).  Under the second, field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Id.*  Field preemption can be "inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or

language in section 25982 — against the offer for sale and import of those products from other States into California.  (Tenenbaum Decl. ¶ 7.)

where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 1022-23, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Third, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372.  "Conflict preemption, in turn, has two forms:  impossibility and obstacle preemption.  Courts find impossibility preemption 'where it is impossible for a private party to comply with both state and federal law.'  Courts will find obstacle preemption where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 1023 (citations and quotations omitted).

Congressional intent is the "ultimate touchstone of preemption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  Some cases talk of a "presumption against preemption," which should be abandoned in the face of an express preemption clause.  *Cf. Altria Group, Inc. v. Good*, 555 U.S. 90, 98 (2009) (dissent of Justices Thomas, Roberts, Scalia, and Alito) (noting that Court's "reliance on the presumption against pre-emption has waned in the express pre-emption context" and that most decisions since *Cipollone* "have refrained from invoking the presumption in the context of express pre-emption").  In any event, while the "historic police powers of the States" are not superseded unless it is "the clear and manifest purpose of Congress," there is no question that federal law preempts state law where, as here, Congress expresses its intent to preempt through explicit statutory language.

Here, as explained below, the USDA has established the definition and standards for poultry products containing foie gras, and the PPIA explicitly prohibits any State from imposing any "additional" or "different" ingredient requirement for such USDA-approved products.  21 U.S.C. § 467e.  As a result, application of § 25982 to Plaintiffs' federally-regulated poultry products violates the Supremacy Clause.  Federal law provides that foie gras products "are obtained ***exclusively*** from specially fed and fattened geese and duck."  *See National Broiler Council v. Voss*, 44 F.3d 740, 747 (9th

- 12 -

Cir. 1994) (giving "controlling weight to USDA's Policy Memo reflecting agency's construction of PPIA's regulatory scheme"). By requiring that poultry products be made with livers from ducks that are not the result of California's idiosyncratic definition of force feeding, § 25982 imposes an "additional" and "different" ingredient requirement on the sale of Plaintiffs' poultry products and is thus preempted by the PPIA.

## III. The PPIA Expressly Preempts § 25982 Because California's Requirement that Poultry Products May Only Be Sold if Made from Non-Force-Fed Ducks Is "In Addition To, or Different Than" the Ingredient Requirements for Foie Gras under Federal Law.

As the Ninth Circuit has recognized, "The PPIA regulates the distribution and *sale of poultry and poultry products* and contains an express pre-emption clause." *Voss*, 44 F.3d at 743 (emphasis added). As set forth verbatim in the Statement of Relevant Facts above, the PPIA' preemption clause invalidates any "ingredient requirements" that are "in addition to, or different than, those made under" the PPIA if "imposed by any State … with respect to articles prepared at any official establishment in accordance with the requirements of" the PPIA. 21 U.S.C. § 467e. Here, every single one of Hudson Valley's and the Canadian Farmers' products is prepared, as it is required to be, at an official establishment. (Henley Decl. ¶ 3; Cuchet Decl. ¶¶ 3-5.)

As also set forth verbatim above, the USDA establishes the product standards and ingredient requirements for all foie gras products sold in the United States based on an agreement between the American and French national governments. The ingredient requirements for Plaintiffs' "Whole Duck Foie Gras" require that "the only animal tissues present" be duck liver foie gras, and they define duck liver foie gras as "obtained *exclusively from specially fed and fattened geese and ducks*." (RJN Ex. A.) There is absolutely no additional requirement that the livers — the *most* "valuable constituent," *see* 21 U.S.C. § 453(g)(8); 9 C.F.R. § 381.1(b) — be obtained from ducks that were not subject to California's definition of "force feeding." Likewise, the ingredient requirements for Plaintiffs' "Mulard Duck Foie Gras" require that they be "composed of a minimum 85 percent goose liver or duck liver foie gras," again with duck liver foie

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL PREEMPTION CLAIM

1  gras defined by federal law as "obtained exclusively from specially fed and fattened

2  geese and ducks."  There is absolutely no requirement that the livers be those of non-

3  force-fed ducks — or that the ducks have been fed in any particular manner or limited

4  to any particular amount of food.

