Michael Tenenbaum, Esq. (No. 186850)
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.
1431 Ocean Ave., Ste. 400
Santa Monica, CA  90401-2136
Tel   (424) 246-8685
Fax   (424) 203-4285

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ASSOCIATION DES ÉLEVEURS DE CANARDS ET D'OIES DU QUÉBEC, a Canadian nonprofit corporation; HVFG LLC, a New York limited liability company; and SEAN "HOT" CHANEY, an individual;

            Plaintiffs,

– against –

XAVIER BECERRA, in his official capacity as Attorney General of California;

            Defendant.

Case No. 2:12-cv-05735-SVW-RZ

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON SECOND CAUSE OF ACTION FOR IMPOSSIBILITY PREEMPTION AND, IN THE ALTERNATIVE, ON FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF**

Date:          August 26, 2019
Time:          1:30 p.m.
Courtroom: 10A

Hon. Stephen V. Wilson

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

### NOTICE OF MOTION AND MOTION

TO DEFENDANT AND HIS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that, on August 26 2019, at 1:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Stephen V. Wilson in court-room 10A of the above-entitled court, located at 350 W. 1st St., Los Angeles, CA 90012, Plaintiffs Association des Éleveurs de Canards et d'Oies du Québec (the "Canadian Farmers", HVFG LLC ("Hudson Valley"), and Sean "Hot" Chaney will and hereby do move this Court under Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment against Defendant Xavier Becerra (in his official capacity as Attorney General of California) on Plaintiffs' Second Cause of Action for declaratory and injunctive relief pursuant to the Supremacy Clause of the United States Constitution because section 25982 of the California Health and Safety Code is preempted by federal law under the doctrine of impossibility preemption.  In the alternative, Plaintiffs will and hereby do move this Court for an order granting summary judgment against Defendant on their First Cause of Action for a declaration that § 25982's prohibition on foie gras products "sold in California" does not apply to out-of-state sales of products that are shipped to persons in California.

This motion is and will be made on the grounds that it is physically impossible for Plaintiffs to comply with both federal law and § 25982 because, under federal law, Plaintiffs' foie gras products must be "obtained *exclusively* from *specially fed* and *fattened* geese and ducks" whereas § 25982 prohibits such products if they are "the result of" any process that "causes a bird to consume *more food* than a typical bird of the same species would consume voluntarily."  Section 25982 is therefore preempted by the Poultry Products Inspection Act, 21 U.S.C. §§ 451 *et seq.*, and by the federal regulations issued thereunder, 9 C.F.R. §§ 381 *et seq.*, as applied to Plaintiffs' foie gras products.  In the alternative, this motion is and will be made on the grounds that section 25982 does not apply when sales of foie gras products take place outside California and the products are shipped to persons in California after title has passed from

the seller outside California.

Plaintiffs' motion is and will be based upon the attached Memorandum of Points and Authorities; upon the accompanying Statement of Uncontroverted Facts and Conclusions of Law; upon the accompanying Request for Judicial Notice and such other matters of which the Court may take judicial notice; upon the accompanying Declarations of Robert Hibbert, Daniel Guémené, Gavin Hitchener, Marie-Pierre Pé, Nikola Smatrakalev, Marcus Henley, Sean Chaney, and Michael Tenenbaum; upon the pleadings and papers on file in this action; and upon such other evidence or argument as may be presented to the Court in connection with the hearing on the motion.

This motion is made following several conferences of counsel pursuant to L.R. 7-3, which took place on March 4, 2019, and March 25, 2019, among other dates.

Dated:        July 16, 2019        THE OFFICE OF MICHAEL TENENBAUM, ESQ.

/s/ Michael Tenenbaum
_____

Michael Tenenbaum, Esq.
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF MOTION .................................................. 1

THE RELEVANT LEGAL AND FACTUAL BACKGROUND ................................ 3

A.  Plaintiffs Produce, for Sale in Commerce, USDA-Approved Poultry Products from Foie Gras Obtained Exclusively from Specially Fed and Fattened Ducks ................................................................................................. 3

    1.  Pursuant to its Statutory Authority, USDA Defines Foie Gras as "Fat Liver" "Obtained Exclusively from Specially Fed and Fattened Geese and Ducks" ......................................................... 3

        a.  Congress Authorizes USDA to Establish the Specifications and Definitions for Poultry Products ............................... 3

        b.  USDA Has a Well-Established Definition of "Foie Gras" ........... 5

    2.  Plaintiffs Produce Foie Gras Products from Specially Fed and Fattened Ducks that Fully Comply with the Federal Definitions and Standards ......................................................................................... 9

B.  California Purports to Allow the Sale of Foie Gras But Bans Poultry Livers that Result from Causing a Bird to Consume "More Food Than a Typical Bird of the Same Species Would Consume Voluntarily" ................ 10

C.  As a Matter of Basic Biology, It is Physically Impossible to Obtain Foie Gras from a "Specially Fed and Fattened" Duck That Has Not Been Caused to Consume "More Food Than a Typical Bird of the Same Species Would Consume Voluntarily" ........................................................... 11

    1.  In Addition, the Liver of a Non-Force-Fed Duck or Goose Is Different — Both Physically and Chemically — from That of One Which Has Been Specially Fed and Fattened ............................... 13

D.  Defendant and the District Attorneys He Supervises are Threatening to Prosecute Out-of-State Sellers of Foie Gras Products Even for Sales Consummated Outside the State If the Products Are Sent to California ........ 14

ARGUMENT .................................................................................................................. 15

I.  Plaintiffs Are Entitled to Summary Judgment on Their Second Cause of Action for Impossibility Preemption ................................................................ 15

    A.  The Legal Standard for Impossibility Preemption ................................. 16

B.     Because It is Physically Impossible for Plaintiffs to Comply with Both Federal Law and Section 25982 of the California Health and Safety Code, the State Law Is Preempted.........................................16

C.     Recognizing Preemption in This Case Respects Congress's Intent to Ensure a Uniform National Market for Poultry Products ...............20

II.    In the Alternative, Plaintiffs Are Entitled to Summary Judgment on Their First Cause of Action for a Declaratory Judgment that § 25982 Does Not Apply to Sales Made Outside California Even If the Product Is Sent to the Purchaser in California ..............................................................22

A.     The Legal Standard for Declaratory Relief ...........................................22

B.     Section 25982 Applies Only to a Product "Sold in California" — Not to Products Sold Outside the State But Sent Here — and the Court Should Declare That In Its Judgment ...................................22

CONCLUSION .................................................................................................25

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## Cases

*Animal Legal Defense Fund v. United States Dep't of Agriculture*,
   Case no. 2:12-cv-04028-ODW-PJW (C.D. Cal.) ........................................ 8, 13

*Armour & Co. v. Ball*, 468 F.2d 76 (6th Cir. 1972) ................................. 21

*City of Fontana v. Cal. Dep't of Tax & Fee Admin.*,
   17 Cal.App.5th 899 (Cal. Ct. App. 2017) ...................................... 24

*City of South San Francisco v. Board of Equalization*,
   232 Cal.App.4th 707 (Cal. Ct. App. 2014) ...................................... 23

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ................................. 16

*Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977) ......................................... 21

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) ................................................................... 25

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)................. 1, 20, 21

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)...................................... 22

*Merck Sharp & Dohme Corp. v. Albrecht*, 139 S.Ct. 1668 (2019) ......................... 16

*Miss. Poultry Ass'n v. Madigan*, 31 F.3d 293 (5th Cir. 1994)................................. 20

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ....................... 21

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) ................................................. 19

*National Meat Association v. Harris*, 565 U.S. 452 ................................................. 21