5       In its highly instructive opinion in *National Broiler Council v. Voss*, 44 F.3d 740

6  (9th Cir. 1994), the Ninth Circuit affirmed summary judgment in favor of an industry

7  association that similarly challenged a California statute as preempted by the PPIA.

8  Section 26661(a)(2) of the California Food and Agricultural Code prohibited a poultry

9  product from being sold as "fresh" if its internal temperature had ever been 26 degrees

10  or below or if it had ever been stored for 24 hours or more at an average temperature

11  of 26 degrees or below.  *Id.* at 743 n.1.  The industry noted that the PPIA had no such

12  requirement and argued that the PPIA's preemption clause as to "marking, labeling,

13  packaging, or ingredient requirements" preempted § 26661.  The Ninth Circuit agreed.

14       The state defendant first tried to argue that, because § 26661 was not phrased as

15  a "requirement" but, instead, as a "prohibition," it was not a "labeling requirement"

16  subject to preemption under the PPIA.  *Id.* at 743.  In our case, Defendant Harris may

17  try to argue the same thing about § 25982, in that it is not phrased as a "requirement"

18  that the ingredients in poultry products sold in California come from non-force-fed

19  ducks but, rather, as a prohibition on the sale of poultry products that are the result of

20  force feeding.  But *Voss* soundly rejects this argument, explaining that "the term

21  'requirements' ordinarily includes prohibitory obligations" and that "there is no

22  practical difference between a command that requires that the opposite of an action be

23  taken … as opposed to one that prohibits the very action."  *Id.*  Indeed, analyzing the

24  PPIA, the Ninth Circuit:  (1) affirmed that "Congress did not intend a distinction

25  between 'requirements' and 'prohibitions,'" (2) emphasized that "the term

26  'requirements' in the PPIA pre-emption clause unambiguously includes prohibitory

27  enactments," and (3) concluded that the prohibition in the California statute imposed a

28  'labeling requirement' within the meaning of § 467e of the PPIA.  *Id.* at 743-45.

- 14 -

The court in *Voss* thus had no trouble recognizing that California's prohibition on the use of the word "fresh" for poultry products was preempted as "in addition to" the requirements under the PPIA, since the plaintiffs had fully complied with federal law (which allowed them to label their poultry products as fresh even if chilled to below 26 degrees). Similarly, Hudson Valley and the Canadian Farmers can produce foie gras products made from the livers of specially fed and fattened ducks in full compliance with all federal requirements for their sale, and they have indeed been doing so with full USDA approval for decades. But § 25982 nevertheless purports to prohibit the sale of Plaintiffs' wholesome products by imposing the "additional" requirement that the ducks not be fed using a tube or not otherwise be fed "more food" than California might wish. Put another way, because § 25982's requirements for the sale of poultry products containing duck liver foie gras are not identical to the USDA's, they are preempted. Indeed, as the Ninth Circuit affirmed in *Voss*, the terms "'[n]ot identical' and 'in addition to, or different than' are not distinguishable under any fair construction of the phrases." *Id.* at 745.

Here, Plaintiffs' foie gras products are inspected and certified as wholesome by the USDA and, because they conform to all federal standards, may be sold without restriction pursuant to § 458(a)(2) of the PPIA. *See also* 9 C.F.R. § 381.190(b)(1). But California's enactment of § 25982 purports to impose an additional and different ingredient requirement on any poultry product made from a duck or goose, namely, that it not be "the result of force feeding for the purpose of enlarging the bird's liver beyond normal size." This requirement is plainly "in addition to," and very "different than" those made by the USDA pursuant to the PPIA. Accordingly, § 25982 is preempted by § 467e of the PPIA.

### A. The Preemptive Language of the PPIA Has Been Held to Invalidate at Least One Other State's Attempt to Impose Ingredient Standards on a USDA-Approved Meat Product.