*People v. Garcia*, 2 Cal.5th 792 (2017) .................................................................... 25

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ......................................................... 20

*Schollenberger v. Pa.*, 171 U.S. 1 (1898) ................................................................. 21

*Sullivan v. Oracle Corp.*, 51 Cal.4th 1191 (2011)................................................... 25

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ................................. 16

## Statutes, Regulations, and Rules

21 U.S.C. § 451 ............................................................... 1, 3, 4, 7, 20

21 U.S.C. § 452 ............................................................... 4, 20, 22

21 U.S.C. § 453 ............................................................... 1, 3, 4, 10, 19

21 U.S.C. § 457 ............................................................... 4, 5

21 U.S.C. § 458 ............................................................... 4, 19

21 U.S.C. §461 ............................................................... 19

21 U.S.C. § 466 ............................................................... 5

21 U.S.C. § 467 ............................................................... 5

28 U.S.C. § 2201 ............................................................... 22

7 C.F.R. § 2.53 ............................................................... 5

9 C.F.R. § 130.1 ............................................................... 6

9 C.F.R. § 300.2 ............................................................... 5

9 C.F.R. § 381 ............................................................... 1

9 C.F.R. § 381.1 ............................................................... 4, 9, 19

9 C.F.R. § 381.79 ............................................................... 4, 9

9 C.F.R. § 381.155 ............................................................... 5

9 C.F.R. § 381.190 ............................................................... 4

9 C.F.R. § 381.195 ............................................................... 5

9 C.F.R. § 381.196 ............................................................... 5

9 C.F.R. § 381.208 ............................................................... 5, 9

58 Fed. Reg. 62014 (Nov. 23, 1993) ............................................................... 7

60 Fed. Reg. 6774 (Feb. 3, 1995) ............................................................... 3, 20

Fed. R. Civ. P. 57 ............................................................... 22

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## INTRODUCTION AND SUMMARY OF MOTION

2    As it did the last time it was presented with similar cross-motions (Dkts. 116,
3 117, 118), the Court should decide this motion *first*.  The granting of this motion as to
4 Plaintiffs' preemption claim (i.e., the Second Cause of Action) alone will necessarily re-
5 sult in the denial of Defendant's motion to dismiss and will fully dispose of this action.

6    While passions on all sides of the debate over the production of foie gras — like
7 over animal agriculture in general — continue to sizzle, this is a straightforward motion
8 on a simple point of law.  Under the Supremacy Clause and the doctrine known as
9 impossibility preemption, in circumstances where a state law makes it physically impos-
10 sible for a person to comply with federal law, the state law is preempted.  And as the
11 Supreme Court has recognized for decades:  "That no State may completely exclude
12 federally licensed commerce is indisputable[.]"  *Fla. Lime & Avocado Growers, Inc. v.*
13 *Paul*, 373 U.S. 132, 142 (1963).

14    Foie gras is a poultry product defined by the United States Department of Agri-
15 culture ("USDA") as the "fat liver" "obtained exclusively from specially fed and fat-
16 tened geese and ducks."  There is no dispute in this case that Plaintiffs' foie gras pro-
17 ducts sold in commerce have passed federal inspection and satisfy this federal definition,
18 as they must for sale in commerce.  Indeed, if this "valuable constituent" were omitted
19 from Plaintiffs' foie gras products, or anything else substituted for it, they would be
20 adulterated under the federal Poultry Products Inspection Act.  21 U.S.C. § 453(g)(8).
21 Plaintiffs' products were freely sold in California before July 1, 2012, and again for four
22 years after this Court granted summary judgment on Plaintiffs' ingredient preemption
23 claim in January 2015, until the Ninth Circuit's mandate issued in January of this year.

24    But an ill-conceived California law, § 25982 of the California Health and Safety
25 Code, again makes it impossible for Plaintiffs to satisfy their obligations under both
26 federal law and the law of this state.  Section 25982 purports not to ban all foie gras,
27 but it prohibits the sale of a finished foie gras product if it is "the result of" "force feed-
28 ing a bird," which § 25980(b) defines as "a process that causes the bird to consume

1  more food than a typical bird of the same species would consume voluntarily."  Yet,

2  because it is physically impossible to obtain the "specially fed and fattened" liver that

3  defines foie gras from a duck that has **not** been made to consume "more food" than it

4  would consume voluntarily, it is impossible for Plaintiffs to comply with the federal

5  requirements while complying with § 25982.  If not obvious on its face, this motion

6  establishes such impossibility both by definition and as a matter of basic biology.

7          Because compliance with both federal and state law is impossible, § 25892 is

8  preempted, and the Court should again enter judgment and a permanent injunction

9  against its enforcement.  Defendant may try to argue (as he does in his motion to dis-

10  miss) that the Ninth Circuit's prior opinion somehow bars this claim, but that is simply

11  wrong, since the Ninth Circuit was never presented with the claim of impossibility

12  preemption and therefore could not have adjudicated it.  In fact, this Court expressly

13  granted Plaintiffs leave to amend to add this "new claim premised upon the theory of

14  'impossibility preemption.'"  (Dkt. 184.)  Moreover, it is pointless for Defendant to

15  argue (as he does) that federal law is silent on "the treatment of farm animals."  This

16  case is not about living birds; it is about finished, USDA-approved poultry products

17  made from the livers of dead ducks.  And, as the Supreme Court has recently reiterated,

18  it is no answer for Defendant to say that Plaintiffs may escape this impossibility by

19  choosing not to produce or sell their federally-approved poultry products in California.

20          This case again requires summary judgment in Plaintiffs' favor, this time based

21  on impossibility preemption.  In the event that the Court were not to grant this motion

22  on that ground, then it should grant on Plaintiffs' Second Cause of Action and declare

23  that section 25982's ban on sale does not apply where, under the California Commer-

24  cial Code, sales of foie gras products take place *outside* California and the products are

25  shipped to persons in California after title has passed from the seller *outside* California.

26  Section 25982 provides only that a product may not be "sold in California."  It

27  nowhere prohibits a product from being imported to the state or otherwise sold in

28  *another* state and then sent to a purchaser here.

## THE RELEVANT LEGAL AND FACTUAL BACKGROUND

**A.** **Plaintiffs Produce, for Sale in Commerce, USDA-Approved Poultry Products from Foie Gras Obtained Exclusively from Specially Fed and Fattened Ducks.**

Plaintiffs produce and sell in commerce a variety of USDA-approved, finished poultry products made from foie gras. Foie gras is French for "fat liver." *See* Merriam-Webster Dictionary ("literally, fat liver"), available at https://www.merriam-webster.com/dictionary/foie%20gras. Under the federal definition issued by USDA, foie gras is the "fat liver … obtained exclusively from specially fed and fattened" geese and ducks. RJN Ex. A (definition of "foie gras" in USDA's *Food Standards and Labeling Policy Book*). All of Plaintiffs' foie gras products sold in commerce must be inspected by USDA, and all of them satisfy this federal definition for sale in commerce. Under the federal Poultry Products Inspection Act (the "PPIA"), Plaintiffs would face prosecution for selling "adulterated" products if they omitted this "valuable constituent" from their foie gras products or substituted anything else for it. 21 U.S.C. § 453(g)(8).