States have rarely ventured to do what California has done in § 25982 here. But at least one case is on all fours with ours. In *Armour & Co. v. Ball*, 468 F.2d 76 (6th

- 15 -

Cir. 1972), a Michigan statute governed the sale of meat that "has been subjected to a process whereby it has been reduced to minute meat particles," i.e., to create sausage. Just as Plaintiffs in our case seek to enjoin enforcement of § 25982 as to their USDA-approved foie gras products, the plaintiff sausage manufacturers challenged the Michigan law as preempted by the FMIA and sought to enjoin its enforcement as to "sausage manufactured or processed by plaintiffs which has passed federal inspection." *Id.* at 77.  (The express preemption provision in the FMIA is identical to that in the PPIA as to "ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State."  21 U.S.C. § 678.)[3]

The plaintiffs argued that the Michigan law was invalid because "the federal act entirely preempts the field of meat labeling and ingredient requirements." *Id.* at 78.  As with Plaintiffs' USDA-approved duck products here, all of the meat manufacturers' "sausage products shipped into Michigan are subject to federal inspection."  *Id.* at 79.  The court cited the nearly identical provisions in the FMIA as those quoted from the PPIA in the Statement of Relevant Facts above:  the Secretary of Agriculture's authority to prescribe definitions and standards of identify or composition for meat products whenever he determines it "necessary for the protection of the public" and the declaration of a food product as "misbranded" if it does not conform to the definition and standard of identity or composition established by the USDA.  *Id.* at 80.

The court observed that one purpose of the statutory language was to "empower the Secretary to adopt definitions and standards of identify or composition so that the 'integrity' of meat food products could be 'effectively maintained'" and that "[w]ithout such standards it would be impossible to carry out the express congressional policy." *Id.* at 81.  As the court noted, the federal statute delegated to the USDA the authority to prescribe the "ingredients" in meat products — as the PPIA does for poultry products

---

[3]    "The legislative history of the two Acts and subsequent amendments indicate a congressional intent to construe the PPIA and the FMIA consistently."  *Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996)

1  — and "[p]rescribing the 'ingredients' is essential to determine the 'identity' of the

2  finished product and to protect the consumer from 'economic adulteration.'" *Id*. The

3  court concluded that the phrase "'definitions and standards of identity or composition'

4  is the functional equivalent of the term 'ingredient requirements'" found in the

5  preemption provision. *Id*.

6      Michigan claimed to impose a "higher" standard on the sale of sausage in that

7  State. To take just a few examples, it only allowed sausage to be made from certain

8  parts of cattle, swine, or sheep, whereas federal regulations allowed goat meat as an

9  ingredient. The Michigan law required a certain protein content, whereas there was no

10 federal regulation governing protein content. *Id*. at 87. The Michigan statute banned

11 the use of such parts as the animal's heart, liver cracklings, lungs, eyes, lips, ears, or

12 snout in order for the sausage to be saleable in that State, whereas federal regulations

13 permitted all of these ingredients. *Id*. at 86. Yet the Court of Appeals recognized that,

14 even if Michigan's law would have resulted in arguably *more wholesome* sausage, it

15 was still preempted. "The Federal Act itself manifests a congressional intent to

16 prescribe *uniform standards of identity and composition*," and non-conformity with the

17 federal requirements would result in the product being "misbranded." *Id*. at 83.

18 "[T]he congressional purpose to standardize identity and composition of meat food

19 products would be defeated if states were free to require ingredients, however

20 wholesome, which are not within the Secretary's standards." *Id*.

21      Accordingly, the Sixth Circuit had no trouble resolving the "ultimate issue" of

22 whether the ingredient provisions of the Michigan statute were "in addition to, or

23 different than" the USDA regulations, such that Michigan's law would be

24 unenforceable against the plaintiffs' products prepared for shipment in commerce and

25 consequent sale in Michigan. *Id*. The Supreme Court had said in *Florida Lime &*

26 *Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963), that "federal regulation of a

27 field of commerce should not be deemed preemptive of state regulatory power in the

28 absence of persuasive reasons — either that the nature of the regulated subject matter

- 17 -

1   permits no other conclusion, or that the Congress has unmistakably so ordained."  The

2   Court of Appeals in *Armour & Co.* could not have been more emphatic about the

3   preemptive effect of the very language in the FMIA that is found verbatim in the PPIA:

> 4   Thus, by prohibiting a state's imposition of … ["]ingredient requirements"
>     which are "in addition to, or different than [those made by the Secretary],"
> 5   Congress has "unmistakably … ordained" that the Federal Act *fixes the sole*
>     *standards.*  [¶]  ["I]ngredient requirements" prescribed by the Secretary
> 6   *completely preempt* this field of commerce.  [¶]  [A] state would not be
>     permitted to prevent the distribution in commerce of any article that
> 7   "conforms" to the "definition and standard of identity or composition."
>     Thus, *Congress is ordaining uniform national ingredient requirements*
> 8   prescribed by the Secretary.