**1.** **Pursuant to its Statutory Authority, USDA Defines Foie Gras as "Fat Liver" "Obtained Exclusively from Specially Fed and Fattened Geese and Ducks."**

**a.** **Congress Authorizes USDA to Establish the Specifications and Definitions for Poultry Products.**

Under the PPIA, "a "poultry product" is "any product which is made wholly or in part from any poultry carcass or part thereof." 21 U.S.C. § 453(f). Congress passed the PPIA in 1957 to make federal inspection "mandatory for all poultry products intended for distribution in interstate commerce." 60 Fed. Reg. 6774, 6776 (Feb. 3, 1995). Congress declared that "poultry products are an important source of the Nation's total supply of food" and deemed all poultry products under the PPIA to be "in interstate or foreign commerce." 21 U.S.C. § 451. In 1968, Congress "amended the [PPIA] to assure uniformity in the regulation of products shipped in interstate, intrastate, and foreign commerce." 60 Fed. Reg. 6774, 6776 (Feb. 3, 1995). Congress provided that "regulation by the Secretary of Agriculture and cooperation by the States … are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate

1  such commerce, and to protect the health and welfare of consumers." 21 U.S.C. § 451.

2      Congress found that "[i]t is essential in the public interest that ... poultry pro-

3  ducts distributed to [consumers] are ... not adulterated[.]" 21 U.S.C. § 451.  Congress

4  further found that "adulterated[] or misbranded poultry products impair the effective

5  regulation of poultry products in interstate or foreign commerce, are injurious to the

6  public welfare, destroy markets for wholesome, not adulterated, and properly labeled

7  and packaged poultry products, and result in sundry losses to poultry producers and

8  processors of poultry and poultry products, as well as injury to consumers." *Id.*

9      Section 452 of the PPIA declares "the policy of the Congress" to provide for the

10  inspection of poultry products and to "otherwise regulate the processing and distribu-

11  tion of such articles as hereinafter prescribed to prevent the movement or sale in inter-

12  state or foreign commerce of, or the burdening of such commerce by, poultry products

13  which are adulterated or misbranded." 21 U.S.C. § 452; 9 C.F.R. § 381.1(b).  Under

14  the PPIA, "[n]o person shall ... sell, transport, offer for sale or transportation, or

15  receive for transportation ... any poultry products required to be inspected under [the

16  PPIA] unless they have been so inspected and passed." 21 U.S.C. § 458(a)(2).  Federal

17  law prohibits the sale of "any poultry products which are capable of use as human food

18  and are adulterated or misbranded at the time of such sale." 21 U.S.C. § 458(a)(2); 9

19  C.F.R. § 381.190(b)(1).  A poultry product is deemed "adulterated" if, inter alia, "any

20  valuable constituent has been in whole or in part omitted or abstracted therefrom; or if

21  any substance has been substituted, wholly or in part therefor." 21 U.S.C. § 453(g)(8);

22  9 C.F.R. § 381.1(b).[1]  By contrast, "all organs and other parts of carcasses which are

23  found to be not adulterated shall be passed for human food." 9 C.F.R. § 381.79.

24      The PPIA provides that poultry products may only be imported if they are

25  "healthful, wholesome, fit for human food, [and] not adulterated" and "comply with

26  _____

27  [1]      A poultry product is "misbranded" if "if it purports to be or is represented as a food for which a definition and standard of identity or composition has been prescribed

28  by regulations of the Secretary [of Agriculture] under section 457 of this title unless," *inter alia*, "it conforms to such definition and standard[.]" 21 U.S.C. § 453(h)(6), (i).

the standards provided for in" the PPIA.  21 U.S.C. § 466(a); 9 C.F.R. §§ 381.195 *et seq.*  As relevant to this case, in which foie gras products are imported by the Canadian Farmers, USDA regulations expressly provide that "poultry products may be imported" if they were processed in Canada.  9 C.F.R. §§ 381.195(c), 318.196(b).  They also expressly provide that, only upon compliance with the applicable regulations, "imported poultry products which have been inspected, passed, and marked under this subpart may be transported in commerce."  9 C.F.R. § 381.208(c).

The PPIA provides that the Secretary of Agriculture, "whenever he determines such action is necessary for the protection of the public, may prescribe ... definitions and standards of identity or composition [f]or articles subject to" the PPIA.  21 U.S.C. § 457(b).  Federal regulations reflect that the Secretary has delegated to the Administrator of the Food Safety and Inspection Service ("FSIS") within USDA "the responsibility for exercising the functions of the Secretary of Agriculture" under the PPIA.  9 C.F.R. § 300.2(a); 7 C.F.R. § 2.53(a)(2)(i).  And USDA regulations expressly authorize the Administrator "to establish specifications or definitions and standards of identity or composition, covering the principal constituents of any poultry product with respect to which a specified name of the product or other labeling terminology may be used, whenever he determines such action is necessary to prevent sale of the product under false or misleading labeling."  9 C.F.R. § 381.155(a)(1) ("Authorization to establish specifications").  "Further, the Administrator is authorized to prescribe definitions and standards of identity or composition for poultry products whenever he determines such action is otherwise necessary for the protection of the public."  *Id.*[2]

### b.   USDA Has a Well-Established Definition of "Foie Gras."

USDA has promulgated standards of identity or composition for some poultry products in its regulations.  9 C.F.R. § 381.155 *et seq.*  USDA has also established the

---

[2]     As the Court well knows, the PPIA also expressly provides that "ingredient requirements ... in addition to, or different than those made under [the PPIA] may not be imposed by any State" with respect to poultry products prepared in accordance with the requirements under the PPIA.  21 U.S.C. § 467e.

specifications and definitions for hundreds of others in its *Food Standards and Labeling Policy book*, including standards for "foie gras."  Under the federal definition, "Goose liver and duck liver foie gras (fat liver) are obtained *exclusively* from *specially fed and fattened* geese and ducks."  (RJN Ex. A at PDF p. 3 [emphasis added]; Hibbert Decl. ¶¶ 8, 10 & Ex. D.)  The terms "specially fed" and "specially … fattened" are not defined in any USDA materials.  A USDA regulation does define "nonstandard" care and handling, as applied to a poultry animal, to include "hand-feeding."  9 C.F.R. § 130.1.

According to the Merriam-Webster dictionary, "specially" means "in a special manner" or "for a special purpose."  *See* https://www.merriam-webster.com/dictionary/specially.  The applicable definition of "special," in turn, is "being other than the usual : ADDITIONAL, EXTRA."  *See* https://www.merriam-webster.com/dictionary/special.  Dictionary.com — "based on the Random House Unabridged Dictionary" — similarly defines "special" as "distinguished or different from what is ordinary or usual" and "extraordinary; exceptional, as in amount or degree."  *See* https://www.dictionary.com/browse/special.  "Fed" is simply the past participle of the transitive verb "feed," which the Merriam-Webster dictionary defines as "to give food to."  *See* https://www.merriam-webster.com/dictionary/feed.  And "fattened" is the past participle of "fatten," which the Merriam-Webster dictionary defines as "to make fat, fleshy, or plump — *especially* : to feed (an animal ) for slaughter" or "to make more substantial."  *See* https://www. merriam-webster.com/dictionary/fattened (emphasis in original).  Dictionary.com defines "fatten" as "to make fat" or "to feed (animals) abundantly before slaughter."  *See* https://www.dictionary.com/browse/fatten.

Based on these terms, USDA's definition of foie gras may be read as the "fat liver" obtained exclusively from a goose or duck that has been fed other than in the "usual" way by feeding it "additional," "extra," or an "extraordinary" "amount" of food or in an "unusual" or "exceptional" way to make it "fat" and "more substantial" before slaughter.  Popular American dictionaries also define "foie gras" itself as "the liver of specially fattened geese or ducks."  *See, e.g.,* https://www.dictionary.com/

browse/foie-gras.  As USDA has observed, "poultry product standards provide a simple and direct means by which consumers can learn what to expect from a product if it is labeled with a particular name.  Thus, these requirements help to ensure that consumers' expectations are met."  58 Fed. Reg. 62014, 62017 (Nov. 23, 1993).