9   

10  *Id.* at 84 (emphasis added).  For these reasons, the Court of Appeals reversed the district

11  court's denial of summary judgment to the industry; for the same reasons, this Court

12  should grant Plaintiffs' motion and likewise find § 25982 preempted as applied to

13  Plaintiffs' USDA-approved poultry products here.

14  **B.   Courts Routinely Declare Even the Most Well-Intentioned State Laws**
    **Preempted under the PPIA's Express Preemption Clause.**

15  

16  Courts have regularly recognized that the PPIA preempts even the most well-

17  intentioned state laws, even where the state's concern may differ from that of Congress

18  and the USDA.  While our case was pending in the Ninth Circuit on Plaintiffs'

19  preliminary injunction appeal, a federal district court in California granted summary

20  judgment and permanent injunctive and declaratory relief to the plaintiff on a

21  preemption claim against the application of a California statute in *Del Real, LLC v.*

22  *Harris*, 966 F.Supp.2d 1047 (E.D. Cal. 2013).  Del Real sold Mexican poultry dishes

23  packaged in heat and serve containers throughout California.  *Id.* at 1050.  Just as

24  Plaintiffs face prosecution under § 25982 here, several counties threatened Del Real

25  with enforcement of California's "Fair Packaging and Labeling Act"(the "CFPLA"),

26  which the company was alleged to have violated by allowing "nonfunctional slack fill,"

27  i.e., empty space in a package filled to less than its capacity.  *Id.* at 1053-54.

28  The district court recognized that the "FMIA and PPIA comprehensively regulate

- 18 -

1   meat and poultry products, respectively, in order to protect 'the health and welfare of

2   consumers.'" *Id.* at 1052. Even though the Secretary of Agriculture had not directly

3   addressed slack fill, and the PPIA regulations "do not otherwise address any subjects

4   that could arguably be equivalent to the concept," the court observed that federal

5   regulations generally prohibited the sale of any poultry product in a container "filled as

6   to be misleading." *Id.* at 1056-57. Much like Defendant Harris here may argue that

7   the PPIA does not address the feeding of ducks, she argued in *Del Real* that, because the

8   PPIA did not define how to assess nonfunctional slack fill, "the more specific California

9   law does not contravene the federal law." *Id.* at 1057. But, as the district court

10  emphasized, the "key question" is whether the state statute's provisions "constitute

11  'requirements … in addition to, or different than, those made under' the PPIA." *Id.*

12          The court in *Del Real* quoted the Supreme Court's recent ruling that the "FMIA's

13  preemption clause" — which is essentially identical to the PPIA's — "***sweeps widely***

14  …. The clause prevents a State from imposing any additional or different — even if

15  non-conflicting — requirements that fall within the scope of the Act …" *Id.* at 1058

16  (emphasis added), quoting *National Meat Ass'n v. Harris*, 132 S.Ct. 965, 970 (2012).

17  The court went on to explain that California's nonfunctional slack fill prohibition "is

18  simply nonexistent under federal law," *id.* at 1061 — just like California's force-fed

19  duck liver prohibition is simply nonexistent under federal law. The court concluded,

20  "In light of the plain language in the preemption provision, which *National Meat* found

21  to 'sweep broadly,' the CFPLA's slack-fill provisions are 'requirement[s] in addition to

22  or different than' those set forth in the FMIA and PPIA" — and enjoined enforcement

23  of the California statute as preempted by federal law. *Id.* at 1064.