USDA's definition of foie gras and specifications of foie gras products have been established for some 35 years.  The entry for FOIE GRAS PRODUCTS in USDA's Standards and Labeling Policy Book refers producers to Policy Memo 076, dated September 21, 1984, which answers:  "What are the standards and labeling requirements for duck liver and/or goose liver 'foie gras' products?" (RJN Ex. A at PDF p. 5; Hibbert Decl. ¶ 8 & Ex. D; also available at https://www.fsis.usda.gov/ wps/wcm/connect/92485d36-be7f-451b-9153-7a921b13dc72/Policy_Memos_101818. pdf?MOD=AJPERES at p. 63 of PDF.)  It, too, provides that "[g]oose liver and duck liver foie gras (fat liver) are obtained exclusively from specially-fed and fattened geese and ducks ." (*Id.*)  Policy Memo 076 further explains that the definitions for foie gras products have their origin in a petition from the French government and a subsequent agreement between our national governments to follow the French definitions and standards for these products:

> In 1975, representatives of the French government petitioned the USDA to adopt the French standards for foie gras products.  ***An agreement was reached between our respective governments to follow these standards*** pending a rulemaking procedure.  Although a rulemaking was not finalized at that time, over the years the French standards were followed and applied to foie gras products.

> In June of 1980, the French government and trade associations revised their 1973 standards for foie gras products and requested our renewal and approval of the new regulations.  Since the standards followed over the years for the imported product have become obsolete and the marketing and consumption of these products have become more popular, ***SLD has decided to follow these requirements*** with some modifications including the English translation of French terms, the requirements for product name qualifiers, and other general policy requirements.  ***The adoption of these requirements will eliminate confusion and provide a descriptive classification for these products.***

(*Id.* at p. 2 [emphasis added].)

In May 1983, i.e., a year before USDA issued Policy Memo 076, the Director of FSIS's Standards and Labeling Division had written to the French Embassy "concerning the French regulations for the composition … of imported 'foie gras' products." (Hibbert Decl. at ¶ 4 & Ex. A.)  He was responding to France's technical standards for foie gras products, i.e., the "revised" standards in Policy Memo 076 — which were adopted by FSIS as the "requirements" for foie gras products.  The requirement for foie gras was translated at the time to specify:  "The 'foie gras' (livers) *must exclusively come from specially crammed* and suitably bleeded geese and ducks." [emphasis added].) (Hibbert Decl. ¶¶ 5-6 & Exs. B & C.)[3]

In that letter, the Director indicated that FSIS will "continue to monitor all 'foie gras' products entering this country for compliance with the French regulations" and "will also continue to deny approval for any of these products which are not in compliance with these standards."  (*Id.* at ¶ 7 & Ex. A.)  The Director referred to the these decisions by USDA "as an agreement between our two governments."  (*Id.*)

Finally, USDA itself has repeatedly noted — in its filings in *this* Court — that "[f]oie gras is a poultry product derived from the livers of ducks or geese that have been *deliberately forced to consume excessive feed (a process known as gavage)* for approximately three weeks.  This results in a build-up of fatty tissue in the liver which gives the produc[t] its distinctive taste."  *See* USDA Motion for Summary Judgment in *Animal Legal Defense Fund v. United States Dep't of Agriculture*, case no. 2:12-cv-04028-ODW-PJW (C.D. Cal.), at Dkt. 67, p. 3, n.3 (emphasis added; evidentiary citation omitted); *see also id.* at Dkt. 26, p. 4, n.3.  In *Animal Legal Defense Fund v. United States Dep't of Agriculture*, 223 F.Supp.3d 1008, 1013 (C.D. Cal. 2016), the court cited USDA's administrative record as establishing that "the bird is force-fed a special mix of

---

[3]     French law declares: "Foie gras is a part of the protected cultural and gastronomic heritage of France.  Foie gras means the liver of a duck or of a goose specially fattened by gavage." (RJN Ex. B [Code rural et de la pêche maritime, Art. L654-27-1]; Dkt. 137 [Barth Decl. at ¶¶ 2-4].)  Indeed, French law specifies that foie gras must be the result of "gavage," which the authoritative Collins dictionary defines as "force-feeding."  *See* https://www.collinsdictionary.com/dictionary/french-english/gavage.

food using a feeding tube (a process also known as gavage)" and that "[t]his causes a large buildup of fat in the bird's liver, which gives the product its signature taste."

### 2. Plaintiffs Produce Foie Gras Products from Specially Fed and Fattened Ducks that Fully Comply with the Federal Definitions and Standards.

Plaintiffs Canadian Farmers and Hudson Valley are producers and sellers of foie gras products. (Smatrakalev Decl. ¶¶ 2-3; Henley Decl. ¶ ¶1, 4.) The Canadian Farmers' foie gras products are imported into the United States, which requires that they comply with the standards provided for under the PPIA and USDA regulations, including the definitions and specifications established by USDA for foie gras products. 9 C.F.R. § 381.208(c). (Smatrakalev Decl. ¶ 2.) Hudson Valley's foie gras products are all processed at its official establishment and certified as wholesome by USDA for sale in commerce. 9 C.F.R. § 381.1 (defining "official establishment"). (Henley Decl. ¶ 2.)

USDA recognizes that Plaintiffs' foie gras products are obtained from ducks that have been "specially fed and fattened" — and that this special feeding and fattening has been accomplished by using a tube to hand-feed the ducks in the French tradition of *gavage*, i.e., "force-feeding." (Smatrakalev Decl. ¶ 5 & Ex. A; Henley Decl. ¶ 5 & Ex. A.) USDA has even approved Plaintiffs' label applications stating as much. (Smatrakalev Decl. ¶ 6 & Ex. B; Henley Decl. ¶ 6 & Ex. A.) For example, with USDA's express approval, Palmex's Flash Frozen Duck Foie Gras indicates right on the label that it has been obtained from ducks that were "individually tube fed by hand for not less than 7 days before processing, and not less than 4.2 kg of dry grain during that period, for the purpose of enlarging the duck's liver, by gavage in the French tradition." (Smatrakalev Decl. ¶ 8 & Ex. B; *see also* Henley Decl. ¶ 10 & Ex. B.)

Foie gras produced by this method is the most valuable constituent in Plaintiffs' foie gras products. (Smatrakalev Decl. ¶ 5; Henley Decl. ¶ 5.) As noted above, USDA regulations provide that the livers used in Plaintiffs' poultry products are authorized for human consumption: "[A]ll organs and other parts of carcasses which are found to be not adulterated *shall be passed for human food*." 9 C.F.R. § 381.79. Under the

1   PPIA, especially after having obtained USDA approval, Plaintiffs would face prosecu-

2   tion for selling "adulterated" products if they omitted this "valuable constituent" from

3   their foie gras products or substituted anything else for it.  21 U.S.C. § 453(g)(8).

**B.**   **California Purports to Allow the Sale of Foie Gras But Bans Poultry Livers that Result from Causing a Bird to Consume "More Food Than a Typical Bird of the Same Species Would Consume Voluntarily."**

6   Everyone from the author of § 25982 to the governor who signed it to Defen-

7   dant's predecessor in this case — and even the Ninth Circuit — has claimed that

8   § 25982 does not ban foie gras.  When he introduced the bill, Senator John Burton said:

9   "This bill has nothing to do … with banning, uh, foie gras."  (Dkt. 118-5 [Tenenbaum

10   Decl. ¶ 2].)  In his signing statement, Governor Schwarzenegger wrote:  "It does not

11   ban the food product, foie gras." (*Id.* at ¶ 3 & Ex. A.)  Earlier in this case, Defendant's

12   predecessor argued:  "Moreover, section 25982 does not ban the sale of all foie gras,

13   but only the sale of foie gras produced by means of prohibited animal cruelty."  (Def.