24          In *Northwestern Selecta, Inc. v. Munoz*, 106 F.Supp.2d 223 (D. Puerto Rico

25  2000), an importer of frozen poultry challenged the constitutionality of a Puerto Rico

26  regulation requiring a bird's inspection date to appear on certificates of inspection for

27  poultry products (so that one could determine how much time had elapsed from the

28  "kill date" until arrival in Puerto Rico). The Commonwealth argued that the PPIA did

- 19 -

1   not preempt the entire field and thus did not preclude States' exercise of their police

2   power to enact health and safety regulations.  *Id.* at 225.  Yet the court recognized that,

3   because the inspection date was not required by any federal regulations authorized by

4   the PPIA, Puerto Rico's requirement of a document accrediting such date "imposes a

5   marking requirement in addition to those mandated by federal law" and, to that extent,

6   "is preempted by section 467e of the PPIA."  *Id.* at 230-31.

7         These PPIA preemption cases are legion.  *See, e.g., Barnes v. Campbell Soup*

8   *Company*, 2013 WL 5530017 at *5 (N.D. Cal. Jul. 25, 2013) (holding that PPIA

9   preempted claims under California consumer protection statutes that chicken soup

10  containing genetically modified corn was not "100% Natural"); *Meaunrit v. The*

11  *Pinnacle Food Groups, LLC*, 2010 WL 1838715 at *6-*7 (N.D. Cal. May 5, 2010)

12  (explaining that PPIA preempted state law claims that USDA-approved labels on frozen

13  pot pies were required to instruct consumers to heat to 170° to avoid bacterial

14  contamination); *Kuenzig v. Hormel Foods Corp.*, 505 Fed.Appx. 937, 938 (11th Cir.

15  2013) (affirming preemption of state law claims under PPIA because poultry producers

16  complied with federal requirements regarding fat percentages); *Kraft Foods North*

17  *America, Inv. v. Rockland County Dep't of Weights and Measures*, 2003 WL 554796

18  at *6 (S.D.N.Y. Feb. 26, 2003) (interpreting PPIA to preempt enforcement of state laws

19  as to package weight where New York inspectors used less tolerant method "'different

20  from' that required under federal law"); *see also American Meat Institute v. Leeman*,

21  180 Cal.App.4th 728, 735 (Cal. Ct. App. 2009) (affirming grant of summary judgment

22  to plaintiff meat associations in preemption challenge to application of Proposition 65

23  to sale of USDA-approved meat products).

24  **IV.   Section 25982 is Also Impliedly Preempted by the PPIA Because Federal
         Regulation Pervasively Occupies the Field of Poultry Product Ingredients and
25       Because § 25982 Stands as an Obstacle to Ensuring the Uniform Availability
         of Poultry Products in the Nation's Food Supply.**
26

27         It should be manifest from the foregoing that § 25982 is expressly preempted by

28  the PPIA as applied to Plaintiffs' USDA-approved poultry products.  Even if it were

- 20 -

somehow not, § 25982 would still be impliedly preempted under the doctrines of field preemption and conflict preemption. *See Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98 (1992). Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (citations omitted). Conflict preemption occurs "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). There is ample evidence of both forms of implied preemption here.

### A.   Field Preemption.

Indeed, as to the pervasiveness of the PPIA and its regulatory framework in the field of poultry product standards and ingredients, the district court in *Del Real* just recently reminded that the "FMIA and PPIA *comprehensively regulate meat and poultry products.*" *Del Real*, 966 F.Supp.2d at 1052. The Sixth Circuit has also long recognized that, "by prohibiting a state's imposition of … [']ingredient requirements' which are 'in addition to, or different than [those made by the Secretary],' Congress has 'unmistakably … ordained' that the Federal Act fixes the *sole standards.*" *Armour & Co.,* 468 F.2d at 84 (last brackets in original; emphasis added). As that Court of Appeals summed it up: "['I]ngredient requirements' prescribed by the Secretary *completely preempt this field* of commerce." *Id.* (emphasis added).

In *Campbell v. Hussey*, 368 U.S. 297 (1961), the Supreme Court considered whether a Georgia law that required "type 14 flue-cured leaf tobacco" for sale to be marked with a "white sheet ticket." *Id.* at 298. But, like the PPIA here, the federal Tobacco Inspection Act — which likewise had as its purpose the elimination of the "burden upon commerce" that a lack of uniform standards would create — established "standards" for tobacco, and the Secretary of Agriculture had prescribed such standards. *Id.* at 299. The federal standards required that type 14 flue-cured tobacco be identified with a *blue* tag, and the question for the high court was "whether the

- 21 -

federal scheme of regulation has left room for Georgia" to so legislate.  *Id.* at 299-300.