14   Ans. Brief, filed 12/31/12, in 9th Cir. case no. 12-56822, Dkt. 16-1, at p. 41.)  And the

15   Ninth Circuit explained in its prior opinion: "Section 25982, however, does not pro-

16   hibit foie gras.  It bans the sale of foie gras produced through force feeding, but would

17   not ban foie gras produced through alternative methods." (Dkt. 104 at p. 12 n.4.)

18   Section 25982 provides:  "A product may not be sold in California if it is the

19   result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal

20   size."  Cal. Health & Safety Code § 25982.  Section 25980(a) provides that a "bird"

21   includes a "duck or goose."  Cal. Health & Safety Code § 25980(a).  And Section

22   25980(b) defines force feeding a bird as "a process that causes the bird to consume

23   more food than a typical bird of the same species would consume voluntarily."  Cal.

24   Health & Safety Code § 25980(b).  That same provision continues:  "Force feeding

25   methods include, but are not limited to, delivering feed through a tube or other device

26   inserted into the bird's esophagus."  *Id.*

27   The Ninth Circuit in this case has previously interpreted § 25982 to apply only

28   to liver products, "i.e., products made from an enlarged duck liver," and not to "non-

liver products from force-fed birds." (Dkt. 104 at pp. 10, 12.) Read together with the definitions above, § 25982 prohibits a duck liver product from being sold in California if it is the result of causing a duck to consume more food than a typical duck of the same species would consume voluntarily, for the purpose of enlarging its liver. Under California's definition, any "process" that causes a duck to consume more food than a typical duck would consume voluntarily would constitute prohibited force feeding. Cal. Health & Safety Code § 25980(b).

Responding to Plaintiffs' earlier claim of vagueness, Defendant argued to the Ninth Circuit: "No farmer would go to the trouble of forcing a tube down a bird's esophagus to feed it the same amount of food it would eat voluntarily." (Def. Ans. Brief, filed 12/31/12, in 9th Cir. case no. 12-56822, Dkt. 16-1, at p. 33.) Defendant has illustrated the breadth of California's definition of force feeding by telling this Court and the Ninth Circuit that, to avoid engaging in it: "Farmers are not prohibited from *leaving out more food than usual for a particularly hungry duck*." (Dkt. 57 at p. 16; Def. Ans. Brief, filed Dec. 31, 2012, in 9th Cir. case no. 12-56822, Dkt. 16-1, at p. 32) [emphasis added].)

## C. As a Matter of Basic Biology, It is Physically Impossible to Obtain Foie Gras from a "Specially Fed and Fattened" Duck That Has Not Been Caused to Consume "More Food Than a Typical Bird of the Same Species Would Consume Voluntarily."

In contrast to what most lawyers and politicians know, two leading experts familiar with the production of foie gras make clear that, as a matter of basic biology, it is impossible to obtain foie gras from a "specially fed and fattened" duck if the duck has not been caused to consume "more food" than it (or a typical bird like it) would consume voluntarily. (Guémené Decl. ¶¶ 1-4; Hitchener Decl. ¶¶ 1-3.) These experts explain that "a bird's liver will only become fattened beyond its normal size if the bird consumes more food than it (or a typical bird like it) would consume voluntarily. That is because, in order for a bird to produce and maintain the fattened liver recognized as foie gras, the bird's consumption of food must be in excess of what is normal, such that

the amount of fat into which the food is converted through lipogenesis in the liver exceeds the amount of fat it exports to other parts of its body and otherwise requires for its metabolism." (*Id.* at ¶¶ 6; *id.* at ¶¶ 5.)  Each of them agrees:  "As a matter of basic waterfowl biology, it is impossible to obtain a fattened liver from a goose or duck without causing the bird to consume more food than it (or a typical duck like it, raised under the same conditions and provided the same diet) would consume voluntarily." (*Id.*; *id.*)  In other words, it is physically impossible to produce foie gras in a manner that does not entail the force-feeding prohibited by § 25982.

These experts' views are consistent with those of the American Veterinary Medical Association (AVMA).  In its recent peer-reviewed summary of the scientific literature on the production of foie gras, the AVMA states point-blank:  "Force feeding is ***necessary*** to produce the size and fat content that makes a liver 'foie gras'." (Hitchener Decl. ¶ 7 & Ex. A (emphasis added), available at https://www.avma.org/KB/ Resources/LiteratureReviews/Documents/foie_gras_bgnd.pdf.)  After reviewing the scientific literature, it further explains:  "There is no current alternative to force feeding that produces an equivalent product." (*Id.*)

Apart from these scientific experts, no one in the industry who has any first-hand experience producing foie gras in commerce is aware of any verified method of producing foie gras without "force feeding" based on California's definition of the term. As defined by California, the general manager of the North American affiliate of one of the largest producers of foie gras in the world is "unaware of any verified method of producing foie gras without force feeding a bird." (Smatrakalev Decl. ¶¶ 1, 7.)  Neither is the Operations Manager of the largest producer in the United States aware of any such method. (Henley Decl. ¶¶ 1, 7.)  Nor is the Secretary General of the body representing all federations of foie gras producers in the European Union — aware of any such method. (Pé Decl. ¶¶ 1-6.)

Even USDA itself has recognized, in a case which Defendant Becerra cited to the Ninth Circuit in this case, that an "attempt to maintain a distinction between force-fed

- 12 -

foie gras and non-force fed foie gras is untenable as *any product labeled 'foie gras' is almost certainly the product of a force-feeding process*."  *See Animal Legal Defense Fund v. USDA*, No. 2:12-cv-04028 (C.D. Cal.), Dkt. 67 (4/22/16), at p. 7 n.7 (emphasis added).  And this Court had correctly observed at the outset of this case:  "From SB 1520's legislative history and the declarations submitted by the parties, it appears that foie gras is the only product sold that *requires a bird to be force-fed*[.]"  (Dkt. 87 at p. 2, lns. 7-9) (emphasis added).

1.    **In Addition, the Liver of a Non-Force-Fed Duck or Goose Is Different — Both Physically and Chemically — from That of One Which Has Been Specially Fed and Fattened.**

As the Court knows, the important constitutional issues in this case caught the attention of the Supreme Court, which issued a call for the views of the Solicitor General of the United States (the "SG").  One "essential factual premise" that the SG's brief repeatedly noted had not yet been established is whether § 25982 operates to prohibit "any poultry products containing foie gras" or "a type of foie gras that is a materially distinct substance, physically or chemically."  (U.S. Br. in Supreme Court case no. 17-1285, at pp. 12-13.)  Section 25982 operates in just that way.

For starters, the liver of a non-force-fed duck or goose is *physically* very different from that of one that has been specially fed and fattened to produce foie gras:



(Henley Decl. ¶ 8.)  The liver of a duck that has not been caused to consume more food than it (or a typical duck like it) would consume voluntarily will typically be uniformly dark in color, while the liver of a duck that has been fattened for foie gras will be uniformly yellow/tan in color.  (Hitchener Decl. ¶ 7; Guémené Decl. ¶ 7.)