> We do not have here the question whether Georgia's law conflicts with the federal law.  Rather we have the question of pre-emption.  Under the federal law there can be but one 'official' standard — one that is 'uniform' and that eliminates all confusion by classifying tobacco not by geographical origin but by its characteristics.  In other words, our view is that Congress, in legislating concerning the types of tobacco sold at auction, preempted the field and left no room for any supplementary state regulation concerning those same types.

*Id.* at 300-01 (footnote omitted).  As the Court concluded:  "We have then a case where the federal law excludes local regulation, *even though the latter does no more than supplement the former*.  Under the definition of types or grades of tobacco and the labeling which the Federal Government has adopted, complementary state regulation is as fatal as state regulations which conflict with the federal scheme."  *Id.* at 302.

The same is true in light of the USDA's standard and definition of products containing foie gras here.  As the Eleventh Circuit has observed in reviewing the history of the PPIA, "Congress thus subjected all domestic poultry production sold in interstate commerce to a single, federal program *with uniform standards.*"  *Mississippi Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 295-96 (11th Cir. 1994) (emphasis added) ("The PPIA created one uniform regulatory scheme for the national market[.]").  Indeed, "[e]ven after the 1968 amendments," which added the preemption provision in § 467e, "the PPIA maintained uniformity regarding the interstate sale of domestic poultry products.  Such sales still could occur only if the poultry had been inspected under THE federal program — not under some state program, whether identical or equivalent — and then only according to THE uniform federal standards."  *Id.* at 296 (capitals in original).  If any State could enact its own requirements as to the sale of USDA-approved poultry products based on the manner in which the bird was raised, it would destroy the very national uniformity that the PPIA seeks to achieve.

### B.   Obstacle Preemption.

Section 25982's attempt to ban the sale of USDA-approved poultry products also stands as an obstacle to Congress's objectives in the PPIA of ensuring that all

1  poultry products remain "an important source of the Nation's total supply of food"

2  and "to prevent and eliminate burdens upon such commerce."  21 U.S.C. § 451.  Just

3  weeks ago, in *Zogenix, Inc. v. Patrick*, 2014 WL 1454696 (D. Mass. Apr. 15, 2014), a

4  federal court enjoined Massachusetts's ban on the sale of an FDA-approved analgesic

5  called Zohydro ER.  The court recognized such a ban as preempted by federal law

6  because it stood in the way of Congress's charge to the FDA to "protect the public

7  health" by making sure that "drugs are safe and effective."  *Id.* at *1.

8      Not unlike Plaintiffs' foie gras products are approved as "wholesome and

9  unadulterated" by the USDA to "protect the health and welfare of consumers" here,

10  Zohydro ER had been approved by the FDA.  But Massachusetts was concerned that

11  the drug was not "abuse-resistant" because it could be crushed and inhaled or injected,

12  which would make the full dose of its active ingredient available immediately and could

13  lead to addiction or overdose fatalities.  *Id.*  Massachusetts was experiencing a recent

14  spike in opioid-related deaths, and its governor had even declared a public health

15  emergency about it.  (Not that it matters for preemption purposes, but Massachusetts

16  thus had a more significant interest, i.e., saving human lives, than California does here.)

17      Zogenix asserted, much like we do here, that the Massachusetts law was

18  preempted because it conflicted with the federal Food, Drug, and Cosmetic Act.  *Id.* at

19  *1-*2.  Although the FDCA nowhere required that States permit federally-approved

20  products to be sold, the district court found that the FDA had approved the drug for

21  sale to the public as one of a range of safe and effective prescription drugs and that,

22  "[i]f the Commonwealth were able to countermand the FDA's determinations and

23  substitute its own requirements, it would undermine the FDA's ability to make drugs

24  available to promote and protect the public health."  *Id.* at *2.