At the level of biochemistry, the liver of a non-force-fed duck will, microscopically, have minimal amounts of lipid within the hepatocytes (liver cells), whereas the liver of a duck that has been specially fed and fattened will consist virtually entirely of hepa-

- 13 -

tocytes characterized by substantially increased intracellular lipid accumulation, which explains why the liver may be enlarged to many times its original size.  (Hitchener Decl. ¶ 7; Guémené Decl. ¶ 7.)  Among many other chemical differences, the liver of a duck that has been fattened will have a higher ratio of saturated/polyunsaturated fatty acids. (Guémené Decl. ¶ 7.)  It will also have a very different texture, taste, and smell.  (*Id.*)

As USDA itself has explained, and the experts agree, "while the appearance of the foie gras liver, both grossly and microscopically, might be considered abnormal because it *differs from* a liver from a bird on a diet that contains less fat and carbohy-drate, the fatty changes are exactly those that would be expected due to the altered phy-siologic state of the bird."[4]  (Hitchener Decl. ¶ 7; Guémené Decl. ¶ 7.)  In other words, unless a goose or duck consumes more food than it (or a typical goose or duck like it) would consume voluntarily, the resulting liver will be a materially distinct substance, physically and chemically, from the liver of a specially fattened goose or duck.  (*Id.*)

**D.   Defendant and the District Attorneys He Supervises are Threatening to Prosecute Out-of-State Sellers of Foie Gras Products Even for Sales Consummated Outside the State If the Products Are Sent to California.**

Although § 25982 only prohibits foie gras products from being "sold in Cali-fornia," Defendant and the California prosecutors he supervises have continued to threaten Plaintiffs and other *out-of-state* sellers of their products over sales that take place *outside* California merely because the product is ultimately sent to someone in California.  (Henley Decl. ¶ 9; Tenenbaum Decl. ¶ 2.)  In his motion to dismiss, Defendant takes the position that "Section 25982 applies to sales of products sold by out-of-state sellers to buyers in California, regardless of where title passes."  (Dkt. 190 at p. 14.)  Similarly, prior to the issuance of this Court's injunction in January 2015, at least three county District Attorneys offices in California were threatening Hudson Valley and other out-of-state sellers of its foie gras products for even sending these

---

[4]   This statement from the USDA appears in its published response to a petition submitted by various animal rights groups.  *See* https://www. fsis.usda.gov/wps/wcm/ connect/05322a8b-4f58-44d5-bc7d-8bc55e84dcd6/Petition-FSIS-Response-FoieGras. pdf?MOD=AJPERES (emphasis added).

products to anyone in California.  (Henley Decl. ¶ 9; Tenenbaum Decl. ¶ 2.)  Prosecutors from each of these offices took the position that, even if these out-of-state sellers consummated a sale of a foie gras product outside California such that the product was delivered to the shipper, and thus title passed, outside California, this would somehow result in the product being "sold in California" for purposes of § 25982 if the product was shipped to anyone in California.  (*Id.*)

Just this past December — at a time when the Court's permanent injunction was still in effect — these District Attorneys filed an action for civil penalties against Amazon.com, Inc., for alleged violations of § 25982 and obtained a stipulated judgment under which Amazon may not "offer for sale" a foie gras product in California, which they defined as "making a product available to be purchased and shipped into the State of California."  (RJN Ex. C; Henley Decl. ¶ 9.)  Plaintiffs thus fear prosecution from Defendant and the prosecutors he supervises if Plaintiffs or other out-of-state sellers ship their foie gras products into California, and Plaintiffs have therefore adopted a policy (in addition to refraining from selling *in* California) of not sending foie gras to purchasers in California.  (Henley Decl. ¶ 9.)

## ARGUMENT

### I.   Plaintiffs Are Entitled to Summary Judgment on Their Second Cause of Action for Impossibility Preemption.

Section 25982 is preempted under the doctrine of impossibility preemption because it is physically impossible for Plaintiffs to comply with the requirements for producing and selling USDA-approved foie gras products under federal law without violating California's curious prohibition on the sale of finished foie gras products that result from having caused a bird to consume more food than it would consume voluntarily.  Specifically, while USDA requires that the foie gras in Plaintiffs' products have been "obtained exclusively from specially fed and fattened geese and ducks," California prohibits foie gras if it is the result of such feeding and fattening.  Because it impossible for Plaintiffs to comply with both federal and state law, § 25982 is preempted.

### A.   The Legal Standard for Impossibility Preemption.

Under the Supremacy Clause, "the Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "A fundamental principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  "[S]tate law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby*, 530 U.S. at 372.

Conflict preemption takes two forms:  impossibility and obstacle preemption.  "Courts find impossibility preemption 'where it is impossible for a private party to comply with both state and federal law.'"  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (quoting *Crosby*, 530 U.S. at 372.  A state statute is preempted under this form of conflict preemption "when it is 'impossible for a private party to comply with both state and federal requirements."  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S.Ct. 1668, 1672 (2019).

### B.   Because It is Physically Impossible for Plaintiffs to Comply with Both Federal Law and Section 25982 of the California Health and Safety Code, the State Law Is Preempted.

Both by definition and as a matter of basic biology, it is physically impossible for Plaintiffs to comply with the federal requirements for the production of their foie gras products — which require that their foie gras be "obtained exclusively from specially fed and fattened" ducks — if Plaintiffs are forced to comply with § 25982 of the California Health and Safety Code — which prohibits products that are "the result of" ducks that were caused to consume "more food than a typical bird of the same species would consume voluntarily."

In the first place, based on the dictionary definitions in section A.1.b. above, to "specially feed and fatten" a bird means to feed it "in a special manner," i.e., "other than" the "ordinary or usual" way, by feeding it "additional" or an "extraordinary" "amount or degree" of food to make it "extra" or "exceptionally" fat  and "more sub-stantial" for slaughter.  *See* A.1.b. above and https://www.merriam-webster.com/ dic-

- 16 -

tionary/special; https://www.merriam-webster.com/dictionary/fattened; https://www. dictionary.com/ browse/fatten.  Yet § 25982, read together with the definition of "force feeding" in § 25980(b), prohibits a product that is "the result of" this very manner of feeding, i.e., any "process that causes a bird to consume more food than a typical bird of the same species would consume voluntarily."  When, at the outset of this case, Plaintiffs challenged this definition as vague, Defendant convinced this Court and the Ninth Circuit of its scope:  "Farmers are not prohibited from *leaving out more food* than usual for a particularly hungry duck."  (Dkt. 57 at p. 16; Def. Ans. Brief, filed Dec. 31, 2012, in 9th Cir. case no. 12-56822, Dkt. 16-1, at p. 32.)  But it is impossible for Plaintiffs' poultry products to comply with the requirement that the foie gras have been obtained from a duck that has been "additional," "extra," or "extraordinary" "amount[s] or degree[s]" of food if the products may not be "the result of" a bird that was not caused to consume "more food" than it would consume voluntarily.

The impossibility is even more pronounced considering that § 25982 prohibits a product that is the result of "force feeding" a bird "*for the purpose of enlarging the bird's liver beyond normal size.*"  While the federal standards require foie gras to be obtained exclusively from specially fed and fattened ducks — i.e., ducks that have been purposely fed to produce the fat liver that USDA defines as foie gras — § 25982 actually prohibits poultry products where the foie gras has been obtained from ducks fed for this very purpose.  It is therefore doubly impossible for Plaintiffs to comply with both federal law and § 25982.

Especially because, as discussed in section A.1.b. above, the federal definition of foie gras was developed as part of an early 1980s agreement between USDA officials and the government of France — the world's leading producer of foie gras — based on the French definition of *gavage*, i.e., to "force-feed," it is clear that the conflict and resulting impossibility here is far more than semantic.  (Hibbert Decl. ¶¶ 4-10.) California's attempt to ban foie gras that results from force feeding is an attempt to ban what the federal government and American consumers over the past three decades have

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

come to understand to be foie gras.  In any event, because it is impossible by definition for Plaintiffs to produce and sell foie gras products that comply with both the federal definition of foie gras and § 25982's prohibition on liver that results from "force feeding," the Court could find impossibility preemption based on these definitions alone.  But there is an even stronger basis.