25      The same is true here.  The USDA has approved Plaintiffs' foie gras for sale to the

26  public as one of a range of wholesome and unadulterated poultry products; if

27  California were able to countermand the USDA's determinations and substitute its own

28  requirements, it would undermine the USDA's ability to make these poultry products

- 23 -

1  available as "an important source of the Nation's total supply of food" and to "to

2  prevent and eliminate burdens upon such commerce, to effectively regulate such

3  commerce, and to protect the health and welfare of consumers." 21 U.S.C. § 451. As

4  the district court concluded in *Zogenix*, and as this Court should conclude here, the

5  state law at issue "stands in the way of 'the accomplishment and execution of' an

6  important federal objective." *Id.*, citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).[4]

7      Indeed, were the law otherwise, any State could undermine the very objectives of

8  the PPIA (or the FMIA) by removing vast quantities of food from the food supply. For

9  example, if § 25982 were not recognized to be preempted, then neither would a state

10  law prohibiting the sale of any USDA-approved poultry product from a turkey that has

11  been artificially inseminated (as virtually all are) or from a chicken that was not raised

12  cage-free (as few are). To allow such state laws to escape preemption would completely

13  undermine the express language and overriding objective of the PPIA. While California

14  may be free to force its own farmers out of business based on the way they raise their

15  animals, it may not impose additional or different requirements on the ingredients in

16  poultry products approved by the USDA as in accordance with federal standards.

17      In *People v. Southern Pac. Co.*, 208 Cal.App.2d 745 (Cal. Ct. App. 1962), a

18  California court considered whether a railroad could be prosecuted under a state law

19  prohibiting animal cruelty notwithstanding Congress's enactment of the so-called

20  "Twenty-Eight Hour Law" requiring a carrzier to, *inter alia*, feed and water livestock

21  transported by rail in interstate commerce. *Id.* at 648. The California statute made it a

22  misdemeanor for any person not to provide an animal proper food and drink. *Id.* at

23  645. The railroad had transported 41 head of cattle from Utah but them left them in a

24  railcar without proper food and water. *Id.* Citing the "detailed care with which the

25  _____

26  [4]    Whether a law like § 25982 is preempted should not depend on anyone's view of
   the necessity or luxury of subject product. Foie gras may not provide the same kind of
27  pain relief as Zohydro ER, but that drug was certainly not the only one available to
   consumers. The ruling in this case should be no different whether the product be
28  Zohydro ER or foie gras, or whether Viagra or chicken soup.

federal act was framed" — much like the USDA's detailed product standards for poultry products here — the court was led "to the ineluctable conclusion that the Congress has intended to occupy the entire field of regulating the treatment of livestock carried in the stream of national commerce." The Court of Appeal's reasoning in finding the California statute preempted is applicable here:

> We are not unmindful of the interest of the state in protecting animals *within its borders* from inhuman treatment by man by imposing and enforcing criminal sanctions. But if this state statute may not be constitutionally applied to a carrier's conduct toward animals in interstate commerce, *no great industry of the state will be threatened, no economic loss will follow, and neither the lives, property nor welfare of state citizens will be affected.* When weighed in the balance, the interest of the state must yield to the national interest.

*Id.* at 648 (emphasis added).

                        *    *    *

Federal preemption of state law under the Supremacy Clause "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). "Pre-emption fundamentally is a question of congressional intent … , and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Electric Co.*, 496 U.S. 72, 78-79 (1990) (citation omitted). Here, there is no question that Congress intended to prohibit any additional or different State requirement as to the uniform ingredients for poultry products — whether country fried chicken or pâté de foie gras. The PPIA thus expressly and impliedly preempts § 25982.

## CONCLUSION

Because § 25982 is preempted by federal law, this Court should grant summary judgment in favor of Plaintiffs on their third cause of action and should: (1) declare § 25982 unconstitutional as applied to the sale of Plaintiffs' USDA-approved poultry products and (2) permanently enjoin its enforcement against Plaintiff's USDA-approved poultry products.

1   Dated:      May 14, 2014                    THE TENENBAUM LAW FIRM

2

3                                              _____

4                                              Michael Tenenbaum, Esq.
                                               *Counsel for Plaintiffs*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FEDERAL
PREEMPTION CLAIM