As Plaintiffs' evidence establishes, it is also physically impossible for Plaintiffs' foie gras to comply with both the "federal standards" — as Defendant refers to them (Def. Mot. to Dismiss [Dkt. 190] at p. 7) — and state law as a matter of basic biology. As set forth more fully in section C above, the experts at the leading-edge of research on ducks and the feeding of waterfowl for foie gras production explain:

> As a matter of basic waterfowl biology, it is impossible to obtain a fattened liver from a goose or duck without causing the bird to consume more food than it (or a typical duck like it, raised under the same conditions and provided the same diet) would consume voluntarily.  … [*A] bird's liver will only become fattened beyond its normal size if the bird consumes more food than it (or a typical bird like it) would consume voluntarily.*  That is because, in order for a bird to produce and maintain the fattened liver recognized as foie gras, *the bird's consumption of food must be in excess of what is normal*, such that the amount of fat into which the food is converted through lipogenesis in the liver is greater than the amount of fat it exports to other parts of its body and otherwise requires for its metabolism.  …  In simpler terms, *it is physically impossible for a goose or duck's liver to become fattened unless it has consumed more food than the goose or duck (or a typical goose or duck like it) would consume voluntarily.*

(Hitchener Decl. ¶ 5; Guémené Decl. ¶ 6.)  The basic scientific principles above thus establish that it is physically impossible for Plaintiffs' products to comply with both federal law and state law, which requires a finding that § 25982 is preempted.

Moreover — because the supporters of § 25982 claim that it does not ban foie gras (*see* section B, above) — to the extent that California purports to allow foie gras products to be sold only if the foie gras that Plaintiffs include in them were replaced with the liver of a "non-force-fed" bird, § 25982 would require Plaintiffs' products to

be adulterated.  As explained in section A.1.a. above, a poultry product is "adulter-ated" if, inter alia, "*any valuable constituent* has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor."  21 U.S.C. § 453(g)(8); 9 C.F.R. § 381.1(b).  The foie gras in Plaintiffs' foie gras products is always the most "valuable constituent" in them.  (Smatrakalev Decl. ¶ 5; Henley Decl. ¶ 5.)  Because § 25982 prohibits Plaintiffs' foie gras products if they include this valuable constituent — but would allow the products to be sold if the "force-fed" foie gras were omitted or substituted with imaginary "non-force-fed" foie gras — it effectively requires Plaintiffs' products to be adulterated under the PPIA. Plaintiffs should not have to choose between facing the penalties in § 25983 for failure to comply with California's idiosyncratic law or facing federal fines and imprisonment under the PPIA for "sell[ing] … any poultry products which are capable of use as hu-man food and are adulterated or misbranded at the time of such sale."  21 U.S.C. §§ 458(a)(2), 461(a).  Fortunately, under the Supremacy Clause, the state law is pre-empted, and the Court should grant this motion on Plaintiffs' Second Cause of Action.

Importantly, it is no answer to say that Plaintiffs can avoid the impossibility in this case by simply refraining from selling their foie gras products in California.  The Supreme Court has squarely rejected such "stop-selling" arguments.  "[O]ur pre-emption cases presume that a manufacturer's ability to stop selling does not turn impos-sibility into possibility."  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 487 (2013).  In *Mutual Pharmaceutical*, the high court considered the converse Hobson's choice faced by a manufacturer and seller of a drug (sulindac) whom federal law prohibited from taking an action (in that case, changing its label) that state law required.  *Id.* at 486-87. The lower court had reasoned that the manufacturer "could escape the impossibility of complying with both its federal- and state-law duties by "choos[ing] not to make [sulindac] at all."  *Id.* at 488 (quoting lower court).  The Supreme Court rejected this:

> We reject this "stop-selling" rationale as incompatible with our pre-emption jurisprudence.  Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations *is not*

> *required to cease acting* altogether in order to avoid liability. Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be "all but meaningless."
>
> The incoherence of the stop-selling theory becomes plain when viewed through the lens of our previous cases. *In every instance in which the Court has found impossibility pre-emption, the "direct conflict" between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting.*

*Id.*, citing *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620-21 (2011) (rejecting argument that pre-emption required proof that federal agency would not have allowed compliance). In other words, in light of the conflicting federal definition and standard for foie gras, California cannot tell Plaintiffs to just stop selling their foie gras products in the state.

### C.   Recognizing Preemption in This Case Respects Congress's Intent to Ensure a Uniform National Market for Poultry Products.

Finally, as many cases have put it, the touchstone of preemption is Congress's intent. But in *Fla. Lime & Avocado Growers*, a seminal case on impossibility preemption, the Supreme Court explained: "A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce," as it is here. 373 U.S. at 142-43. In any event, holding § 25982 to be preempted will uphold Congress's intent to ensure uniform standards and a robust national market for unadulterated poultry products.

Here, Congress made quite clear in the PPIA that poultry products are "an important source of the Nation's total supply of food," that regulation by USDA is "appropriate to prevent and eliminate burdens upon such commerce," and that poultry products distributed for sale to consumers not be "adulterated," since that would result in "losses to poultry producers and processors … as well as injury to consumers." 21 U.S.C. §§ 451, 452. Congress's intent was "to assure uniformity in the regulation of products shipped in interstate, intrastate, and foreign commerce." 60 Fed. Reg. 6774, 6776 (Feb. 3, 1995). "Congress thus subjected all domestic poultry production sold in interstate commerce to a single, federal program with uniform standards." *Miss.*

- 20 -

1   *Poultry Ass'n v. Madigan*, 31 F.3d 293, 295-96 (5th Cir. 1994).

2       The very purpose of having a definitive federal standard is to achieve uniformity.

3   Otherwise, poultry producers would be face a nightmarish hodgepodge of conflicting

4   requirements on the provenance of their poultry parts, with 50 states and countless

5   cities dictating different product standards.  The Sixth Circuit has recognized that the

6   PPIA is preemptive in this regard:  "[A] state would not be permitted to prevent the

7   distribution in commerce of any article that 'conforms' to the 'definition and standard

8   of identity or composition.'  Thus, Congress is ordaining uniform national ingredient

9   requirements prescribed by the Secretary."  *Armour & Co. v. Ball*, 468 F.2d 76, 84 (6th

10  Cir. 1972).  As the Supreme Court explained just last year, all forms of preemption

11  "work in the same way:  Congress enacts a law that imposes restrictions or confers

12  rights on private actors; a state law confers rights or imposes restrictions that conflict

13  with the federal law; and therefore the federal law takes precedence and the state law is

14  preempted."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018).

15      In light of this, could Congress really have intended for any poultry product to be

16  produced and federally inspected based on a uniform national standard, only to have a

17  state come along and try to define the product out of existence?  The Supreme Court has

18  said that States have no such authority.  In *National Meat Association v. Harris*, the

19  court unanimously struck down a California ban on the sale of meat from the "kind" of

20  pig that could not walk, flatly rejecting the notion that "States are free to decide which

21  animals may be turned into meat."  565 U.S. 452, 465 (2012) ("We think not.")  In *Fla.*

22  *Lime & Avocado Growers*, the Court held:  "That no State may completely exclude fed-

23  erally licensed commerce is indisputable[.]"  373 U.S. at 142; *see also Douglas v. Sea-*

24  *coast Products, Inc.*, 431 U.S. 265, 283 (1977) (reiterating this "'indisputable' precept").

25  And in *Schollenberger v. Pa.*, 171 U.S. 1, 14 (1898), it held: "[W]e yet deny the right of

26  a state to absolutely prohibit the introduction within its borders of an article of com-

27  merce which is not adulterated, and which in its pure state is healthful."

28      It would make zero sense for Congress to establish a national system for uniform

inspection of poultry products in commerce if any state could later undercut the system through a ban, like § 25982, that treated such federally-inspected products as contra-band.  As the Supreme Court explained in *National Meat*, if such a "sales ban" were to avoid preemption, then any state could impose an obligation on USDA-regulated producers "just by framing it as a ban on the sale of meat produced in whatever way the State disapproved" — which would "make a mockery" of preemption.  565 U.S. at 464.  Accordingly, this Court's finding of preemption will be consonant with Congress's intent and a century of Supreme Court cases.

**II.   In the Alternative, Plaintiffs Are Entitled to Summary Judgment on Their First Cause of Action for a Declaratory Judgment that § 25982 Does Not Apply to Sales Made Outside California Even If the Product Is Sent to the Purchaser in California.**

If for any reason the Court were not to grant summary judgment on Plaintiffs' claim for impossibility preemption, then it should still grant summary judgment on Plaintiffs' claim for declaratory relief that § 25982 does not apply to sales of Plaintiffs' products that are made outside of California.

**A.   The Legal Standard for Declaratory Relief.**

The legal standard on a claim for declaratory relief is well-known to this Court.  Fed. R. Civ. P. 57.  "In a case of actual controversy within its jurisdiction, …any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.  While Plaintiffs have been forced to refrain from selling foie gras since January, "[t]he dilemma posed by that coercion — putting the challenger to the choice between abandoning his rights or risking prosecu-tion — is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

**B.   Section 25982 Applies Only to a Product "Sold in California" — Not to Products Sold Outside the State But Sent Here — and the Court Should Declare That In Its Judgment.**

There are at least three compelling reasons, as a matter of basic statutory inter-pretation, for concluding that § 25982 does not apply to products sold outside Califor-

nia, even if they are sent to purchasers here.  First, the plain language of § 25982 demonstrates that it was limited to prohibiting products from being "sold in California." It thus does not apply to products sold in *other* states or to conduct that does not constitute a sale in California.  And it nowhere prohibits a product from being "imported" into California, "contracted for sale" in the state, "offered for sale" in the state, or otherwise being sold in *another* state and then received by a consumer here.

The California Legislature certainly knows how to ban the "import" of an animal product when it intends to do that.  *E.g.,* Cal. Pen. Code § 653o(a) (making it unlawful "to import into this state for commercial purposes … or to sell within the state" any product of various wild animals).  Likewise, it knows how to ban an animal product from being "contracted for sale."  *E.g.,* Cal. Health & Safety Code § 25996 (providing that shelled eggs from hens not confined in compliance with California's standards "shall not be sold or contracted for sale … in California").  And it knows how to ban the "offer for sale" of an animal product.  *E.g.,* Cal. Fish & Game Code §2021(b) (making it unlawful to "sell, offer for sale, trade, or distribute a shark fin").  By contrast, § 25982 does not make it unlawful to do any of these things with a foie gras product in California.

Second, § 25982 does not include any special definition of the term "sold in California."  The dictionary defines "sale" as "the act of selling — *specifically* : the transfer of ownership of and title to property from one person to another for a price." https://www.merriam-webster.com/dictionary/sale.  More relevant to the sales at issue here is the definition used in the California Commercial Code, which provides a default rule.  Indeed, California courts look to the Commercial Code when a statute does not include a definition of sale.  In *City of South San Francisco v. Board of Equalization*, 232 Cal.App.4th 707, 728 (Cal. Ct. App. 2014), the California Court of Appeal explained:  "The State Tax Law … does not set forth any rule for determining the point at which title passes.  Since the sales at issue in this appeal were negotiated at retailers in a California city *but had to be shipped to the California consumer from an out-*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1    *of-state location, title passed out of state* under section 2401, subdivision (2) of the

2    California Uniform Commercial Code[.]"   *See also City of Fontana v. Cal. Dep't of Tax*

3    *& Fee Admin.*, 17 Cal.App.5th 899, 905 (Cal. Ct. App. 2017) (noting that state board

4    "did not exceed its authority 'by using section 2401" to determine location of sale).

5         Section 2106 of the Commercial Code defines a "sale":  "A 'sale' consists in the

6    passing of title from the seller to the buyer for a price (Section 2401)."  Cal. Comm.

7    Code § 2106.  A sale therefore takes place where title passes, and section 2401 provides:

8    "Unless otherwise explicitly agreed title passes to the buyer at the time and place at

9    which the seller completes his performance with reference to the physical delivery of the

10   goods … and in particular … (a) If the contract requires or authorizes the seller to send

11   the goods to the buyer but does not require him to deliver them at destination, title

12   passes to the buyer at the time and place of shipment[.]"  Cal. Comm. Code 2401(a)(2).

13   And to the extent that New York's version of the UCC would apply to Hudson Valley's

14   sales from New York (where it is located), it is entirely congruent with the California

15   Commercial Code's definition of sale.  N.Y. U.C.C. Law § 2-401 (McKinney) (same).

16        Thus, for foie gras products sold by Hudson Valley and other sellers outside Cali-

17   fornia by physically delivering them only to a shipping company outside California to

18   be sent to a buyer (or other recipient) in California, these products may not be consi-

19   dered "sold in California" under § 25982.  By contrast, when the California Legislature

20   wishes to make a sale complete at the time of physical transfer to the purchaser, it

21   knows how to alter the default rule to do that.  *See* Cal. Pen. Code § 597z(a)(2) ("For

22   the purposes of this section, the sale of a dog or dogs shall not be considered complete

23   … unless and until the seller physically transfers the dog or dogs to the purchaser.").

24   But that is not what the California Legislature did with § 25982.

25        Finally, interpreting § 25982's ban on poultry liver products "sold in California"

26   as applying only to sales that take place *in California* will satisfy two important canons

27   of statutory interpretation.  The California Supreme Court applies a "presumption

28   against extraterritoriality."  "However far the Legislature's power may theoretically

extend, we presume the Legislature did not intend a statute to be operative, with respect to occurrences outside the state, ... unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history." *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1207 (2011) (cleaned up).  There is nothing in § 25982 (or the provisions enacted with it) that suggests that the Legislature intended to reach out-of-state sales, even if the product is sent to someone in California.  In addition, under the "doctrine of constitutional avoidance," statutes should not be construed to raise constitutional issues "if any other possible construction remains available." *People v. Garcia*, 2 Cal.5th 792, 804 (2017).  This canon "reflects the prudential concern that constitutional issues not be needlessly confronted." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  Thus, declaring that § 25982's ban on products "sold in California" does not apply to products sold in other states, when title passes from an out-of-state seller outside California to a buyer at the time and place of shipment, will avoid magnifying the burden that § 25982 already imposes on interstate commerce (and the dormant Commerce Clause issues that are the subject of Plaintiffs' Third and Fourth Causes of Action).  Based on all the points above, it is the only sensible way to read the statute.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion as to Plaintiff's Second Cause of Action for "impossibility preemption" and permanently enjoin Defendant from enforcing § 25982.  In the alternative, the Court should enter a declaratory judgment on Plaintiffs' First Cause of Action declaring that § 25982 does not apply to products sold in other states, when title passes from an out-of-state seller outside California to the buyer at the time and place of shipment.

Dated:      July 16, 2019              Respectfully submitted,

*/s/ Michael Tenenbaum*
Michael Tenenbaum, Esq.
THE OFFICE OF MICHAEL TENENBAUM, ESQ.
*Counsel for Plaintiffs*

- 25 -